**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **AIR TIGER EXPRESS (USA), INC.,** : | |
| : | CASE NO. 08 CV 1945 |
| Plaintiff, : | |
| : | |
| v. : | Judge John W. Darrah |
| : | |
| **PAUL BARCLAY; and THE ORIGINAL** : | Magistrate Judge Martin C. Ashman |
| **AUSTRALIAN, LLC,** : | |
| : | |
| Defendants. : | |

**ANSWER AND AFFIRMATIVE DEFENSES OF DEFENDANT,**
**THE ORIGINAL AUSTRALIAN, LLC, TO COUNT I OF COMPLAINT**

Pursuant to Rule 12 of the Federal Rules of Civil Procedure, The Original Australian, LLC answers Count I of the Complaint as follows:

**INTRODUCTION**

This case arises form ATE's performance of freight forwarding services and customs brokerage services for The Original Australian. After ATE contracted for all of The Original Australian's transportation needs, ATE requested payment of $110,451.80 for the unpaid services. In response, The Original Australian – through its Founder and CEO Barclay – agreed to pay the requested amount and <u>even faxed a copy of a completed check that it claimed it would be sending to ATE.</u> The promise to pay was made on November 2, 2007 but ATE still has not received any money from the Original Australian despite repeated attempts to resolve this issue amicably. Therefore, ATE has no other recourse than to file suit in this case against Defendants.

**ANSWER:** The Original Australian, LLC denies the allegations of the unnumbered introductory paragraph of the Complaint.

1.     ATE is a Delaware corporation with an office in Elk Grove Village, Illinois. The Original Australian, LLC contracted for freight forwarding and other services with ATE's Elk Grove Village office on multiple occasions, including unpaid services at issue in this case.

**ANSWER:** The Original Australian, LLC admits the allegations of ¶1 of the Complaint that The Original Australian, LLC contracted for freight forwarding and other services with Air

Tiger Express (USA), Inc.'s Elk Grove Village office; The Original Australian, LLC is without information or knowledge sufficient to form a belief as to the truth of the remaining allegations of ¶1 of the Complaint.

    2.    The Original Australian is an Ohio limited liability company that does business as "Warmbat." The Original Australian sells its footwear to retailers across the United States including Illinois.

    **ANSWER:**    The Original Australian, LLC admits the allegations of ¶2 of the Complaint.

    3.    Barclay is the Founder and Chief Executive Officer of The Original Australian. Upon information and belief, Barclay is a citizen of Ohio. Upon information and belief, Barclay is either a member of The Original Australian or owns an entity that is a member of The Original Australian.

    **ANSWER:**    The Original Australian, LLC admits the allegations of ¶3 of the Complaint.

    4.    The Court has personal jurisdiction over The Original Australian pursuant to 735 ILCS 5/2-209. The Court has personal jurisdiction over Barclay pursuant to 735 ILCS 5/2-209.

    **ANSWER:**    Admitted.

    5.    The Court has jurisdiction over The Original Australian because it transacts business in Illinois, committed a fraud in Illinois, and/or made a contract or promise that is substantially connected with Illinois.

    **ANSWER:**    The Original Australian, LLC admits that personal jurisdiction exists over The Original Australian in this action but denies the balance of ¶5 of the Complaint.

    6.    The Court has jurisdiction over Barclay because he committed a fraud in Illinois, and/or made a contract or promise that is substantially connected with Illinois.

    **ANSWER:**    The Original Australian, LLC admits that personal jurisdiction exists over Barclay but denies the balance of ¶6 of the Complaint.

    7.    The Court has venue over this case pursuant to 735 ILCS 5/2-101. Defendants are not residents of Illinois. The underlying transaction or some part thereof occurred in Cook County, Illinois.

**ANSWER:** The Original Australian, LLC admits that venue exists over this action and that the defendants are not residents of Illinois; The Original Australian, LLC denies the remaining allegations of ¶7 of the Complaint.

8.  On September 24, 2007 Barclay e-mailed ATE to request freight forwarding quotes for three shipments, including an oceanborne shipment scheduled to depart from Shanghai on October 5, 2007.

**ANSWER:** The Original Australian, LLC admits the allegations of ¶8 of the Complaint.

9.  After other e-mails between Barclay and ATE, on September 25, 2007 Joe Davis, an ATE employee, e-mailed a proposal to Barclay. This proposal contained various pieces of information including ATE's rates and policies for carriage of goods by sea, ocean forwarding fees, customs brokerage fees, and explanations of its services. (Exhibit 1)

**ANSWER:** The Original Australian, LLC admits the allegations of ¶9 of the Complaint.

10. In the "CUSTOMS BROKERAGE" section of the proposal, it states:

- All payments of Duty, Transportation, Delivery, and Handling are due within 10 days of the issuance of the A.T.E. Invoice.

- Disbursement Fee of 1.5% of the amount outlayed by A.T.E. for all invoices not paid within 10 days of the issuance of the invoice.

- After increments of 30 days, an additional 1.0% of the amount outlayed by A.T.E. will be assessed.

- Any invoices in excess of US $10,000 must be paid upfront, before cargo is released.

**ANSWER:** The Original Australian, LLC admits the allegations of ¶10 of the Complaint.

11. The proposal also noted that transit time would be "12-14 Days (Port to Port)." (Exhibit 1) Later on September 25, 2007, Barclay agreed to the terms of the proposal, e-mailing "Please proceed with this 1st shipment via sea container." (Exhibit 2, at 2)

  **ANSWER:** The Original Australian, LLC admits the allegations of ¶11 of the Complaint.

  12. The container ship carrying The Original Australian's goods was scheduled to carry the goods from China to the Port of Long Beach from October 12-23, 2007 or eleven days. The goods actually arrived at the Port of Long Beach on October 24, 2007 – 12 days after they left China.

  **ANSWER:** The Original Australian, LLC is without information or knowledge sufficient to form a belief as to the truth of the allegations of ¶12 of the Complaint.

  13. The parties also entered into a bill of lading for the oceanborne leg of the shipment, customs charges, and other expenses. The bill of lading states:

  (16) FREIGHT AND CHARGES

  16.2  Freight shall be deemed earned on receipt of goods by Carrier, whether the freight be intended to be prepaid or collected at destination. Payment shall be in full and in cash, in the currency named in this Bill of Lading, or another currency at Carrier's option. Interest at 12% shall run from the date when freight and charges are due…In any referral fro collection or action against Merchant for monies due to Carrier, upon recovery by Carrier, Merchant shall pay the expenses of collection and litigation, including reasonable attorneys' fees.

(Exhibit 3)  Section 16.2 has been publicly available in ATE's tariff, an electronic copy of which has been available for public review at all relevant times in this case at the U.S. Traffic Service at www.ustraf.com. (Also printed as party of Exhibit 3)

  **ANSWER:** The Original Australian, LLC denies the allegations of ¶13 of the Complaint that it "entered into" a bill of lading with the plaintiff; The Original Australian, LLC is without information or knowledge sufficient to form a belief as to the truth of the remaining allegations of ¶13 of the Complaint.

  14. After the goods arrived and were discharged at the Port of Long Beach, they were presented to U.S. Customs on October 25, 2007. U.S. Customs did not clear the goods until October 29, 2007.

  **ANSWER:** The Original Australian, LLC is without information or knowledge sufficient to form a belief as to the truth of the allegations of ¶14 of the Complaint.

15. Before, during, and after the oceanborne leg of this shipment, ATE and The Original Australian discussed ATE lining up trucks to carry the goods from the Port of Long Beach, California to The Original Australian's office in Dayton, Ohio. The Original Australian agreed to ATE's additional service offer. ATE obtained the requisite trucking services for the Original Australian.

**ANSWER:** The Original Australian, LLC admits the allegations of ¶15 of the Complaint that Air Tiger Express (USA), Inc. discussed the transportation of the goods from the Port of Long Beach, California to The Original Australian, LLC's office in Dayton, Ohio and contracted for the transportation; The Original Australian, LLC denies the remaining allegations of ¶15 of the Complaint.

16. The parties agreed that the trucking portion of the shipment should take 2-3 business days. Five of the seven containers carrying the goods were transported by truck from California during the 2-3 business day time period and arrived on either November 2, or November 5. The other two containers arrived shortly thereafter. One truckload was delivered on November 6 because The Original Australian could not handle its delivery on November 5—a situation unrelated to ATE's freight forwarding services. The other truckload arrived on November 8, which The Original Australian knew was first being loaded in California on November 5, 2007 and to which The Original Australian did not raise any objection before its arrival on November 8.

**ANSWER:** The Original Australian, LLC admits the allegations of the Complaint that the parties agreed that the trucking portion of the shipment should take 2-3 business days, and that containers arrived in Dayton on November 2, November 5, November 6, and November 8; The Original Australian, LLC denies the remaining allegations of ¶16 of the Complaint.

17. Upon information and belief, The Original Australian has not returned any of the goods.

**ANSWER:** The Original Australian, LLC admits the allegations of ¶17 of the Complaint.

18. The Original Australian did not complain about any aspect of ATE's services while the goods were in transit from China to Ohio.

5

**ANSWER:** The Original Australian, LLC denies the allegations of ¶18 of the Complaint.

19. ATE provided the services pursuant to the contract between itself and The Original Australian.

**ANSWER:** The Original Australian, LLC denies the allegations of ¶19 of the Complaint.

20. On October 23, 2007 ATE issued Invoice #7105300 to The Original Australian for the oceanborne leg of the carriage in the amount of $15,300. (Exhibit 4) Although ATE's credit terms state otherwise as set forth in the CUSTOMS BROKERAGE language recited earlier in this complaint, ATE agreed to release The Original Australian's freight in California in exchange for a copy of a check the day the freight arrives and the actual check five days later. The Original Australian sent a check to ATE for the full amount of Invoice #7105300 dated October 29, 2007.

**ANSWER:** The Original Australian, LLC admits the allegations of ¶20 of the Complaint that Air Tiger Express (USA), Inc. issued Invoice #7105300 to The Original Australian and The Original Australian paid the full amount of Invoice #7105300; The Original Australian, LLC denies the remaining allegations of ¶20 of the Complaint.

21. On November 2, 2007, ATE issued Invoice #7115026 to The Original Australian for a variety of other freight forwarding services in the amount of $110,451.80. (Exhibit 5) The breakdown of this amount is as follows:

| | |
|---|---|
| Duty: | $65,921.80 |
| Brokerage: | $100.00 |
| Bond Premium: | $3,560.00 |
| Inland Freight: | $34,300.00 |
| Outport Services: | $35.00 |
| Storage: | $200.00 |
| Pallets: | $2,100.00 |
| Drayage: | $1,575.00 |
| Devan/Transload: | $2,660.00 |

**ANSWER:** The Original Australian, LLC admits the allegations of ¶21 of the Complaint.

22.     ATE informed The Original Australian that ATE would not release the freight unless Invoice #7115026 was paid.  The Original Australian and Barclay were aware that payment must be made before ATE would release the cargo.  Following the process that worked previously, ATE agreed to release The Original Australian's freight in California in exchange for a copy of a check on November 2, 2007 with the check to be mailed out shortly thereafter.

**ANSWER:**     The Original Australian admits the allegations of ¶22 of the Complaint to the extent that ATE agreed to release The Original Australian's freight in California in exchange for a copy of a check; The Original Australian denies the remaining allegations of ¶22 of the Complaint.

23.     Barclay instructed one of The Original Australian's employees, Mary Banks, to "cut this check today and fax to Kim."  (Exhibit 6)  On November 2, 2007 Ms. Banks sent Kim at ATE a fax copy of a check for $110,451.80.  (Exhibit 7)  ATE expected to receive the original check within five days of its mailing.  However, The Original Australian has sent neither the original of the faxed check nor any other form of payment to ATE for invoice #7115026.

**ANSWER:**     The Original Australian admits the allegations of ¶23 of the Complaint to the extent that Barclay instructed Mary Banks to "cut this check today and fax to Kim," that, on November 2, 2007, Ms. Banks sent Kim a fax copy of a check, and that The Original Australian has not sent the original faxed check nor any other form of payment to ATE for Invoice #7115026; The Original Australian is without information or knowledge sufficient to form a belief as to the truth of the remaining allegations of ¶23 of the Complaint.

24.     Barclay was aware that ATE would not have released the cargo had The Original Australian not agreed to pay Invoice #7115026 and faxed a copy of the check purportedly intended to pay it.  In other words, ATE detrimentally relied on Barclay's promise to pay.

**ANSWER:**     The Original Australian denies the allegations of ¶24 of the Complaint.

25.     Barclay agreed to make this payment while all or substantially all of the goods were still in transit to The Original Australian.  When Barclay agreed to make this payment, neither he nor anyone else at The Original Australian had uttered a single complaint about the timeliness of ATE's performance.

**ANSWER:**     The Original Australian denies the allegations of ¶25 of the Complaint.

26. When the original check never arrived, ATE took steps to secure payment. ATE also took steps to protect The Original Australian from possible fraud by third parties.

**ANSWER:** The Original Australian is without information or knowledge sufficient to form a belief as to the truth of the allegations of ¶26 of the Complaint.

27. ATE advised The Original Australian to stop payment on the check that never arrived. The Original Australian never responded that the original check was never sent. Instead, The Original Australian insisted that the original check was sent to ATE.

**ANSWER:** The Original Australian admits the allegations of ¶27 of the Complaint to the extent that ATE advised The Original Australian to stop payment on the check that never arrived; The Original Australian denies the remaining allegations of ¶27 of the Complaint.

28. ATE then requested that The Original Australian wire transfer the $110,451.80 due pursuant to Invoice #7115026 because ATE never received the original check. The Original Australian never made any wire transfer to ATE to pay Invoice #7115026.

**ANSWER:** The Original Australian admits the allegations of ¶28 of the Complaint to the extent that The Original Australian never made any wire transfer to ATE to pay Invoice #7115026; The Original Australian denies the remaining allegations of ¶28 of the Complaint.

### COUNT I – BREACH OF CONTRACT (The Original Australian)

29. ATE adopts and incorporates paragraphs 1 to 28 as paragraph 28 of Count I.

**ANSWER:** The Original Australian, LLC incorporates and realleges its answers to paragaphs 1-28 of the Complaint as its answer to Complaint ¶29.

30. ATE and The Original Australian duly executed a contract for freight forwarding services. ATE provided the freight forwarding services pursuant to the parties' contract. The Original Australian agreed it would pay ATE for providing freight forwarding services.

**ANSWER:** The Original Australian, LLC admits the allegations of ¶30 of the Complaint that ATE and The Original Australian formed a contract for freight forwarding services; The Original Australian, LLC denies the remaining allegations of ¶30 of the Complaint.

31.     Pursuant to the parties' contract, The Original Australian agreed it would pay a Disbursement Fee of 1.5% of the amount outlayed by ATE for all invoices not paid within 10 days of the issuance of invoice. The Original Australian has failed to pay Invoice #7115026 for $110,451.80 within ten days of its issuance on November 2, 2007. Therefore, The Original Australian owes $1,656.78 as a Disbursement Fee.

**ANSWER:** The Original Australian, LLC denies the allegations of ¶31 of the Complaint.

32.     Pursuant to the parties' contract, The Original Australian agreed it would pay "[A]fter increments of 30 days, an additional 1.0% of the amount outlayed by A.T.E." As of February 29, 2008, three thirty day periods have passed. Each of these periods has generated an additional fee of $1,104.52 for a total of $3,313.56.

**ANSWER:** The Original Australian, LLC denies the allegations of ¶32 of the Complaint.

33.     Pursuant to the bill of lading, "In any referral for collection or action against Merchant for monies due to Carrier, upon recovery by Carrier, Merchant shall pay the expenses of collection and litigation, including reasonable attorneys' fees." Thus, The Original Australian owes ATE for its expenses of collection and litigation in filing and prosecuting this matter.

**ANSWER:** The Original Australian, LLC denies the allegations of ¶33 of the Complaint

### Counts II-IV

The defendants have moved to dismiss Counts II through IV of the Complaint pursuant to Rule 12(b)(6) and therefore no answer is made to those portions of the Complaint.

### AFFIRMATIVE DEFENSES

### First Affirmative Defense: Breach of Contract

1.      Plaintiff's damages are the result of its own breach of contract. Plaintiff agreed to delivery the shipment of Goods on or before October 29, 2007. Plaintiff understood that time was of the essence. Plaintiff failed to deliver the Goods until after October 29, 2007. The details

9

of this transaction are more fully set forth in the Counterclaim concurrently filed herewith, which is incorporated herein by reference.

### Second Affirmative Defense:  Unclean Hands

2. Plaintiff's claims are barred by the doctrine of unclean hands.  The facts supporting this Affirmative Defense are stated in the Counterclaim of The Original Australian, LLC and incorporated herein by reference.

### Third Affirmative Defense:  Waiver and Estoppel

3. Plaintiff's claims are barred by the doctrines of waiver and estoppel.  The facts supporting this Affirmative Defense are stated in the Counterclaim of The Original Australian, LLC and incorporated herein by reference.

### Fourth Affirmative Defense:  Barring of the Claims

4. Plaintiff's claims are barred by the agreements they executed.  The facts supporting this Affirmative Defense are stated in the Counterclaim of The Original Australian, LLC and incorporated herein by reference.

### Fifth Affirmative Defense:  Parol Evidence Rule

5. Plaintiff's claims are barred by the Parol Evidence Rule.  The facts supporting this Affirmative Defense are stated in the Counterclaim of The Original Australian, LLC and incorporated herein by reference.

**Sixth Affirmative Defense:  Good Faith**

6. At all times, Defendants acted in good faith.  The facts supporting this Affirmative Defense are stated in the Counterclaim of The Original Australian, LLC and incorporated herein by reference.

        Respectfully submitted,

        The Original Australian, LLC

        /s/ Marion B. Adler
        Marion B. Adler
        RACHLIS DURHAM DUFF & ADLER, LLC
        542 South Dearborn, Suite 900
        Chicago, IL 60605
        (312) 733-3957

        Chad D. Cooper
        Christine M. McLaughlin
        THOMPSON HINE LLP
        2000 Courthouse Plaza, N.E.
        P.O. Box 8801
        Dayton, Ohio  45401-8801
        (937) 443-6909

Dated:  April 30, 2008