IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| **AIR TIGER EXPRESS (USA), INC.,** | : | |
| | : | |
| Plaintiff, | : | CASE NO. 08 CV 1945 |
| | : | |
| v. | : | Judge John W. Darrah |
| | : | |
| **PAUL BARCLAY, and THE ORIGINAL AUSTRALIAN, LLC,** | : | Magistrate Judge Martin C. Ashman |
| | : | |
| | : | |
| Defendants. | : | |

## COUNTERCLAIM OF THE ORIGINAL AUSTRALIAN, LLC

Pursuant to Rule 13 of the Federal Rules of Civil Procedure, Defendant, The Original Australian, LLC d/b/a Warmbat Australia ("Warmbat"), for its Counterclaim states as follows:

1.  Warmbat is an Ohio limited liability company with its principal place of business in Ohio. Warmbat is in the business of manufacturing and wholesaling boots and other footwear. Warmbat manufactures its footwear in China and has it shipped it to its US facility in Dayton, Ohio.

2.  Plaintiff, Air Tiger Express (USA), Inc. ("ATE"), is a Delaware corporation with its principal place of business in Springfield Gardens, New York. ATE maintains an office in Elk Grove Village, Illinois. ATE is in the business of brokering overseas freight shipments, especially from China to the US.

3.  On September 24, 2007, at 10:08 a.m., Warmbat's CEO, Defendant, Paul Barclay, emailed ATE's Asian Route Developer, Joe Davis, to request quotes for three shipments from China to Dayton, Ohio, including a shipment available October 5 in Shanghai to move by sea

freight to the Port of Long Beach (the "Shipment"). At that time, Warmbat intended to arrange trucks from Long Beach to Dayton through someone other than ATE.

4. The Shipment contained a custom-made order of boots that Warmbat had contracted to sell to The Finish Line, Inc. ("Finish Line"). The timing of Warmbat's delivery to Finish Line was critical because Finish Line required that the boots arrive in time for the Christmas shopping season and had a cancel date of November 1, 2007.

5. On September 24, at 11:33 a.m., Davis emailed Barclay to ask: "what kind of transit times do you need?"

6. On September 24, at 2:06 p.m., Barclay emailed Davis that, "the timing is *critical*," and that "trucking it ourselves saves about 1 week."

7. On September 25, 2007, at 2:51 p.m., Barclay instructed Davis: "Please proceed with this . . . shipment via sea container."

8. At 4:14 p.m., Davis emailed Barclay: "Attached are the ocean rates ex Shanghai to LAX." In the Notes to the Ocean Import Rates, Davis represented: "Transit Time: 12-14 Days (Port to Port)."

9. Later in the day on September 25, at 5:30 p.m., Barclay forwarded factory contact information to Davis for the Shipment, and urged: "We need this to get on the *1st available vessel* and *as soon* as it has cleared customs, available to unpack and send onto us."

10. On September 26, 2007, Davis emailed Barclay the "shipment status for the ocean containers," including that: "*Cargo will be ready on Oct 5th-Oct 6th*."

11. On September 26, at 4:11 p.m., Barclay emailed the following to Davis:

> Hi Joe,
> Can you let me know first:
>     1. Sailing date
>     2. ETA into long beach
> *Remember, timing is very important to us and every day counts*.

2

12. At 11:27 p.m., Davis responded that the sail date would be October 12, and the arrival into Long Beach October 23.

13. On September 27, 2007, inquiring into the Air Shipment, Barclay emailed to Davis that they "***desperately*** need an update of customs and of course to have the shipment delivery the day after it clears." Also on September 27, Barclay emailed, concerning the Shipment: "Please proceed with this shipment. As discussed, we will need to breakdown in LA and get the product to Dayton *ASAP*."

14. In response, on September 27, at 7:49 p.m., Davis wrote: "If you don't have a trucker ***I can quote this business as well***."

15. On October 19, 2007, at 1:03 p.m., Barclay emailed Davis to ask him to "please confirm the ETA and number of containers for our sea shipment. We will coordinate the trucking to get to our warehouse *ASAP*." Receiving no response, at 2:23 p.m., in an email marked "High" importance, Barclay asked Davis to "Please confirm." Barclay later confirmed that the containers would arrive at the Port of Long Beach on October 24.

16. Before the Shipment arrived at the Port of Long Beach, Barclay and Davis repeatedly discussed whether ATE could move the shipment from Long Beach to Dayton. On October 23, Barclay wrote: "As per our conversation, please quote us on moving all the containers to Dayton *via express*. ***We will want it here in about 2 work days after it clears customs***."

17. On October 24, 2007, ***before*** Davis issued a quote for the line haul, Barclay wrote:

> ***Please make sure you baby-sit this shipment, its for Finish Line*** and they could be worth up to 5 million to us next year. Late shipments make it harder to sell in the stores this late in the season.

3

18.     Later in the day on October 24, Davis issued a quote (the "Quote") for a line haul from "ATE/LAX – Dayton, OH" of $4,900 per trailer.  The Notes represent: "*Transit for Line Haul is 2-3 days*."  A copy of the Quote is attached as "Exhibit A."

19.     Also on October 24, ATE emailed Barclay:

> Attached please find a Surety Bond Application for that we need you to complete and sign in order for us to apply for a Single Entry Bond for the ocean shipment with 7 containers which has arrived in Los Angeles *today*. . . .  Please expedite this bond as quickly as possible *so we can get the approval we need to arrange clearance* in Los Angeles.

20.     On Wednesday, October 24, in the afternoon, Barclay transmitted his expectations to Davis: "Please proceed!  Hopefully we can clear customs *today or Thursday* so we can move it over the weekend."  Based on Warmbat's past experience, and in accordance with Warmbat's transmitted expectations, Warmbat expected to receive the entire Shipment by no later than October 29, 2007.

21.     On October 25, 2007, ATE emailed Barclay to advise that the bond would not be delivered to California until the next day.

22.     ATE did not secure release from U.S. Customs until Monday, October 29, 2007, five days after the containers arrived in Long Beach.  Nevertheless, even with the delay in moving the Shipment through Customs, in accordance with shared expectations, Air Tiger should have delivered the entire Shipment by no later than November 1, 2007.

23.     On October 30, 2007, ATE advised Warmbat that one container (perhaps two) would be delivered to Dayton on November 2.  Warmbat asked ATE to confirm the 2-3 day transit time, but ATE's employee *was not aware* of the delivery terms quoted to Warmbat.

24.     On November 2, 2007, Warmbat received *one* container.

4

25.     Before ATE could deliver any of the remaining six containers, Finish Line canceled its order with Warmbat.

26.     ATE tried to schedule delivery of six containers for November 5. If delivery had been timely, Warmbat would have accommodated a shipment of six containers in one day. Because Finish Line had already canceled its order, Warmbat had no need to accept all six containers on November 5, and scheduled the deliveries for November 5 and 6, so that it could handle higher priorities.

27.     On November 8, ATE delivered the last container. The last container arrived so long after the freight cleared Customs (i.e., ten days later) because ATE dispatched it with just one driver, instead of having it team-driven.

## COUNT I

28.     Warmbat incorporates the allegations of ¶¶ 1 through 27 into this paragraph as if they were fully re-written herein.

29.     ATE and Warmbat entered into a contract providing for ATE's transportation and delivery of the Shipment from Shanghai, China, to the Port of Long Beach, California, to Dayton, Ohio.

30.     Time was of the essence in the performance of the contract.

31.     ATE knew and understood that time was of the essence in the performance of the contract.

32.     ATE knew and understood that Warmbat intended to resell the contents of the Shipment to Finish Line for a profit.

33.     Under the terms of their contract, ATE was obligated to make complete delivery of the Shipment to Warmbat in Dayton by no later than October 29, 2007.

34.   ATE's failure to begin delivery of the Shipment until November 2, 2007, and its failure to complete delivery until November 8, 2007, constitutes a material breach of contract.

35.   Until ATE's material breach of contract, Warmbat did all that it was required to do under the terms of the contract.

36.   As a direct result of ATE's material breach of contract, Finish Line canceled its order with Warmbat. Warmbat lost its anticipated profit from the sale and was left with custom-made boots that it could not resell. Warmbat was damaged in an amount exceeding $180,000.00.

37.   Warmbat's damages as the result of ATE's material breach of contract were within the specific contemplation of the parties at the time that ATE agreed to transport the Shipment from the Port of Long Beach to Dayton.

## COUNT II

38.   Warmbat incorporates the allegations of ¶¶ 1 through 37 into this paragraph as if they were fully re-written herein.

39.   Warmbat and ATE formed an express contract providing for ATE's transportation and delivery of the Shipment from Shanghai, China, to the Port of Long Beach, California, to Dayton, Ohio.

40.   ATE committed a material breach of the express contract.

41.   As a direct result of ATE's material breach of contract, Warmbat is excused from any further performance under the terms of the contract.

42.   Warmbat is entitled to a declaratory judgment from the Court providing that Warmbat is excused from making any further payment to ATE.

WHEREFORE, Defendant, The Original Australian, LLC d/b/a Warmbat Australia, demands judgment in its favor on its Counterclaim as follows:

(1) On Count I, for judgment against Air Tiger Express (USA), Inc., in an amount exceeding $180,000.00;

(2) On Count II, for a declaratory judgment providing that The Original Australian, LLC d/b/a Warmbat Australia is excused from making any further payment to Air Tiger Express (USA), Inc.;

(3) For its attorney fees and court costs; and

(4) For such other and further relief as this Court finds just and equitable.

Respectfully submitted,

  /s/ Marion B. Adler
Marion B. Adler
RACHLIS DURHAM DUFF & ADLER, LLC
542 South Dearborn, Suite 900
Chicago, IL 60605
(312) 733-3957

Chad D. Cooper
Christine M. McLaughlin
THOMPSON HINE LLP
2000 Courthouse Plaza, N.E.
P.O. Box 8801
Dayton, Ohio  45401-8801
(937) 443-6909

*Attorneys for Defendants,
Paul Barclay and The Original Australian, LLC*

Dated:  April 30, 2008

# EXHIBIT A



# WARMBAT/ORIGINAL AUSTRALIA
## Rates
## CFS Warehousing

| Service | Cost |
|---|---|
| Drayage from LGB to ATE Facility | $225.00 per container |
| Terminal Pier Pass Fee | $50/20' $100/40' |
| Devan/Transload Fee | $325/20' $380/40' |
| Pallet Fee | $15.00 per pallet |
| Line Haul From ATE/LAX – Dayton, OH | $4900.00 per trailer |

**Notes:**
Drayage from Port to ATE Facility is subject to a FSC (Current 15%)
Rates are subject to change.
After 3 Days storage fees will apply
FSC is included in the Line Haul Rates
Transit for Line Haul is 2-3 days.

Date: 24 October 2007

**EXHIBIT A**