**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **AIR TIGER EXPRESS (USA), INC.,** | : | CASE NO. 08 CV 1945 |
| | : | |
| Plaintiff, | : | Judge John W. Darrah |
| | : | |
| v. | : | Magistrate Judge Martin C. Ashman |
| | : | |
| **PAUL BARCLAY; and THE ORIGINAL** | : | |
| **AUSTRALIAN, LLC,** | : | |
| | : | |
| Defendants. | : | |

## DEFENDANTS' BRIEF IN SUPPORT OF MOTION TO DISMISS

### I.    INTRODUCTION

On March 4, 2008, Plaintiff, Air Tiger Express (USA), Inc. ("ATE"), filed its Complaint against Defendants, Paul Barclay ("Barclay") and The Original Australian, LLC d/b/a Warmbat Australia ("Warmbat") alleging four claims for relief:  (1) breach of contract against Warmbat arising out of an agreement to ship Warmbat's goods; (2) account stated against Warmbat arising out of the same transaction; (3) fraud against Warmbat arising out of an alleged promise to pay ATE for the transaction; and (4) fraud against Barclay arising out of the alleged promise to pay.

ATE's claims for account stated (Count II) and fraud (Counts III and IV) fail as a matter of law.  Because ATE's alleged statement of account does not refer to any completed transaction, and because the alleged account stated is based on just a single transaction, ATE cannot state a claim for account stated.  Furthermore, because ATE's fraud claims are based upon Warmbat's faxing of a copy of a check to ATE, which contained no factual misrepresentations and was not part of any alleged "scheme" to defraud ATE, ATE's claims for fraud also fail.  Accordingly, Warmbat and Barclay request that this Court dismiss Counts II, III and IV of the Complaint.

II.    **FACTS**

For the purposes of this Motion, the following facts, drawn from the Complaint's allegations, are assumed to be true:

1.    On September 24, 2007, Warmbat (through Barclay) emailed ATE to request freight forwarding quotes for the shipment of goods (the "Goods") from Shanghai, China to the United States (the "Oceanborne Services").  Complaint, ¶8.  ATE submitted a proposal to Warmbat.  Complaint, ¶9.  A copy of the proposal is attached to the Complaint as Exhibit 1.

2.    Warmbat requested that ATE proceed with the Oceanborne Services.  Complaint, ¶11, Ex. 2.

3.    ATE shipped the Goods from China to the Port of Long Beach, California. Complaint, ¶12.

4.    While the Goods were in transit on the Pacific Ocean, ATE and Warmbat discussed the shipment of the Goods from Long Beach to Dayton, Ohio.  Complaint, ¶15.  ATE and Warmbat agreed that ATE would ship the Goods to Dayton (the "Land Services"). Complaint, ¶¶15-16.

5.    The Goods arrived at the Port of Long Beach on Wednesday, October 24, 2007. Complaint, ¶12.  The Goods did not clear U.S. Customs until Monday, October 29, 2007. Complaint, ¶14.

6.    ATE agreed to ship the Goods from Long Beach to Dayton in 2-3 business days. Complaint, ¶16.  ATE shipped the Goods in seven containers from the Port of Long Beach to Dayton.  Id.  Five containers "arrived on either November 2 or November 5."  Id.  One container was delivered on November 6, 2007, and the last container was delivered on November 8, 2007. *Id.*

7.      On October 23, 2007, ATE issued an invoice for the Oceanborne Services. Complaint, ¶20.  On October 29, 2007, Warmbat paid this invoice in full.  *Id.*

8.      On November 2, 2007, ATE issued another invoice (the "Invoice") for the Land Services.  Complaint, ¶21; a copy of the Invoice is attached to the Complaint as "Exhibit 5."

9.      ATE refused to release the Goods to Warmbat unless Warmbat faxed a copy of a check in the amount of the Invoice to ATE.  Complaint, ¶22.  At the time of ATE's demand, Warmbat had not inspected the Goods.  *Id.*  Moreover, Warmbat had only a short time to review the Invoice before it was required to fax a copy of the check to ATE.  *Id.*

10.     To facilitate shipment of the Goods, Barclay instructed a Warmbat employee to draw a check and fax a copy of it to ATE.  Complaint, ¶23.  On November 2, 2007, Warmbat faxed to ATE a copy of a check.  *Id.*; a copy of the fax is attached to the Complaint as "Exhibit 7."  The fax contains nothing more than a faxed copy of the check.  Complaint, Ex. 7.  The check does not contain notes or promises.  *Id.*  Warmbat did not send the original check to ATE. Complaint, ¶23.

11.     ATE alleges that "Barclay was aware that ATE would not have released the cargo had [Warmbat] not agreed to pay [the Invoice] and faxed a copy of the check purportedly intended to pay it."  Complaint, ¶24.  "Barclay agreed to make this payment while all or substantially all of the goods were still in transit to [Warmbat]."  Complaint, ¶25.

12.     ATE alleges that Warmbat's faxing of a check to ATE converted the Invoice into an actionable statement of account.  Complaint, ¶¶36-38.

13.     ATE alleges that Warmbat and Barclay engaged in a "scheme" to defraud ATE by promising to pay ATE the amount of the Invoice for the Land Services when it faxed a check in the amount of the Invoice to ATE.  Complaint, ¶¶40-41.

## III.    LAW AND ARGUMENT

### A.    AIR TIGER IS REQUIRED TO PLEAD FRAUD WITH PARTICULARITY, AND IT MUST PLEAD ALL CLAIMS SUCH THAT THEY ARE PLAUSIBLE ON THEIR FACE.

Pursuant to Fed. R. Civ. P. 9(b), a plaintiff must plead fraud with particularity.  A plaintiff alleging fraud must specify the time, place, and contents of any alleged false representation and the full nature of the transaction.  *Thompson v. Capital One Bank, Inc.*, 375 F. Supp. 2d 681 (N.D. Ill. 2005); *Bruss Co. v. Allnet Communication Services, Inc.*, 606 F. Supp. 401 (N.D. Ill. 1985); *Lincoln Nat'l Bank v. Lampe*, 414 F. Supp. 1270 (N.D. Ill. 1976).  All circumstances of an alleged "scheme to defraud" must be alleged with specificity, and failure to do so mandates dismissal.  *U.S. v. All Meat & Poultry Prods. Stored at Lagrou Cold Storage*, 470 F. Supp. 2d 823 (N.D. Ill. 2007).  Conclusory language fails to satisfy the particularity requirement. *Lincoln Nat'l Bank*, 414 F. Supp. at 1279.

Moreover, pursuant to Fed. R. Civ. P. 8, in the complaint a plaintiff is required to make a showing of its entitlement to relief.  *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007); see also *Jennings v. Auto Meter Prods., Inc.,* 495 F.3d 466 (7th Cir. 2007) ("Evaluating this case as *Twombly* instructs . . . we have no trouble concluding that [the plaintiff] has not presented a RICO case").  "A plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 127 S. Ct. at 1964-65.  Courts are simply not bound to accept as true a legal conclusion couched as a factual allegation.  Id. at 1965.  "We do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face.  Because the plaintiffs here have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed."  Id. at 1974.  In other words,

to comply with *Twombly*, the line "between the factually neutral and the factually suggestive . . . must be crossed to enter the realm of plausible liability." *Iqbal v. Hasty*, 490 F.3d 143 (2nd Cir. 2007). In the wake of *Twombly*, where competing explanations for the defendant's conduct exist, fact pleading is required to make the plaintiff's central allegations.

B.    ATE'S CLAIM FOR ACCOUNT STATED FAILS AS A MATTER OF LAW.

ATE's claim for account stated is based on the Invoice as a statement of account and on the faxed check as an expression of agreement to pay the amount in the Invoice. Because a claim for account stated cannot be based on an incomplete transaction or on a single invoice for a single transaction, ATE's claim fails as a matter of law.

"An account stated is an agreement between parties who ***previously*** engaged in transactions that the account representing those transactions is true and the balance stated is correct, together with a promise for the payment of the balance." *Dreyer Medical Clinic v. Corral*, 227 Ill. App. 3d 221, 226, 591 N.E.2d 111, 115 (1992) (emphasis added). "[A]n account stated is merely a form of proving damages for the breach of a promise to pay on a contract." *Id.* "An 'account stated' determines the amount of a ***preexisting*** debt when parties who previously have conducted monetary transactions agree that there truly is an account representing the transactions between them and one party renders a statement of account to another who retains that statement beyond a reasonable amount of time without objection." *ITQ Lata, LLC v. MB Financial Bank, LLC*, 317 F. Supp. 2d 844, 858 (N.D. Ill. 2004) (emphasis added). "Merely sending an invoice does not create an account stated unless the debtor or creditor intends to establish a balance due or a final settlement to date." *United States Fire Protection Illinois, Inc. v. St. Paul Fire and Marine Insurance Company*, No. 02 C 7462, 2004 U.S. Dist. LEXIS 23517,

*42 (N.D. Ill., November 22, 2004) (citing *Toth v. Mansell*, 207 Ill. App. 3d 665, 566 N.E.2d 730 (1990)) (copy of *U.S. Fire* attached as Exhibit A).

Here, ATE alleges that the Invoice constitutes an account stated and that it was converted into a statement of account when Warmbat faxed a check to ATE in response to ATE's request. There are two problems with ATE's allegations. The first problem is that the Invoice does not represent a completed transaction. The primary purpose of an account stated claim is to establish a specific amount due and owing on a "preexisting" liability. This makes sense. For example, a parts supplier may deliver multiple shipments to a customer and consummate the deliveries with a written statement of the final amount due. The buyer and seller agree that the amount specified in the invoice is the right amount (typically by the buyer's silent acquiescence). To avoid transforming the invoiced amount into an account stated, the buyer objects to the stated amount. Issuing a "final" statement, however, would not make sense if the supplier had not yet supplied the parts.

By contrast, ATE delivered the Invoice and insisted that Warmbat fax a check **before** it would deliver any of the Goods. Warmbat's faxing of a check could never be reasonably construed as an unconditional agreement to pay the amount in the Invoice. If, for instance, Warmbat had faxed a check in response to ATE's demand, and ATE proceeded to **lose** the entire shipment, Warmbat would owe nothing to ATE (and, conversely, ATE would owe Warmbat a large sum of money). The actual events are similar. ATE demanded that Warmbat fax a check to release the Goods, Warmbat faxed the check, and ATE proceeded to deliver the Goods so late that delivery was not complete until it was at least a week overdue.[1]  Because the alleged

---

[1]  In the Counterclaim of Warmbat, filed concurrently with this Motion, Warmbat alleges that ATE was required to deliver the Goods no later than October 29, 2007, and that its failure to do

statement of account does not refer to a completed transaction, unconditional agreement on the amount stated in the invoice was impossible, and Count II fails as a matter of law. *ITQ*, 317 F. Supp. 2d at 858.

The second problem is that the Invoice represents only a single transaction between ATE and Warmbat. The purpose of an account stated claim is to provide a shorthand manner of summarizing numerous transactions into a single claim. ("An 'account stated' determines the amount of a preexisting debt when parties . . . have conducted monetary transactions." *ITQ*, 317 F. Supp. 2d at 858. Here, there is no need for an account stated claim because ATE alleges one contract, one transaction, one breach. Because the account stated claim is simply redundant of the breach of contract claim, it is duplicative and unnecessary. Count II fails as a matter of law, and the Court should dismiss it. *Id.*

C.       ATE'S CLAIMS FOR FRAUD FAIL AS A MATTER OF LAW.

ATE alleges that Warmbat and Barclay each engaged in a scheme to defraud ATE. Because neither Warmbat nor Barclay made any factual misrepresentation to ATE, and because Warmbat and Barclay engaged in no "scheme" to defraud ATE, ATE's claims of fraud fail as a matter of law.

To constitute fraud a party must make a representation and "(1) the representation must be a statement of material fact;  (2) the representation must be false;  (3) the person making the statement must know that it is false;  (4) the person to whom it is made must rely on its truth;  (5) it must be made for the purpose of making the person relying on it affirmatively act;  and (6) the reliance must lead to the injury alleged." *P.M.C., Inc. v. Ekstein*, No. 91 C 3709, 1992 U.S. Dist. LEXIS 7306, *11 (N.D. Ill., May 14, 1992) (copy attached as Exhibit B). "A false

---

so resulted in the cancellation of a purchase order by the party to whom Warmbat had contracted to sell the Goods.

representation within the meaning of the law in order to constitute a cause of action must be a representation as to an existing or past fact and not a mere promise to do some act in the future." *Wright v. Peabody Coal Company*, 290 Ill. App. 110, 115, 8 N.E.2d 68, 70 (1937). "A failure to comply with a future promise does not constitute fraud." *Id.; see also State v. Murphy-Knight*, 248 Ill. App. 3d 382, 387, 618 N.E.2d 459, 463 (1993) ("[s]tatements regarding future events are considered opinions, not statements of fact"). "Even a false promise of future conduct with no current intent to fulfil [sic] that promise will not constitute fraud." *Murphy-Knight*, 248 Ill. App. 3d at 382, 618 N.E.2d at 463. "The general rule denies recovery for fraud based upon a false representation of intention or future conduct." Id.

Illinois law makes an exception to the general rule if the false promise to perform a future action is made as part of a "fraudulent scheme." *Id.* at 382, 618 N.E.2d at 463. Known as "promissory fraud," the exception "exists when a party communicates an intent to perform future conduct when he does not actually intend to carry out that promise" ***and*** "it is part of a ***pattern*** of fraudulent acts, known as a ***scheme*** to defraud." *American Hardware Manufacturers v. Reed Elsevier, Inc.*, No. 03 C 9421, 2005 U.S. Dist. LEXIS 30260, *14 (N.D. Ill., November 29, 2005) (attached as Exhibit C) (emphasis added). "A scheme to defraud *may* exist when there *is a string of broken promises*, particularly egregious broken promises that occur in close proximity to the promises." *Id.* at *14-15 (emphasis added). "[A] single promise will not support a promissory fraud claim unless it is particularly egregious." *Id.* at *51; *see also Jada Toys, Inc. v. Chicago Import, Inc.*, No. 07 C 699 (N.D. Ill., April 10, 2008) (attached as Exhibit D). "Because promissory fraud 'is easy to allege and difficult to prove or disprove,' it is disfavored in Illinois and the burden on the plaintiff claiming promissory fraud is 'deliberately high.' " *American*

*Hardware*, 2005 U.S. Dist. LEXIS 30260 at *15 (citing *Bower v. Jones*, 978 F.2d 1004, 1012 (7th Cir. 1992)).

A breach of contract action is more suitable to breached promises to pay. *See Gage v. Lewis*, 68 Ill. 604 (1873).  The Court in *Gage* held that:

> A promise to perform an act, though accompanied, at the time, with an intention not to perform, is not such a representation as can be made the ground of an action at law. The party should sue upon the promise, and if this be void he has no remedy.

*Id*. at 616.

Here, ATE alleged that Warmbat and Barclay engaged in a scheme to defraud ATE by promising to pay ATE the amount of the Invoice.  ATE alleges that Barclay made the promise when he instructed an employee to fax a copy of a check to ATE.  Because the faxed copy of a check does not constitute a representation and because no "scheme to defraud" occurred, these claims fail as a matter of law.

The faxed copy of the check does not contain any false representation.  According to the Complaint, ATE demanded that Warmbat fax a copy of a check before it would release Warmbat's Goods.  In response to ATE's demand, Warmbat faxed a copy of a check to ATE.  Because Rule 9(b) requires it, it should be presumed that ATE pled its fraud claim with particularity.  Nevertheless, ATE utterly fails to allege that any statement made in Warmbat's fax (Complaint, Ex. 7) was factually untrue.  Complaint, ¶¶ 23-24, 40-52.  The allegations of the Complaint clarify that ATE's fraud allegations are not based on any factual misstatement:

> On November 2, 2007 [Warmbat] ***promised*** it would pay ATE $110,451.80.  This statement was false. . . .
> ATE released [Warmbat's] cargo in exchange for the false promise . . . .
> [Warmbat] knew that its false promise would . . . .
> ATE's reliance on [Warmbat's] false promise . . . .

Complaint, ¶¶ 41-43 (emphasis added).  Warmbat and Barclay uttered no false statements of fact to ATE, and barring a viable claim for promissory fraud, the Court should dismiss Counts III and IV.  Fed. R. Civ. P. 9(b); *Wright,* 290 Ill. App. 3d at 115, 8 N.E.2d at 70; *Murphy-Knight,* 248 Ill. App. 3d at 382, 618 N.E.2d at 463.

ATE alleges that Warmbat committed promissory fraud.  There are two problems with this notion.  First, the faxed check itself does not constitute an actionable promise.  At the time Warmbat faxed the check, ATE had not delivered the Goods.  It is utterly implausible that the faxed check was intended as an unconditional promise to pay the amount of the Invoice.  As explained above, if ATE had lost the Goods after Warmbat had faxed a check, ATE could not have treated the fax as an enforceable promise to pay money.  In fact, if Warmbat had tendered a *live* check to ATE, and ATE had then lost the Goods, Warmbat would have been well within its rights to stop payment on the check.  The reality is similar.  ATE demanded that Warmbat fax a check.  Warmbat faxed the check.  ATE proceeded to complete delivery of the Goods a week after they were due.  Rather than treat the faxed check as promissory fraud, the competing explanation is more plausible: consistent with having paid ATE for the Oceanborne Services, Warmbat intended to pay for the Land Services (and to pay the amount of the Invoice) if ATE had delivered the Goods in a timely fashion.  ATE did not deliver the Goods in a timely fashion, and so Warmbat has not paid the Invoice.  ATE's claims for promissory fraud are implausible and should be dismissed.  *Twombly,* 127 S. Ct. at 1974*; American Hardware,* 2005 U.S. Dist. LEXIS 30260 at *14-15*; Gage,* 68 Ill. at 616.

Second, ATE failed to allege facts showing that Warmbat and Barclay engaged in a "scheme to defraud" ATE.  Promissory fraud may only be distinguished from a breach of contract based on evidence of a "string of broken promises."  *American Hardware*, 2005 U.S.

Dist. LEXIS 30260 at *14-15.  The only allegation of a broken promise, however, is Warmbat's refusal to tender a live check after having faxed a copy of it.[2]  This one instance is insufficient to demonstrate a scheme to defraud.  Again, the only plausible explanation for Warmbat's actions is that Warmbat intended to pay the Invoice but that after delivery of the Goods was late Warmbat did not feel that it had received full value.  Realistically, for ATE to effectively plead and prove a "scheme to defraud" Warmbat would have had to perpetrate the same alleged ruse over and over again.  ATE has not pled – because it cannot – that Warmbat ever again tried to arrange transportation brokerage services for free.  In fact, the entire enterprise is completely implausible: it simply makes no sense that a business would use a faxed check as a tool of fraud and hope to "get away with it" (and there is no allegation that Warmbat is a "fly-by-night" operation that disappeared after taking delivery of the Goods), let alone get away with it again and again.  Here, there is simply no allegation of a scheme.  There is no allegation of a pattern.  There is no viable allegation of promissory fraud.  Counts III and IV should be dismissed.  *Lincoln Nat'l Bank*, 414 F. Supp. at 1279*; Twombly,* 127 S. Ct. at 1964-65*; American Hardware,* 2005 U.S. Dist. LEXIS 30260 at *14-15.

## IV.    CONCLUSION

ATE has filed a run-of-the-mill collections case.  It walks like a collections case, and it quacks like a collections case.  The case will be won or lost depending on whether ATE can prove that it delivered the Goods and delivered them on time.  Warmbat is prepared to join that dispute.  The allegations of the Complaint that go beyond breach-of-contract allegations make

---

[2]  Any alleged promises made by Warmbat after ATE delivered the Goods are irrelevant because ATE allegedly relied on Warmbat's promise by delivering the Goods and nothing more.  Accordingly, ATE's allegation that Warmbat "compounded its ill behavior by trying to cover up its lie through a series of additional lies" – presumably referring to Warmbat's alleged statement that "the original check was sent to ATE" is meaningless.  Complaint, ¶¶ 27, 44.

for strained reading – for good reason.  ATE wants the Court to believe that it has a valid claim

for account stated, but the claim is based on an Invoice issued (and allegedly agreed-to in an

unconditional sense) before ATE ever delivered the goods.  The allegations are strained because

business is simply not done in this fashion.  Because an account stated must look backwards to

transactions already completed, Count II should be dismissed.  Similarly, ATE wants the Court

to believe that it was defrauded by a faxed check.  Apart from the technical problems of the

claim – the fax contains no factual misrepresentations and no unconditional promises – the claim

simply makes no sense.  The obvious explanation for the alleged events is that Warmbat did not

pay the Invoice because it felt like it was ripped off.  There is a vast chasm between fraud and

failure to pay a bill.  ATE has not crossed that chasm.  Counts III and IV should be dismissed.

Respectfully submitted,

Paul Barclay and The Original Australian, LLC

  /s/ Marion B. Adler
Marion B. Adler
RACHLIS DURHAM DUFF & ADLER, LLC
542 South Dearborn, Suite 900
Chicago, IL 60605
(312) 733-3957

Chad D. Cooper, Esq.
Christine M. McLaughlin, Esq.
THOMPSON HINE LLP
2000 Courthouse Plaza, N.E.
P.O. Box 8801
Dayton, Ohio  45401-8801
(937) 443-6909

Dated:  April 30, 2008

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| AIR TIGER EXPRESS (USA), INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 08 C 1945 |
| vs. | ) | |
| | ) | District Judge Darrah |
| PAUL BARCLAY and | ) | |
| THE ORIGINAL AUSTRALIAN, LLC, | ) | Magistrate Judge Ashman |
| | ) | |
| Defendants. | ) | |

**APPENDIX OF UNREPORTED CASES (EXHIBITS A-D) CITED IN
DEFENDANTS' BRIEF IN SUPPORT OF MOTION TO DISMISS**

*United States Fire Protection Illinois, Inc. v. St. Paul Fire and*                    A
*Marine Insurance Company*, No. 02 C 7462, 2004 U.S. Dist. LEXIS 23517
(N.D. Ill., November 22, 2004)

*P.M.C., Inc. v. Ekstein*, No. 91 C 3709, 1992 U.S. Dist. LEXIS 7306                    B
(N.D. Ill., May 14, 1992)

*American Hardware Manufacturers v. Reed Elsevier, Inc.*,                    C
No. 03 C 9421, 2005 U.S. Dist. LEXIS 30260 (N.D. Ill., November 29, 2005)

*Jada Toys, Inc. v. Chicago Import, Inc.*, No. 07 C 699, 2008 U.S. Dist.                    D
LEXIS 29286  (N.D. Ill., April 10, 2008)

# EXHIBIT A

LEXSEE 2004 U.S. DIST. LEXIS 23517

**UNITED STATES FIRE PROTECTION ILLINOIS, INC., Plaintiff, v. ST. PAUL FIRE AND MARINE INSURANCE COMPANY, Defendant.**

**No. 02 C 7462**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*2004 U.S. Dist. LEXIS 23517*

**November 19, 2004, Decided**
**November 22, 2004 , Docketed**

**DISPOSITION:** St. Paul's motion for summary judgment was denied.

**COUNSEL:** **[*1]** For UNITED STATES FIRE PROTECTION ILLINOIS INC., Plaintiff: Craig M. White, Martha D. Kanter, Chad Eric Clark, Wildman, Harrold, Allen & Dixon, Chicago, IL.

For ST PAUL FIRE & MARINE INSURANCE COMPANY, Defendant: Thomas M. Hamilton, James Michael Hofert, Kent J. Cummings, Hinshaw & Culbertson, Chicago, IL.

For ST PAUL FIRE & MARINE INSURANCE COMPANY, Counter-Claimant: Thomas M. Hamilton, James Michael Hofert, Kent J. Cummings, Hinshaw & Culbertson, Chicago, IL.

For UNITED STATES FIRE PROTECTION ILLINOIS INC., Counter-Defendant: Craig M. White, Martha D. Kanter, Chad Eric Clark, Wildman, Harrold, Allen & Dixon, Chicago, IL.

**JUDGES:** Judge Rebecca R. Pallmeyer.

**OPINION BY:** REBECCA R. PALLMEYER

**OPINION**

**MEMORANDUM OPINION AND ORDER**

Plaintiff United States Fire Protection Illinois, Inc. ("USFP") purchased a variety of comprehensive business insurance policies from Defendant St. Paul Fire and Marine Insurance Company ("St. Paul"). USFP alleges that St. Paul breached its contractual obligations under certain workers' compensation and general liability policies,

as well as the implied duties of good faith and reasonable care, by mishandling 16 workers' compensation claims filed by **[*2]** USFP employees in policy years October 27, 1990 through October 27, 1994. USFP claims that as a result of these breaches, St. Paul overstated USFP's premiums by more than $ 800,000. St. Paul denies any wrongdoing and alleges in a counterclaim that USFP still owes $ 117,153 in unpaid premiums. St. Paul now seeks summary judgment on both the complaint and the counterclaim. For the reasons set forth here, the motion is denied.

**BACKGROUND**

USFP is an Illinois corporation with its principal place of business in Lake Forest, Illinois. USFP provides full service industrial, commercial, and residential fire sprinkler systems. (St. Paul 56.1 P 1; Cmplt. P 1; http://www.unitedstatesfireprotection.com.) [1] St. Paul is a Minnesota corporation with its principal place of business in St. Paul, Minnesota. It is licensed and authorized to sell insurance in Illinois and other states. (St. Paul 56.1 P 2; Cmplt. P 2.)

1    St. Paul's Rule 56.1(a)(3) Statement of Undisputed Material Facts is cited as "St. Paul 56.1 P ."

**[*3] A. The Loss Sensitive Policies**

Beginning in 1990, USFP purchased certain comprehensive business insurance policies from St. Paul, including "Workers Compensation and Employers Liability Insurance" and "Commercial General Liability" covering the years October 27, 1990 through October 27, 1994 (collectively, the "Loss Sensitive Policies"). [2] (USFP 56.1 P 1; Cmplt. P 4.) All of the Loss Sensitive Policies were subject to St. Paul's Retrospective Rating

EXHIBIT

A

and/or Deductible Endorsement, which St. Paul used to determine the amount of premium USFP owed each year. That Endorsement gave St. Paul the right to recalculate and collect premiums for each one-year policy after it had expired, based on losses incurred in that year. St. Paul calculated premiums using retrospective and deductible formulas that were based on USFP's Standard Premium rate. One of the elements used to develop the Standard Premium was "Ratable Incurred Loss" or "Incurred Losses." Ratable Incurred Loss "can equal amounts that have been paid [out on claims] plus reserves set aside for possible future payments." It may also include "allocated loss adjustment expenses" [3] and expenses incurred by St. **[*4]** Paul in seeking recovery of paid losses from third parties. (Cmplt. PP 5-7; St. Paul 56.1 P 16; USFP 56.1 P 4.)

> 2    When an insurance policy is "loss sensitive," the insured's final premium is based on the insured's losses. *See* http://insource.nils.com/gloss/GlossaryTerm.asp?tid=3611. The specific Loss Sensitive Policies at issue here were in effect as follows:

|   |   |
|---|---|
| 1. WVO1204286, | effective 10/27/90 to 10/27/91 |
| 2. KKO1200048, | effective 10/27/90 to 10/27/91 |
| 3. WVO1204484, | effective 10/27/91 to 10/27/92 |
| 4. KKO1200083, | effective 10/27/91 to 10/27/92 |
| 5. WVA1200548, | effective 10/27/92 to 10/27/93 |
| 6. KKO1200113, | effective 10/27/92 to 10/27/93 |
| 7. WVA1200907, | effective 10/27/93 to 10/27/94 |
| 8. KKO1200147, | effective 10/27/93 to 10/27/94 |
| 9. KKO1200170, | effective 10/27/93 to 10/27/94 |
| 10. WVA1201121, | effective 10/27/93 to 10/27/94 |

(Cmplt. P 4.) The disputed claims involve only the first, third, fifth, sixth, and seventh policies, though USFP claims that St. Paul's unreasonable claim handling affected premiums in the other policy years as well. (St. Paul 56.1 P 43; USFP's

Local Rule 56.1(b)(3)B) Statement of Additional Facts in Opposition to St. Paul's Motion for Summary Judgment and Local Rule 56.1(a)(3) Statement of Facts (hereinafter "USFP 56.1") P 82.)

**[*5]**

> 3    The parties do not define this term, nor do they explain whether any amounts other than paid claims, reserves, and loss adjustment expenses may be part of the Ratable Incurred Loss.

In calculating the annual premiums charged on the Loss Sensitive Policies, St. Paul included certain percentages or factors that it used as multipliers against the Standard Premium. Depending on the type of policy, St. Paul used such multipliers as a "Basic Premium Factor," a "Loss Conversion Factor," a "Tax Multiplier," and a "Deductible Factor." [4] (Cmplt. P 9.) St. Paul determined its claim handling fee by applying a Loss Conversion Factor to the Ratable Incurred Loss. As the Ratable Incurred Loss increased, St. Paul's fee for handling claims also increased. (*Id.* P 10.)

> 4    The parties do not define the terms "Basic Premium Factor," "Loss Conversion Factors," "Tax Multiplier," or "Deductible Factor," nor explain how those multipliers affected the Standard Premium.

**[*6]** St. Paul developed the Standard Premium for the Loss Sensitive Policies based on every hundred dollars of payroll multiplied by the "employee classification rate," [5] multiplied by the "experience modification factor" for USFP. (Cmplt. P 12.) USFP's experience modification factor, which compares actual and expected losses, is developed by the National Council of Compensation Insurance based on USFP's loss history. When actual losses exceed expected losses, the experience modification factor increases and causes the Standard Premium to increase as well. (*Id.* P 13.) USFP's Ratable Incurred Loss in a given policy year is reflected in the experience modification factor applied in the next three years. In other words, "the experience modification factor impacted the development of the Standard Premium of USFP in the second, third and fourth years subsequent to the policy-year the losses occurred." (*Id.* P 14.) The greater the amount of money St. Paul paid, or estimated that it paid for losses and expenses associated with claims under the Loss Sensitive Policies, the higher the "Experience Modifiers" became, and the more St. Paul could charge USFP in annual **[*7]** premiums. (*Id.* PP 16, 17; St. Paul 56.1 P 7; USFP 56.1 Resp. P 7.) [6]

> 5    The parties do not define the term "employee classification rate" or explain how it is calculated.

6   USFP's Response to St. Paul's Rule 56.1(a)(3) Statement of Undisputed Material Facts is cited as "USFP 56.1 Resp. P    ."

**B. Procedures for Handling Claims**

St. Paul's Claim Division Procedure Manual "details the procedures by which claims are to be handled by various Company claim offices." (Claim Division Procedure Manual, Ex. 17 to USFP 56.1, at 25.) For "lost time" claims resulting from employees missing work due to injury, St. Paul claims adjusters are expected to obtain a variety of medical reports, including (1) the initial medical report; (2) a medical report summarizing each office visit; (3) change of condition medical reports; (4) admitting and discharge hospital reports; (5) operative reports; (6) emergency room reports; (7) PPD (permanent partial disability) rating reports; [*8] and (8) final medical reports. (*Id.* at 376.) The Manual's "guidelines for thorough investigatory procedures" state that claims adjusters should obtain statements from the insured, the claimant, and appropriate witnesses "wherever good judgment indicates the need to secure and preserve facts." (*Id.* at 440.) The types of injuries requiring the adjuster to engage in "statement activity" include: (1) occupational disease; (2) cumulative trauma; (3) heart attack or stroke; (4) emotional distress; (5) back injuries where the claimant is off work two weeks or longer, or has a previous history of back injury; (6) questions of compensability, including those claims occurring away from premises controlled by the insured or late reporting by claimant to insured; (7) subrogation; and (8) possible involvement of the "Second Injury Fund." [7] (*Id.* at 441.)

7   Neither party has provided a definition of "Second Injury Fund."

The Manual provides that claims adjusters should obtain independent medical examinations if: [*9] (1) consultation is required; (2) the treating physician is not furnishing substantive reports; or (3) final disability rating by a specialist is desired. (*Id.* at 447.) In addition, claims adjusters "usually . . . might want to visit the loss site if there is some type of possible subrogation involved in the claim." (Keil Dep., Ex. 18 to USFP 56.1, at 61-62.) As St. Paul characterizes it, the Manual merely sets forth "guidelines" for handling claims and requires a "reasonable, common sense approach to the problems faced by [St. Paul's] insureds." (St. Paul 56.1 Resp. PP 30-35.)

**C. The Dispute Over Premiums**

USFP contends that St. Paul claims adjusters failed to follow proper procedures for handling 16 workers' compensation claims. Before discussing USFP's challenges to each specific claim file, the court will review the procedural history of the parties' dispute. USFP first began questioning St. Paul's handling of certain workers' compensation claims in 1997. On July 8, 1997, David L. Jennings of The Rockwood Company [8] sent a letter to USFP President Gregg Huennekens enclosing a "tentative retrospective adjustment" from St. Paul seeking payment by USFP of an additional [*10] $ 59,132 in retrospective premiums for the 1992-93 and 1993-94 policy years. (Letter from D. Jennings to G. Huennekens of 7/8/97, Ex. 11 to WRAMSCO Audit Report, Ex. F to St. Paul 56.1.) On August 25, 1997, Jennings sent a letter to Joe Zydlo, a Chartered Property Casualty Underwriter for St. Paul, requesting a meeting between Huennekens and "a St. Paul representative" to discuss the workers' compensation claims that had generated the additional $ 59,132 premium obligation. [9] (Letter from D. Jennings to J. Zydlo of 8/2/97, Ex. 5 to USFP 56.1; St. Paul 56.1 P 9.) There is no indication in the record that anyone responded to Jennings's letter.

8   The Rockwood Company is "one of the Chicago area['s] largest and oldest independent insurance agencies." (*See* http://www.rockwoodco.com.) The parties do not explain the relationship between The Rockwood Company and USFP, though St. Paul states elsewhere in its response to USFP's Local *Rule 56.1* statement that USFP "made some inquiries through its broker." (St. Paul's Response to U.S. Fire's 56.1(b)(3)(B) Statement (hereinafter "St. Paul 56.1 Resp.") P 16.)

[*11]

9   According to Jennings, "the major dollar amount was generated by Walter Harvey and the 2 (two) claims generated in the Arizona office." (Ex. 5 to USFP 56.1.) The parties have not otherwise identified Mr. Harvey or explained which two claims were "generated" in Arizona.

On December 19, 1997, St. Paul issued a final invoice to USFP for the $ 59,132. (USFP 56.1 P 6.) USFP refused to pay the invoice. Instead, early in January 1998, Huennekens called Zydlo directly to request additional information regarding the underlying workers' compensation claims. Zydlo did not respond immediately and on January 13, 1998, Huennekens hired WRAMSCO [10] to conduct an audit of the St. Paul claim files. (*Id.* PP 12-14; Audit Contract, Ex. 7 to USFP 56.1; Amended Counterclaim P 15.) Huennekens called Zydlo to notify him of that decision. This time, Zydlo responded by letter dated January 26, 1998, stating that he had advised Jennings "a few months ago" to contact St. Paul's Claim Service Coordinator, Song Kim, to discuss the claims but that no one from The Rockwood Company or USFP had [*12] done so. [11] Zydlo reiterated that Huennekens could contact Mr. Kim to discuss the claims or to schedule a

claim audit. (Letter from J. Zydlo to G. Huennekens of 1/26/98, Ex. 6 to USFP 56.1.)

> 10   WRAMSCO describes itself as a "resource reduction exposure company" that, among other things, conducts claim audits to identify fraudulent and exaggerated injury claims. (*See* http://www.wramsco.com.)
>
> 11   Zydlo's letter indicates that he left a voice mail message for Huennekens on or about January 22, 1998. (Ex. 6 to USFP 56.1) ("Per my phone message reply to you last Thursday. . .)

WRAMSCO did conduct an initial audit of nine of the claim files at issue in this case in early 1998 and reported its findings to Huennekens on July 24, 1998. [12] (USFP 56.1 PP 15, 17; Letter from R. Wills to G. Huennekens of 8/7/98, Ex. 10 to USFP 56.1.) There does not appear to be any written summary of those initial findings, but in an August 7, 1998 letter to Huennekens, Raymond W. Wills, Assistant Vice President of WRAMSCO, [*13] stated that in WRAMSCO's opinion, USFP did not owe any further premium to St. Paul on the nine claim files and was, in fact, entitled to a refund. (Letter from R. Wills to G. Huennekens of 8/7/98, Ex. 10 to USFP 56.1.)

> 12   Of the 16 workers' compensation claims now in dispute, it is not clear which nine were included in WRAMSCO's July 1998 audit.

On November 12, 1998, Zydlo and Kim met with a representative from WRAMSCO (presumably Wills) to discuss the results of WRAMSCO's audit. (USFP 56.1 P 18; Letter from R. Wills to S. Kim of 6/17/99, Ex. 8 to USFP 56.1.) Kim apparently advised that St. Paul would review the issues and concerns raised by USFP and get back to WRAMSCO with a response. (Ex. 8 to USFP 56.1.) A few days later on November 17, 1998, St. Paul issued an invoice to USFP for $ 81,915 in additional premiums owed under the 1992-93 and 1993-94 Loss Sensitive Policies ($ 59,132 for the 1997 retrospective adjustment plus $ 22,783 for the 1998 retrospective adjustment); USFP again refused to [*14] pay the bill. (USFP 56.1 P 7; Amended Counterclaim PP 16, 17; Answer to Amended Counterclaim P 16.) Several months passed without any apparent contact from Kim regarding the concerns raised at the November 12, 1998 meeting. Wills sent Kim a letter on June 17, 1999 and again on July 12, 1999 seeking St. Paul's position, but it does not appear that Kim or anyone else at St. Paul responded to that correspondence. (Exs. 8 and 12 to USFP 56.1.)

Almost one year later, on July 20, 2000, Wills met with certain unspecified representatives of St. Paul to again discuss the initial audit findings. (Letter from R. Wills to G. Huennekens of 7/20/00, Ex. 13 to USFP

56.1.) Neither party has provided details regarding that meeting, but the participants apparently discussed settlement and possible arbitration. (*Id.*) Also in 2000, St. Paul charged USFP an additional $ 6,722 in retrospective premiums for that year. [13] (USFP 56.1 P 8.)

> 13   The annual adjustment for 1999 was $ 0. (Amended Counterclaim P 18.)

[*15]   The record does not describe the parties' interactions between July 20, 2000 and May 2001. On May 13, 2001, St. Paul issued USFP an invoice for $ 28,516 in additional premiums under the "10/27/90 to 10/27/94" policy years. (USFP 56.1 P 9; Letter from D. Page to G. Huennekens of 5/13/01, Ex. 3 to USFP 56.1.) On August 16, 2001, WRAMSCO audited six additional claim files at issue in this case. [14] (USFP 56.1 P 21; Email from R. Wills to D. Finney of 8/9/01, Ex. 14 to USFP 56.1.)

> 14   Of the 16 workers' compensation claims now in dispute, it is not clear which six were included in WRAMSCO's August 2001 audit.

### D. The Disputed Claim Files

With this background in mind, the court turns to USFP's specific objections to St. Paul's handling of the 16 disputed workers' compensation files. In each case, USFP argues, St. Paul valued the claim at more than it was actually worth. In making its objections, USFP relies primarily on the Audit Report and Audit Notes of Raymond Wills. Wills has [*16] worked in the insurance industry for more than 25 years and, as Vice President of WRAMSCO, is involved in risk management, risk retention, risk transfer, and risk finance programs, including claim investigation and management, insurance program and claim audits, underwriting and premium development, and experience modification factor investigation and development. (USFP 56.1 PP 95, 96.)

St. Paul generally denies that its adjusters mishandled claims and objects to USFP's exclusive reliance on the opinions of Wills. St. Paul, not USFP, has moved for summary judgment; St. Paul nevertheless charges USFP with "attempting to use the Local Rules to require St. Paul to defeat a motion for summary judgment by dumping their expert's opinions into a Rule 56.1(b)(3)(B) Statement of Undisputed Facts." (St. Paul 56.1 Resp. P 48.) St. Paul notes that USFP's President Huennekens testified that he "almost always" attended claims meetings, asked questions at those meetings, and does not recall being dissatisfied with St. Paul during those meetings. (St. Paul 56.1 PP 9, 11.)

The parties' positions regarding the disputed claim files are set forth below.

## 1. Claimant No. 1

Claimant No. 1 injured [*17] his shoulder on December 5, 1990 and ultimately underwent surgery. (St. Paul 56.1 P 37; Ex. 12 to WRAMSCO Audit Notes, Ex. H to St. Paul 56.1, at 2.) St. Paul calculated his average weekly wage for purposes of computing workers' compensation as $ 880, but Wills says the average weekly wage should have been $ 842.35. [15] (USFP 56.1 P 48; Ex. 12 to WRAMSCO Audit Notes, at 4.) Wills notes that Claimant No. 1 had a lawsuit pending in Indiana but that St. Paul did not investigate it. Wills does not know the basis for the lawsuit but questions whether it may have involved the same injuries at issue in the workers' compensation claim. (Ex. 12 to WRAMSCO Audit Notes, at 4.) Wills also points out that, as reflected in a handwritten note from USFP Superintendent Robert Martens dated December 6, 1990, the day after Claimant No. 1's injury, Martens called Claimant No. 1 at home to tell him where to report for work the next day and Claimant No. 1 did not mention any problems with his arm at that time. (USFP 56.1 P 51; Ex. 12 to WRAMSCO Audit Notes, at 1-2.)

> 15   As described *infra*, in several instances the parties differ as to the appropriate wage for the employee claimants. The court is uncertain of the significance of these differences, as the parties agree that there are multiple, reasonable approaches to calculating average weekly wage, including four approaches set forth in the Illinois Workers' Compensation Act. (St. Paul 56.1 PP 60, 61.) *See also 820 ILCS 305/10.*

[*18] St. Paul settled the claim on or about August 5, 1992. [16] (St. Paul 56.1 P 37.) By Wills's calculations, Claimant No. 1 received approximately 96% of the value of his arm even though the highest total percentage listed for arm injuries on St. Paul's 1997 Workers' Compensation Reserve Guide for Workers' Compensation Claims is 25% permanent partial disability of the arm. (USFP 56.1 P 50; Workers' Compensation Reserve Guide, Ex. 28 to USFP 56.1, at SPC011089.) St. Paul claims that Wills did not take into consideration the "claim as a whole" or "the view of the claim in terms of a percentage of the 'man as a whole.'" (St. Paul 56.1 Resp. P 50.) According to St. Paul, "the Guidelines attached as Exhibit 28 to U.S. Fire's Motion themselves recognize factors of increased exposure." (*Id.*)

> 16   It is undisputed that St. Paul had the right to settle claims. (St. Paul 56.1 P 8.)

## 2. Claimant No. 2

Claimant No. 2 injured his left buttock and back when he fell off a ladder [*19] on December 5, 1990 while working at a job site in Elgin, Illinois. (St. Paul 56.1 P 32; Ex. 7 to WRAMSCO Audit Notes, at 1, Workers Compensation & Structural Work Act Investigations dated 12/29/90, at 3 (SPC008347).) St. Paul's claims adjuster did not believe USFP had a subrogation claim against the ladder manufacturer and stated that a subrogation claim against the general contractor, W.E. O'Neil Construction Company, "might be very difficult because according to the contract we have obtained, the general contractor has been made an additional insured under your [USFP's] policy." (Ex. 7 to WRAMSCO Audit Notes, at 4, quoting Workers Compensation & Structural Work Act Investigations dated 12/29/90, at 8 (SPC008342).) St. Paul did not pursue any third-party recovery and settled the claim on August 26, 1991. (USFP 56.1 P 52; St. Paul 56.1 P 32.) USFP suggests that this was improper but does not explain why. Wills acknowledges that the contract with the general contractor "reflected that it did require a waiver of subrogation to the benefit of" the general contractor. He notes, however, that the file "did not contain a copy of the general liability [*20] policy in the event a common law action was filed by the claimant against the general contractor and the general contractor in turn filed a third party complaint seeking contribution from the employer." (Ex. 7 to WRAMSCO Audit Notes, at 4.)

In addition to these issues, it is Wills's opinion that "case management duties resembled claim adjuster duties that were charged as medical in the amount of $ 4,215." (Ex. 7 to WRAMSCO Audit Notes, at 4-5.)

## 3. Claimant No. 3

Claimant No. 3 injured his wrist and shoulder on April 16, 1993. He continued regular employment until June 22, 1993 when he stopped working due to the injury. (St. Paul 56.1 P 36; Ex. 11 to WRAMSCO Audit Notes, at 1-2.) According to Wills, St. Paul's investigation did not include any inquiry into the question whether Claimant No. 3 was performing on April 16, 1993; whether he had complained of injuries between April 16 and June 22, 1993; whether he had exhibited any disability between those dates; what he claimed as an injury between those dates; or whether USFP had accommodated his job duties between those dates. (Ex. 11 to WRAMSCO Audit Notes, at 5.) In addition, USFP notes that an internal fax between St. Paul [*21] investigators concerning the merits of a different claim contrasted that other claim, which "sounded legitimate," with this one, which the investigators called an "obvious B.S. claim[]." (Fax from J. White to N. Houlihan of 10/27/94, Ex. 29 to USFP 56.1; USFP 56.1 P 57.) St. Paul calculated Claimant No. 1's average weekly wage as $ 998.80; Wills calculated the average weekly wage as $ 934.59. (USFP 56.1 P 56.) St. Paul

settled the case on or about January 4, 1995. (St. Paul 56.1 P 36.)

### 4. Claimant No. 4

Claimant No. 4 fell off a ladder and injured his knee on June 28, 1994. (Ex. 8 to WRAMSCO Audit Notes, at 1.) He did not report the injury, however, until November 14, 1994. (*Id.;* USFP 56.1 P 58.) According to Wills, St. Paul did not obtain any statements from Claimant No. 4, his supervisor, or any witnesses. (USFP 56.1 P 59.) St. Paul insists that such statements are reflected in the claimant's First Report of Injury and the medical history as recorded by Claimant No. 4's doctors. (St. Paul 56.1 Resp. P 59.) The case settled when Claimant No. 4 accepted a January 9, 1996 settlement offer from St. Paul. (St. [*22] Paul 56.1 P 33; Ex. 8 to WRAMSCO Audit Notes, at SPC1040.)

### 5. Claimant No. 5

Claimant No. 5 slipped on a wet floor and injured his shoulder on December 4, 1990. (Ex. 5 to WRAMSCO Audit Notes, at 1; St. Paul 56.1 P 28.) A June 5, 1991 memo from Rusty Pinckney, a senior claim representative with St. Paul, to Larry Neff, a St. Paul workers' compensation supervisor, stated that St. Paul would "vigorously pursue third-party recovery" from the manager of the building where Claimant No. 5 fell. (*Id.* at SPC5212.) In Wills's view, St. Paul did not pursue any such third-party recovery. (*Id.* at 4.) St. Paul insists that the claim handler considered the possibility of a third-party claim but that "the referenced documents show the injury resulted from a natural accumulation for which no recovery is permitted." (St. Paul 56.1 Resp. P 60.) St. Paul does not specify which of the 75 pages attached to Exhibit 5 of the WRAMSCO Audit Notes support this assertion.

St. Paul calculated Claimant No. 5's average weekly wage as $ 880; by Wills's calculation, the average weekly wage was only $ 865.16. (USFP 56.1 P 61.) St. Paul settled the [*23] claim on December 11, 1992. On December 16, 1992, St. Paul sent a fax to David Jennings of The Rockwood Company advising him of the settlement. (St. Paul 56.1 PP 28, 30; Ex. 5 to WRAMSCO Audit Notes, at SPC5369.) Huennekens testified that he formed the belief that Claimant No. 5 had been overpaid at the time of settlement because he knew that Claimant No. 5 was going to retire soon thereafter. (*Id.* P 29; Huennekens Dep., Ex. E to St. Paul 56.1, at 335-37.) Huennekens stated that he "probably expressed [his] concern to the agent but other than that, what did you want me to do about it. It was done." (Huennekens Dep., at 337-38.)

### 6. Claimant No. 6

Claimant No. 6 sustained a hernia on February 5, 1991. (Ex. 2 to WRAMSCO Audit Notes, at 1.) He first reported the injury six days later on February 11, 1991, which was also his last day of work. He underwent hernia repair surgery on February 20, 1991 and received temporary total disability benefits totaling $ 6,956.45. (*Id.;* St. Paul 56.1 P 25; USFP 56.1 P 62.) St. Paul did not obtain any statements from co-workers and, according to Wills, St. Paul also failed to investigate Claimant [*24] No. 6's activities between the date of injury and the date he reported the injury. (USFP 56.1 PP 62, 63.) St. Paul claims that "documents referenced in Mr. Wills' report themselves reflect investigation performed by St. Paul, including medical reports discussing the post-accident period." (St. Paul 56.1 Resp. P 63.) The medical reports do indicate that Claimant No. 6 continued to work for several days after the injury, but they say nothing about the type of work he performed. (*See, e.g.,* Ex. 2 to WRAMSCO Audit Notes, at SPC10699, SPC10695.)

St. Paul calculated Claimant No. 6's average weekly wage as $ 880. Wills claims this figure is too high and should have been only $ 872.88. (USFP 56.1 P 64.)

### 7. Claimant No. 7

Claimant No. 7 injured his shoulder on August 27, 1991. According to Wills, St. Paul improperly charged USFP for case management duties that resembled claim adjuster duties. St. Paul settled the claim in or about September 1992 for "35% of an arm," but Wills says that based on the "Q-Dex," a Quick Index to Industrial Commission Decisions in Illinois, the "probable Arbitration value would approximate 20% of an arm." (USFP 56.1 P 65; Ex. [*25] 16 to WRAMSCO Audit Notes, at 1-3; St. Paul 56.1 P 41.) In addition, St. Paul calculated an average weekly wage for Claimant No. 7 as $ 502, but Wills believes the figure should have been only $ 462.96. (*Id.* P 66.)

### 8. Claimant No. 8

Claimant No. 8 sustained a hernia on November 1, 1993. (St. Paul 56.1 P 27; Ex. 4 to WRAMSCO Audit Notes, at 1, SPC10940.) St. Paul's claim file indicates that Claimant No. 8 had injured himself about one month earlier. The adjuster notes confirm that Claimant No. 8's supervisor verified the November 1 incident, but the notes also state that there were no witnesses to the injury. (USFP 56.1 P 67; Ex. 4 to WRAMSCO Audit Notes, at 2-3, SPC10943.) Wills claims that the file did not contain a wage statement reflecting Claimant No. 8's wages at the time of his injury; St. Paul notes that the First Report of Injury identifies an average weekly wage of $ 1,000. (St. Paul 56.1 Resp. P 67; Ex. 4 to WRAMSCO Audit Notes, at SPC10940.) By Wills's estimation, Claim No. 8 was worth $ 0 but St. Paul valued it at $ 11,256.11. (Ex.

9 to WRAMSCO Audit Report, Ex. F. to St. Paul 56.1.) Claimant No. 8 returned [*26] to work on February 21, 1994. (St. Paul 56.1 P 27.)

### 9. Claimant No. 9

Claimant No. 9 injured his knee on October 24, 1994. (St. Paul 56.1 P 38; Ex. 13 to WRAMSCO Audit Notes, at 1.) St. Paul did not interview two individuals Claimant No. 9 identified as witnesses to the accident, and though medical records indicated that Claimant No. 9 had suffered a prior injury to the same knee, St. Paul neither referred to nor inquired about the earlier injury. (USFP 56.1 P 69; St. Paul 56.1 Resp. P 69.) St. Paul calculated Claimant No. 9's average weekly wage to be $ 1,070.80; by Wills's calculation, the average weekly wage was only $ 1,003.90. (*Id.* P 68.) St. Paul settled Claimant No. 9's claim on November 18, 1995. (St. Paul 56.1 P 38.)

### 10. Claimant No. 10

Claimant No. 10 hurt his knee when he slipped on some mud on April 5, 1994. (St. Paul 56.1 P 35; Ex. 10 to WRAMSCO Audit Notes, at 1.) According to Wills's summary of the file, after the injury, Claimant No. 10 went for an independent medical examination and reported that he could perform some activity around the house such as cutting the lawn. [*27] [17] (Ex. 10 to WRAMSCO Audit Notes, at 2.) The claim adjuster, however, did not ask Claimant No. 10's doctors how he was able to perform physical activities at home but not at his job. (*Id.* at 4; St. Paul 56.1 Resp. P 70.)

> 17    The parties did not produce the underlying report from the independent medical examiner.

Claimant No. 10 filed a lawsuit against Ford Motor Company, Edward Gray Corporation, and Accurate Ready Mix relating to his knee injury. [18] The case settled for $ 40,000 and the lawsuit was dismissed on or about December 17, 1996. According to Wills, St. Paul should have received over $ 43,600, representing 75% of its lien on that lawsuit. Instead, St. Paul agreed to accept only about $ 13,300. (USFP 56.1 P 71; Ex. 10 to WRAMSCO Audit Notes, at 4; Ex. 10 to WRAMSCO Audit Notes, at SPC1526; St. Paul 56.1 P 35; USFP 56.1 Resp. P 35.) Wills does not explain how St. Paul could expect to recover a lien amount greater than the settlement figure. For its part, St. [*28] Paul responds only that "the full lien amount is a matter of interpretation. For example, what is considered the 'full amount' of a lien when the employee is found 49% at fault?" (St. Paul 56.1 Resp. P 71.)

> 18    Presumably, these companies were the general contractor and subcontractor for the construction site where Claimant No. 10 was injured.

USFP claims that St. Paul failed to investigate the worksite where Claimant No. 10 was injured even though the case involved third-party claims against Ford Motor Company, Edward Gray Corporation, and Accurate Ready Mix. (USFP 56.1 P 71; File Notes, Ex. 30 to USFP 56.1; Ex. 10 to WRAMSCO Audit Notes, at SPC1525-26.) St. Paul disagrees and again insists that unspecified documents referenced in Wills's report reflect due investigation of the worksite. (St. Paul 56.1 Resp. P 71.) It is not clear to the court which of the produced documents purportedly support St. Paul's position.

### 11. Claimant No. 11

Claimant No. 11 injured himself on November 11, 1992 when [*29] he fell off a walkway on his way to a job site. (Ex. 15 to WRAMSCO Audit Notes, at 1; St. Paul 56.1 P 40.) St. Paul's "house counsel" handled the case but, Wills says, wrongfully charged USFP $ 8,393.55 for those legal services. (*Id.* at 2; USFP 56.1 P 72.) St. Paul claims that it charged "fees" only "in the sense of court charges, copying charges, court reporters, etc." (St. Paul 56.1 Resp. P 11.) St. Paul settled the case for $ 1,500 on May 9, 1997; Wills says the case was worth $ 0. (Ex. 15 to WRAMSCO Audit Notes, at 2, SPC1228; St. Paul 56.1 P 40; Ex. 9 to WRAMSCO Audit Report, Ex. F. to St. Paul 56.1.)

### 12. Claimant No. 12

Claimant No. 12 tore the cartilage in his knee on June 20, 1994. (Ex. 1 to WRAMSCO Audit Notes, at 1; St. Paul 56.1 P 24.) He had dislocated the same knee on at least one prior occasion and, in Wills's opinion, St. Paul failed to ascertain whether he had suffered a work-related accident covered by the workers' compensation statute. Specifically, the adjuster did not ask the doctor how old Claimant No. 12's knee tear was or whether the tear had caused the prior dislocations. (*Id.* at 2.) [*30] USFP notes that Claimant No. 12 missed time from work to have knee surgery, but the claim file does not contain any medical report describing the procedure or its results. (USFP 56.1 P 73.) Claimant No. 12 returned to work on August 8, 1994. He received a total of $ 14,466.84 on his claim. (St. Paul 56.1 P 24; Ex. 1 to WRAMSCO Audit Notes, at 2.) St. Paul claims that the last charge occurred on December 2, 1995, though the cited documentation does not confirm this assertion. (*Id.*)

### 13. Claimant No. 13

Claimant No. 13 injured his shoulder on October 2, 1992. (Ex. 9 to WRAMSCO Audit Notes, at 1; St. Paul 56.1 P 34.) Wills states that St. Paul failed to obtain all of the medical records relating to the injury, noting that the

claim file does not include records from one of the doctors. Wills also states generally that "pertinent medical was not obtained," but it is not clear whether he is referring to records besides those missing from the one physician. (*Id.* at 5-6.) St. Paul insists that relevant medical records "were obtained" but fails to direct the court to any specific records from the doctor in question, or to any [*31] documents which prove that further records were unnecessary. (St. Paul 56.1 P 74.)

Also missing from the claim file, Wills says, is documentation regarding Claimant No. 13's wage rate at the time of injury. (USFP 56.1 P 74; Ex. 9 to WRAMSCO Audit Notes, at 5-6.) St. Paul directs the court to the Employer's Report of Industrial Injury, which indicates an hourly wage of $ 19.35. (St. Paul 56.1 Resp. P 74.) Wills finally opines that St. Paul failed to investigate Claimant No. 13's accident, to obtain any witness statements, or to determine whether Claimant No. 13 had been injured on another job. (USFP 56.1 P 75.) Again without specific citation or reference, St. Paul claims that the "documents referenced in Mr. Wills' report themselves show investigation by St. Paul of the incident and the date it took place." (St. Paul 56.1 Resp. P 75.) The court notes that in addition to medical records from two physicians and a physical therapist, there is one Investigator's Interview Memorandum and a surveillance report in the file. According to the surveillance report, an investigator observed Claimant No. 13 lifting and carrying and noted that Claimant No. [*32] 13 appeared to be employed at the Biltmore Fountain Office Building. (Ex. 9 to WRAMSCO Audit Notes, at SPC8612-13, SPC10454-57.)

### 14. Claimant No. 14

Claimant No. 14 sustained a back injury on July 17, 1992. (Ex. 14 to WRAMSCO Audit Notes, at 1; St. Paul 56.1 P 39.) Wills states that St. Paul failed to investigate whether Claimant No. 14 was working another job despite surveillance evidence that he was possibly working for another employer. (*Id.* at 5; USFP 56.1 P 76.) St. Paul claims it did investigate this issue as evidenced by "the documents referenced in Mr. Wills' report." (St. Paul 56.1 Resp. P 76.) St. Paul did not identify which of the more than 80 documents attached to Exhibit 14 refers to Claimant No. 14's alleged employment with another company, nor was the court able to find such a reference in its own review of the documents. Claimant No. 14's claim was settled on or about March 30, 1994. (St. Paul 56.1 P 39.)

### 15. Claimant No. 15

Claimant No. 15 suffered a hernia on July 29, 1994 but did not report the injury until September 23, 1994. (Ex. 3 to WRAMSCO Audit Notes, at 1; St. Paul 56.1 P 26; [*33] USFP 56.1 P 77.) According to Wills, the

claim file did not contain any medical records from one of the treating physicians, or the operative report from Claimant No. 15's surgery. (*Id.* at 2.) St. Paul responds only that it requested "all medical records" from physicians. (St. Paul 56.1 Resp. P 78.) The court is not certain which document purportedly establishes this fact.

St. Paul calculated Claimant No. 15's average weekly wages to be $ 1,070.80; Wills's calculations, in contrast, resulted in an average weekly wage of $ 1,018.05. (USFP 56.1 P 79.) Claimant No. 15 returned to work on November 28, 1994. (St. Paul 56.1 P 26.)

### 16. Claimant No. 16

Claimant No. 16 injured his back on September 14, 1994. (Ex. 6 to WRAMSCO Audit Notes, at 1; St. Paul 56.1 P 31.) St. Paul did not take a statement from Claimant No. 16, instead relying on the statements Claimant No. 16 made to his employer and doctors. (USFP 56.1 P 80; St. Paul 56.1 Resp. P 80.) Claimant No. 16 had injured his back in January 1994 but St. Paul did not question the doctor about the earlier injury or its relation, if any, to the later one. [*34] (Ex. 6 to WRAMSCO Audit Notes, at 3.) St. Paul's claim file did not contain a wage statement for Claimant No. 16, but St. Paul directs the court to the Employer's First Report of Injury, which indicates a gross annual salary of $ 44,855. (*Id.* at 3, SPC1210; USFP 56.1 P 81; St. Paul 56.1 Resp. P 81.) Claimant No. 16 returned to work on February 20, 1995. (St. Paul 56.1 P 31.)

### D. This Lawsuit

As noted, WRAMSCO audited six of the 16 disputed claim files in August 2001. The record is silent as to what transpired between the parties during the following year, but on September 6, 2002, USFP filed suit against St. Paul in the Circuit Court of Cook County, Illinois, alleging breach of contract in connection with 15 workers' compensation claim files. [19] Specifically, USFP claimed that St. Paul mishandled investigations, evaluations, and settlements relating to those files and, as a result, charged USFP excessive and unreasonable premiums. St. Paul timely removed the case to this court on the basis of federal diversity jurisdiction. *28 U.S.C. § 1332.* On October 24, 2002, St. Paul filed its Answer and Counterclaim [*35] alleging breach of contract based on USFP's failure to pay premiums allegedly still owed under the Loss Sensitive Policies. (USFP 56.1 P 26; Counterclaim.) St. Paul amended its counterclaim on May 14, 2003 to reflect that the Loss Sensitive Policies were subject to a "Total Cost Agreement" in addition to the Retrospective Rating and/or Deductible Endorsement. The Amended Counterclaim does not define or explain that new term. (Amended Counterclaim P 4.) Shortly thereafter on June 1, 2003, St. Paul issued USFP a $ 25,636

credit against the previously billed and unpaid premiums for the 1993 to 1994 policy year. (USFP 56.1 P 10; Letter from A. Miller to G. Huennekens of 6/1/03, Ex. 4 to USFP 56.1.) The parties do not explain the specific basis for this credit.

> 19 The court presumes that the "15 workers' compensation and general liability claim files" referenced in the complaint are the same ones reviewed and audited by WRAMSCO.

## F. The Confusion Over Disputed Claims

Though the [*36] Complaint indicated that USFP was disputing 15 claim files, it initially identified only nine such files-Claimant Nos. 3, 4, 8, 10, 11, 12, 13, 15, and 16 -- in answering St. Paul's interrogatories. (*See* Answer and Amended Answer to Supplemental Interrogatories, Exs. B and C to St. Paul's Motion to Strike Expert Report, P 1.) On December 3, 2003, USFP served St. Paul with its expert report from Raymond Wills, identifying seven additional disputed files - Claimant Nos. 1, 2, 5, 6, 7, 9, and 14. St. Paul sought to strike the report for improperly and unfairly raising new claims, but the court denied the motion and instead allowed the parties to conduct additional discovery relating to those files.

St. Paul now seeks summary judgment on USFP's claim that St. Paul breached contractual and fiduciary duties by mishandling the 16 files, and on its amended counterclaim for payment of additional premiums.

## DISCUSSION

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as [*37] a matter of law." *FED. R. CIV. P. 56(c)*. In determining whether there is a genuine issue of fact, the court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*.

St. Paul argues that USFP's claims are barred by the doctrines of account stated and laches, public policy, and the statute of limitations. St. Paul also claims that there is no evidence that it handled the workers' compensation claims in an unreasonable manner, or that its actions caused USFP any injury. USFP argues that St. Paul has waived its affirmative defenses; that those defenses fail in any event; and that genuine issues of fact preclude summary judgment as to the reasonableness of St. Paul's claim handling.

## I. Affirmative Defenses

St. Paul asserts four affirmative defenses to USFP's lawsuit: account stated, laches, public policy, and statute of limitations. USFP argues that St. Paul waived all of these defenses by failing to raise them in its amended answer as required by *FED. R. CIV. P. 8(c)*. *See Brunswick Leasing Corp. v. Wisconsin Central, Ltd., 136 F.3d 521, 530 (7th Cir. 1998)* [*38] ("as a general matter, an affirmative defense that is not timely pleaded is waived"). St. Paul filed an answer to the Complaint on October 24, 2002 and an amended answer on May 14, 2003. Neither of those pleadings raised any affirmative defenses. St. Paul claims that "until U.S. Fire's expert report was filed, St. Paul was generally unaware as to what issues were being raised with respect to the claims St. Paul believed were at issue." (St. Paul Reply, at 2.) [20] According to St. Paul, it could not in good faith have raised any affirmative defenses until "it became clear U.S. Fire was not complaining about the most recent invoice *per se* but about long past invoices." (*Id.*)

> 20 St. Paul's Reply in Support of its Motion for Summary Judgment is cited as "St. Paul Reply, at ."

The chronology here undermines St. Paul's position. USFP submitted its expert report identifying all disputed claim files on December 3, 2003. The court denied St. Paul's motion to strike that report on January 22, 2004, yet [*39] rather than seek leave to file affirmative defenses at that time, St. Paul instead chose to raise them for the first time in this motion for summary judgment, filed on April 23, 2004. Courts have found waiver under similar circumstances. *See Johnson v. Sullivan, 922 F.2d 346, 355 (7th Cir. 1990)* (affirmative defense not raised in initial answer was waived); *MCI Telecommunications Corp. v. Ameri-Tel, Inc., 852 F. Supp. 659, 666 (N.D. Ill. 1994)* (refusing to consider affirmative defenses raised for the first time in responding to a summary judgment motion). The court is not persuaded that St. Paul did not realize USFP was complaining about "long past invoices" prior to filing for summary judgment; to the contrary, in its original Complaint, USFP challenged the handling of workers' compensation claims dating back to the early 1990s and the premiums they generated. Significantly, the nine claim files St. Paul knew to be at issue throughout this case relate to claims from as early as October 1992. Even assuming that the affirmative defenses only became apparent upon receipt of the expert report, moreover, "the appropriate thing for the defendant to do, [*40] of course, was to promptly seek the court's leave to amend [its] answer." *Venters v. City of Delphi, 123 F.3d 956, 967-68 (7th Cir. 1997)*. St. Paul has not explained its failure to do so here.

Nevertheless, waiver is not automatic; courts have allowed parties to raise affirmative defenses at the summary judgment stage where the opposing party has had an opportunity to respond and there is no showing of prejudice from the delay. *Peters v. Northern Trust Co., 1999 U.S. Dist. LEXIS 11179, No. 92 C 1647, 1999 WL 515481, at \*17 (N.D. Ill. July 15, 1999)* (permitting affirmative defense to be raised in motion for summary judgment where the opposing party had an opportunity to conduct discovery on the defenses and craft arguments in response); *Duncan v. Consolidated Freightways Corp., 1995 U.S. Dist. LEXIS 12964, No. 94 C 2507, 1995 WL 530652, at \*5 (N.D. Ill. Sept. 7, 1995)* ("this Court allows affirmative defenses to be introduced in a motion for summary judgment where the plaintiff would not suffer prejudice"). USFP has addressed the merits of the affirmative defenses in responding to St. Paul's motion and has not established any prejudice resulting from the delay. Thus, the court will consider [\*41] the merits of those defenses.

**A. Account Stated**

St. Paul argues that USFP's claims are barred by the doctrine of account stated because it "acquiesced in St. Paul's billings for years and, even when U.S. Fire finally started raising questions, it slept on its rights." (St. Paul Mem., at 1) (citing *La Grange Metal Products v. Pettibone Mulliken Corp., 106 Ill. App. 3d 1046, 436 N.E.2d 645, 62 Ill. Dec. 619 (1st Dist. 1982))*. [21] An "account stated" is "a form of proving damages for a breach of a promise to pay on a contract." *Truserv Corp. v. Flegles Inc., 2004 U.S. Dist. LEXIS 14057, No. 03 C 3284, 2004 WL 1656567, at \*5 (N.D. Ill. July 22, 2004)* (quoting *Dreyer Med. Clinic, S.C. v. Corral, 227 Ill. App. 3d 221, 226, 591 N.E.2d 111, 114, 169 Ill. Dec. 231 (2d Dist. 1992))*. As one court recently explained, an account stated

> determines the amount of a preexisting debt when parties who previously have conducted monetary transactions agree that there truly is an account representing the transactions between them and one party renders a statement of account to another who retains that statement beyond a reasonable amount of time without objection.

*ITQ Lata, LLC v. MB Financial Bank, N.A., 317 F. Supp. 2d 844, 858 (N.D. Ill. 2004)*. [\*42] By retaining the statement of account for an unreasonable time without objection, the receiving party acknowledges that the balance is accurate and due. *Id.* (citing *Motive Parts Co. of America, Inc. v. Robinson, 53 Ill. App. 3d 935, 941, 369*

*N.E.2d 119, 124, 11 Ill. Dec. 665 (1st Dist. 1977))* (an account stated "is merely a final determination of the amount of an existing debt"). Merely sending an invoice does not create an account stated unless the debtor or creditor intends to establish a balance due or a final settlement to date. *Toth v. Mansell, 207 Ill. App. 3d 665, 672, 566 N.E.2d 730, 735, 152 Ill. Dec. 853 (1st Dist. 1990)*.

> 21  St. Paul's Memorandum of Law in Support of its Motion for Summary Judgment is cited as "St. Paul Mem., at   ."

By their terms, the Loss Sensitive Policies allowed St. Paul to recalculate USFP's premiums annually based on losses incurred under the policies. USFP paid St. Paul's invoices reflecting those retrospective premiums until December 1997, at which time it began [\*43] questioning the additional premiums and declined to pay further invoices. St. Paul argues that by making payments under the policies until December 1997, USFP acknowledged that it owed the amounts stated and is now barred from challenging the invoices. (St. Paul Mem., at 2.) USFP argues that none of the invoices constituted a "final" bill as required for an account stated. Indeed, St. Paul issued invoices in 1998, 2000, and 2001 charging USFP additional premiums under the policies. (USFP Resp., at 4.) [22] St. Paul did not finally close the three policies in effect between 10/27/90 and 10/27/93 until sometime after this lawsuit was filed. (USFP 56.1 P 22; Tredinnick Dep., Ex. 15 to USFP 56.1, at 85-87; St. Paul 56.1 Resp. P 24.) St. Paul has yet to close the policy in effect from 10/27/93 to 10/27/94; indeed, in June 2003, well after this lawsuit was filed, St. Paul refunded USFP $ 25,636 paid under that policy.

> 22  USFP's Opposition to St. Paul's Motion for Summary Judgment is cited as "USFP Resp., at   ."

[\*44]  St. Paul has not established, as a matter of law, that its invoices constituted an account stated on any of the Loss Sensitive Policies. St. Paul concedes that the existence of an account stated is a question of fact, *La Grange Metal Products, 106 Ill. App. 3d at 1053, 436 N.E.2d at 651*, but claims that in light of Huennekens's admitted receipt and review of the annual invoices, he "was clearly acquiescing in St. Paul's statement of the account." (St. Paul Mem., at 2.) To the extent each invoice was subject to change the following year, none "rendered certain the amount of a debt for preexisting liability" as required for an account stated. *Toth, 207 Ill. App. 3d at 672, 566 N.E.2d at 735*. Moreover, St. Paul offers nothing to support its theory that USFP retained the invoices for an unreasonable time without objection. "What constitutes a reasonable amount of time within

which to make an objection depends upon the circumstances of the case, the ordinary course of business, and the relationship of the parties." *ITQ Lata, 317 F. Supp. 2d at 858.* Absent any argument on these issues, St. Paul has not demonstrated that it is entitled to [*45] summary judgment on a theory of account stated.

### B. Laches

St. Paul next argues that USFP's claims are barred by the doctrine of laches. Laches is "the neglect or omission to assert a right which, taken in conjunction with a lapse of time and circumstances causing prejudice to the opposite party, will operate as a bar to a suit." *Bill v. Board of Educ. of Cicero Sch. Dist. 99, 351 Ill. App. 3d 47, 54, 812 N.E.2d 604, 610, 285 Ill. Dec. 784 (1st Dist. 2004)* (quoting *Lee v. City of Decatur, 256 Ill. App. 3d 192, 195, 627 N.E.2d 1256, 1258, 194 Ill. Dec. 614 (4th Dist. 1994)).* For laches to apply, a plaintiff must have knowledge of his right but fail to assert it in a timely manner. *Id.* St. Paul claims that USFP "was surely aware of all potential issues [in] this case years ago, during the claim meetings." (St. Paul Mem., at 2.) Without citing any supporting authority, St. Paul insists that an insured always knows a potential claim exists under a retrospective policy, and that the laches doctrine is designed to prevent the inequity that results when "a party recognizing it *may* have a claim . . . simply refuses to look to see if it has a claim." (St. Paul Reply, at 4-5) (emphasis [*46] in original).

USFP insists that it was not aware of its claims against St. Paul until Mr. Wills completed his initial audit on July 24, 1998. (USFP Resp., at 7.) In the court's view, the mere fact that there may always be potential claims under a retrospective policy does not establish that USFP knew prior to July 1998 about the particular claims asserted here, but knowingly "slept" on them. *City of Chicago v. Alessia, 348 Ill. App. 3d 218, 228-29, 807 N.E.2d 1150, 1159, 283 Ill. Dec. 309 (1st Dist. 2004)* (plaintiff who knowingly "slept" on its rights is deemed to have acquiesced to the defendant's actions). Nor is it clear that USFP knew about potential claims against St. Paul at the time each workers' compensation claim was settled or closed. (St. Paul Motion PP 11-18.) [23] St. Paul annually recalculated premiums after the claims settled, and it was those new premium calculations that ultimately prompted USFP to obtain an audit and question the underlying claim handling.

[23]   St. Paul's Motion for Summary Judgment is cited as "St. Paul Motion P    ."

[*47] There is sparse evidence in the record as to what transpired between the parties between July 1998 and the date USFP filed this lawsuit in September 2002. USFP claims that it was attempting to negotiate a settle-

ment with St. Paul, and it does appear that the parties exchanged correspondence and attended meetings to discuss the disputed claims and the possibility of arbitration. (USFP Resp., at 7; Letter from R. Wills to S. Kim of 6/17/99, Ex. 8 to USFP 56.1; Letter from R. Wills to G. Huennekens of 7/20/00, Ex. 13 to USFP 56.1.) In any event, St. Paul has not demonstrated that it was unfairly prejudiced by the delay in filing suit. *See LaSalle Nat'l Bank v. Dubin Residential Communities Corp., 337 Ill. App. 3d 345, 351, 785 N.E.2d 997, 1002, 271 Ill. Dec. 803 (1st Dist. 2003)* ("if the defendant is not injured by the delay, laches is inapplicable") (internal quotations omitted). St. Paul asserts generally that it is unfair for a party to delay its investigation of potential claims until "witnesses are gone, until memories have faded, and otherwise the evidence of all defenses is lost." (St. Paul Reply, at 5; St. Paul Mem., at 2) (citing *Tully v. State, 143 Ill.2d 425, 434, 574 N.E.2d 659, 662-63, 158 Ill. Dec. 546 (1991))* [*48] (Illinois Appellate Court judge who waited a year before challenging statute requiring his automatic retirement was barred from contesting election of another judge to his seat; "while candidates expended considerable time, energy and money on their campaigns, he sat by and did not raise any objection to their candidacy").

As evidence of such prejudice, St. Paul points only to the deposition of USFP President Gregg Huennekens, in which Huennekens often responds to questions with "I don't remember" or "I don't recall." (*Id.*) St. Paul has not explained how Huennekens' failing memory on any specific question has prejudiced St. Paul's ability to defend this lawsuit, and it is not this court's responsibility to wade through the 540-page deposition and speculate as to St. Paul's theory. In addition, as USFP notes, St. Paul was able to file a counterclaim against USFP for amounts due under the same Loss Sensitive Policies. (USFP Resp., at 7) ("equity will not allow St. Paul to bring its own contract claims while barring USFP from asserting its claims"). Absent compelling evidence of prejudice in this case, there is no basis for St. Paul's laches defense.

### C. Public Policy

St. [*49] Paul claims that summary judgment is nonetheless appropriate here because Illinois public policy favors settlement, and "no insurer will settle any claim under a retrospective premium or other loss sensitive policy if the insured can reap the benefit of a settlement but then question the settlement after the fact." (St. Paul Motion P 34.) *See, e.g., Pritchett v. Asbestos Claims Mgmt. Corp., 332 Ill. App. 3d 890, 900, 773 N.E.2d 1277, 1285, 266 Ill. Dec. 207 (5th Dist. 2002)* ("public policy in Illinois favors settlements and dictates that, absent fraud or duress, settlements should be final"). In St. Paul's view, public policy requires that "the review of

an insurer's decision to settle . . . be deferential, and insureds that wish to challenge those decisions should be required to meet a high burden." (St. Paul Reply, at 3.) USFP responds that St. Paul has settled the underlying workers' compensation claims, but has not settled the amount USFP owes in retrospective premiums. In other words, "Illinois public policy does not affect USFP's claim against St. Paul because USFP simply wants its premiums back from St. Paul." (USFP Resp., at 5.)

The Complaint makes clear that USFP is challenging [*50] the premiums generated by St. Paul's alleged mishandling of certain workers' compensation claims. There is no evidence that USFP is seeking to overturn those underlying settlements in this lawsuit and, thus, St. Paul's public policy concerns are without foundation.

### D. Statute of Limitations

St. Paul's final affirmative defense relates solely to the workers' compensation claim filed by Claimant No. 1. St. Paul notes that it settled Claimant No. 1's claim on August 5, 1992, and argues that any attack on that settlement is barred by the applicable ten-year statute of limitations. (St. Paul Motion P 35; St. Paul Mem., at 2.) See 735 ILCS 5/13-206 (setting forth ten-year limitation on contract claims). USFP argues that the statute of limitations does not begin to run until a plaintiff knew or reasonably should have known about a potential claim. (USFP Resp., at 5) (citing Perelman v. Fisher, 298 Ill. App. 3d 1007, 1013, 700 N.E.2d 189, 193, 233 Ill. Dec. 88 (1st Dist. 1998)) (trial court erred in dismissing breach of contract complaint as untimely where there were genuine issues of material fact as to when the plaintiff knew or should have known about the claim). As noted, USFP [*51] claims that it first learned about St. Paul's alleged mishandling of Claimant No. 1's file upon receiving Mr. Wills's audit in July 1998. (Id. at 6.) St. Paul nonetheless insists that USFP should have known of any issues relating to Claimant No. 1 immediately after settlement. St. Paul notes that Huennekens acknowledged at his deposition that he "most likely" learned about the resolution of the claim shortly after it settled, and that he "probably wasn't happy." (Huennekens Dep., at 471, 472.) Yet Huennekens does not recall complaining to St. Paul or taking any other action at that time. (Id. at 472.)

In the court's view, the fact that Huennekens knew about, and was unhappy with, the settlement does not in and of itself establish that he should have known the file was mishandled. At the same time, a jury could reasonably find that Huennekens should have expressed his concerns and made further inquiries into the handling of the file upon learning of the settlement. USFP has raised a genuine issue of fact as to when it should have known about the mishandling of Claimant No. 1's file, and

summary judgment is not appropriate on statute of limitations grounds. See, e.g., Johnstone v. Wabick, 207 F. Supp. 2d 824, 827 (N.D. Ill. 2002) [*52] ("the determination of when the statute of limitations begins to run is ordinarily a question of fact for the jury") (internal quotation omitted); Witherell v. Weimer, 85 Ill.2d 146, 156, 421 N.E.2d 869, 874, 52 Ill. Dec. 6 (1981)).

### II. Breach of Duty

Having determined that St. Paul is not entitled to summary judgment based on its affirmative defenses, the court next considers the merits of USFP's case. Before turning to that issue, however, the court briefly addresses St. Paul's assertion, raised for the first time in its reply brief, that it "does not concede the applicability of Illinois law to all matters in dispute." (St. Paul Reply, at 5.) St. Paul notes that the "Total Cost Agreement-Incurred Loss Basis" for the 1993-1994 policy year expressly provides that Minnesota law governs that agreement. (Id.) St. Paul did not provide the court with a copy of this document but claims, in any event, that "there is no substantial difference between Illinois and Minnesota law on the key points raised in its Motion for Summary Judgment." (St. Paul's Sur-Reply re "Additional Facts," at 7.) Notwithstanding its objection, in challenging USFP's breach of contract claim, St. Paul [*53] cites only one authority, an Illinois decision: National Surety Corp. v. Fast Motor Service, Inc., 213 Ill. App. 3d 500, 572 N.E.2d 1083, 157 Ill. Dec. 619 (1st Dist. 1991). See Siler v. Northern Trust Co., 80 F. Supp. 2d 906, 908 n.3 (N.D. Ill. 2000) ("the parties agree to agree that Minnesota law governs this diversity case by relying almost exclusively on cases decided by Minnesota state courts"). The court will therefore analyze this claim under Illinois law.

### A. Burden of Proof

In Illinois, "a cause of action is stated when an insured sues his insurer for a breach of duty for settling claims in an unreasonable manner when the policy of insurance contains a retrospective premium feature." National Surety, 213 Ill. App. 3d at 506, 572 N.E.2d at 1087. The insured in National Surety, Fast Motor, purchased workers' compensation policies with a retrospective premium feature which, like the one at issue in this case, allowed the insurer to adjust premiums annually based on the insured's prior years' losses. Id. at 502, 572 N.E.2d at 1085. A dispute arose between the parties and National Surety sued to recover premiums allegedly [*54] owed under the policies. Fast Motor filed a counterclaim alleging negligence in the handling of workers' compensation claims but the trial court granted a motion to strike the counterclaim for vagueness. Id. at 502-03, 572 N.E.2d at 1085. Thereafter, Fast Motor filed a separate complaint against National Surety, this time alleging

breach of duty by failing to properly investigate and evaluate claims, and by overreserving and overpaying claims. *Id. at 503, 572 N.E.2d at 1086.* A jury found in favor of Fast Motor and National Surety appealed.

The Illinois Appellate Court noted the long-standing principle that an insurer owes its insured a duty of good faith and fair dealing, and that a cause of action exists when an insurer breaches that duty by wrongfully failing to settle an insurance claim within the policy limits. *Id. at 505, 572 N.E.2d at 1087.* The court held that "likewise, an insured should be able to state a viable cause of action for breach of an insurer's duty of good faith based on the insurer's failure to act reasonably when adjusting claims under a policy of insurance which contains a retrospective premium feature . . . [*55] " *Id.* The court reasoned that under retrospective premium policies, an insured is automatically subject to greater financial obligations in the form of increased premium rates when an insurer fails to act reasonably. *Id.* In reaching this conclusion, the court relied on *Deerfield Plastics Co. v. Hartford Ins. Co., 404 Mass. 484, 536 N.E.2d 322 (1989),* noting with approval the Massachusetts court's holding that once an insured produces evidence that a claim was handled negligently, the burden shifts to the insurer "to prove that the settlement made on the claim did not exceed the highest reasonable amount at which the claim would have probably been settled if it had been investigated properly." *National Surety, 213 Ill. App. 3d at 506, 572 N.E.2d at 1087. See also Liberty Mutual Ins. Co. v. Tribco Constr. Co., 185 F.R.D. 533, 540 (N.D. Ill. 1999)* ("relying on *Fast Motor and Deerfield,* this court believes that Liberty [the workers' compensation insurer] should have the right to prove that the individual settlements were reasonable").

Neither the *National Surety* court nor the *Deerfield Plastics* court sets forth the [*56] type of evidence sufficient to show that a claim was negligently handled and to shift the burden of proof to the insurer. The *Deerfield Plastics* court did, however, instruct that "what might have resulted if the claim had been litigated before the Industrial Accident Board [24] is not significant." *404 Mass. at 485-86, 536 N.E.2d at 323-24.* St. Paul finds it "inconceivable" that USFP can satisfy its initial burden "merely by saying that other things could have been done and, if they had been done, maybe there would have been a better result." (St. Paul Reply, at 5.) USFP has done more than generally assert that St. Paul should have handled the claims differently, however; USFP has produced a detailed expert report explaining the ways in which St. Paul allegedly mishandled each of the 16 claims. St. Paul challenges the qualifications of USFP's expert, a challenge the court addresses below.

24  The Massachusetts Industrial Accident Board is the equivalent of the Illinois Industrial Commission.

## [*57] B. Expert Qualifications

St. Paul argues that USFP's expert report does not support its claim of negligent handling because Mr. Wills is not qualified to provide an expert opinion. St. Paul first notes that Wills is neither an attorney nor a doctor, but he has offered testimony concerning legal and medical issues. (St. Paul Motion PP 111, 112; St. Paul 56.1 PP 62, 64.) This argument is a non-starter. Wills need only be qualified as an expert based on "knowledge, skill, experience, training, or education." *FED. R. EVID. 702.* Wills has worked in the insurance industry for over 25 years and, as Assistant Vice President of WRAMSCO, is involved in risk management, risk retention, risk transfer, and risk finance programs, including claim investigation and management, insurance program and claim audits, underwriting and premium development, and experience modification factor investigation and development. (USFP 56.1 PP 95, 96.) The workers' compensation files do contain medical and legal reports, but that does not render Wills unqualified to assess whether St. Paul's adjusters handled and evaluated the claims properly. As USFP points out, none of those claims adjusters are doctors [*58] or lawyers either. (USFP 56.1 PP 39, 40, 42, 43, 45.)

St. Paul next argues that Wills is not a credible witness, noting that one arbitrator discredited his testimony in another case and that Wills "probably disagree[s with arbitrators] most of the time." (St. Paul 56.1 PP 44, 45; Wills Dep., Ex. G to St. Paul 56.1, at 92-94, 195-96.) St. Paul finds it significant that Wills did not consult with Huennekens regarding the facts and circumstances of the claims; that Wills is not familiar with the demographics of USFP or how its business has changed since 1990; that Wills does not have knowledge pertaining to the sprinkler business; and that no one provided Wills with a legal, medical, or accounting opinion. (St. Paul 56.1 PP 54-58, 66-68.) St. Paul also notes that five petitions have been filed seeking to revoke WRAMSCO's license to handle claims based on allegations of improper claim handling. (*Id.* P 49.) USFP responds that St. Paul's own attorneys and legal expert in this case have retained Wills as an expert witness in at least five other cases. (USFP 56.1 PP 86-92.) In USFP's view, "[if] Mr. Wills is a qualified expert when St. Paul's attorneys and St. Paul's legal expert [*59] need him, then he is no less a qualified expert when someone else retains him." (USFP Resp., at 12.)

All of these arguments merely raise questions of fact as to Wills's credibility, which are best resolved by the trier of fact. *See Morus v. Kapusta, 339 Ill. App. 3d*

*483,492, 791 N.E.2d 147, 155, 274 Ill. Dec. 351 (1st Dist. 2003)* ("testimony offered by expert witnesses is to be judged by the same rules of weight and credibility applied to other witnesses, which are questions of fact for a jury").

## C. Reasonableness

Recognizing that the credibility issue will not support summary judgment in this case, St. Paul insists that its primary argument is that Wills "does not say much" in his expert report. (St. Paul Reply, at 6.) St. Paul argues that Wills has not demonstrated that St. Paul acted unreasonably in handling any of the disputed workers' compensation claims. In St. Paul's view, Wills merely speculates as to what might have happened had St. Paul conducted its investigations differently, which is insufficient to establish an initial showing of negligence. (St. Paul Motion P 41.) The court disagrees. Wills identifies several files where St. Paul purportedly failed to obtain necessary **[*60]** medical reports or statements from the claimants and appropriate witnesses. Wills also claims that with respect to certain files, St. Paul failed to pursue third-party recovery or to investigate an injury worksite where appropriate; improperly calculated claimants' average weekly wages; failed to make proper inquiry into prior injuries and their effect on current injury claims; or failed to properly investigate claimant activities between the date of injury and the date of report. In the court's view, this is sufficient to raise a question of fact as to the reasonableness of St. Paul's claim handling.

St. Paul denies the accuracy of Wills's assertions but has not offered any affirmative evidence proving that it acted reasonably as a matter of law. The mere fact that Wills does not establish that the Industrial Commission would have denied compensation to the individual Claimants does not demonstrate that St. Paul's investigations were thorough or that the settlements it negotiated

were reasonable. *See Deerfield Plastics, 404 Mass. at 485-86, 536 N.E.2d at 323-24* (what might have resulted before the Industrial Commission is "not relevant"). (*See also* St. Paul Motion **[*61]** PP 67, 69, 71, 73, 77, 83, 88, 92, 108.) St. Paul objects that Wills cannot raise a question of negligence by noting the existence of numerous unanswered questions. (*See* St. Paul Motion PP 80, 82, 83, 88, 94, 96, 108.) Again, the court disagrees. Once USFP presented evidence that St. Paul did not gather the information reasonably necessary to resolve a claim, the burden shifted to St. Paul to establish that it did. St. Paul insists that "in not one of the sixteen claims does Mr. Wills explain why any particular act or omission caused U.S. Fire to suffer damages." (St. Paul Motion P 65.) Wills's Audit Report, however, addresses how St. Paul's overvalued settlements led to increased premiums for USFP. At most, St. Paul has raised questions of fact as to the reasonableness of its claims handling and the damages it caused. Summary judgment must therefore be denied.

## III. Counterclaim

Having found genuine issues of fact precluding summary judgment on USFP's Complaint, the court also declines to grant summary judgment on St. Paul's Counterclaim to recover outstanding premium payments.

## CONCLUSION

For the reasons stated above, St. Paul's motion for summary judgment **[*62]** (Docket No. 44-1) is denied.

ENTER:

REBECCA R. PALLMEYER

United States District Judge

Dated: November 19, 2004

# EXHIBIT B

2 of 2 DOCUMENTS

**P.M.C., INC., Plaintiffs, v. SAMUEL EKSTEIN, a/k/a SAMUEL and DONNA EK-STEIN, Defendants.**

No. 91 C 3709

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*1992 U.S. Dist. LEXIS 7306*

**May 13, 1992, Decided
May 14, 1992, Docketed**

**JUDGES:** [*1] NORDBERG

**OPINION BY:** JOHN A. NORDBERG

**OPINION**

### MEMORANDUM OPINION AND ORDER

The plaintiff, P.M.C., Inc. brought a six count complaint seeking a declaratory judgment, injunctive relief and reformation of a lease agreement from this court. PMC's complaint also alleged that the defendants, Samuel and Donna Ekstein breached certain guarantees and that Samuel Ekstein breached his employment contract with PMC. In response, the Eksteins filed a four-count counterclaim, which is the subject of the present motion, alleging that PMC breached the lease agreement, breached the employment contract, and committed fraud and conversion. PMC now moves to dismiss three of the four counts in the Eksteins' counterclaim pursuant to *Rule 12(b)(6) of the Federal Rules of Civil Procedure*.

### STATEMENT OF FACTS

A complaint should not be dismissed for failure to state a claim unless it is clear that the plaintiff could not prove any set of facts which would entitle him to relief. *Hishon v. King & Spalding, 467 U.S. 69, 73 (1984); Conley v. Gibson, 355 U.S. 41, 45-46 (1957).* The court must accept as true all well-pleaded factual allegations and draw all reasonable inferences [*2] in the light most favorable to the plaintiff. *Powe v. City of Chicago, 664 F.2d 639, 642 (7th Cir. 1981).* The court is not, however, required to accept the truth of legal conclusions or opinions disguised as factual allegations. *Briscoe v. La Hue, 663 F.2d 713, 723 (1981).* Accordingly, the factual allegations on which the Eksteins' counterclaim is based are as follows.

In November, 1990, the parties entered into two contractual agreements. The first contract, a three-year lease agreement between the Eksteins (the lessors) and PMC, provided that PMC would lease the property that had been occupied by Midco Packaging Inc., the assets of which PMC had purchased from the First Chicago Bank of Ravenswood at a UCC auction on November 16, 1990. In addition to requiring monthly rental payments, the lease provided that if the Midco business carried on by PMC generated sales exceeding $ 2,000,000, PMC would pay 1% percent of Midco's net sales to the Eksteins as additional rent. Thus, the Eksteins stood to benefit from the maximization of Midco's sales potential.

In the second agreement, a one-year employment contract between the parties, Samuel [*3] Ekstein agreed to act as Midco's general manager, in return for an annual salary of $ 70,000 plus additional compensation equal to 5% of Midco's annual pre-tax net income. The employment contract also included a one-year covenant not to compete which prevented Ekstein from seeking employment with a competitor within one year of the termination of his contract with PMC.

### I. Count I - Action for Breach of Contract

In Count I of their counterclaim, the Eksteins assert that PMC has breached the lease agreement. They allege that PMC has not paid the express rent obligation of the contract since September, 1991. According to the Eksteins, when they filed this action, $ 14,580 in delinquent rents had already accrued; rents continue to accrue on a monthly basis. The Eksteins also allege that PMC breached the implied promise of good faith and fair dealing inherent in all contracts by discontinuing the operation of Midco and, so, depriving them of the benefit of the lease provision providing for additional rent in the event that Midco's net sales exceeded $ 2,000,000. For

**EXHIBIT**

**B**

this alleged breach of the lease agreement, the Eksteins seek both compensatory and punitive damages.

PMC [*4] moves to dismiss this claim, asserting that the Eksteins have attempted to engraft tort concepts onto their lease contract claim. The defendant appears to believe that by seeking punitive damages, which are available in tort, the plaintiffs have transformed their claim based on a breach of the implied convenant of good faith and fair dealing into a tort claim. Because this implied covenant cannot be the basis for a tort recovery, under Illinois law, they seek to dismiss the entire claim.

PMC also contends that the Eksteins improperly joined two theories of recovery in one count of their complaint. An analysis of the counterclaim, in light of Illinois law, demonstrates that they have not done this. Even if they had combined two theories, such as tort and contract, in one count, however, dismissal of that count would not have been inevitable. It is not necessary to separate each distinct legal theory into a separate count so long as the pleadings afford the opposing party fair notice of its claims. *Verlan, Ltd. v. John L. Armitage & Co, 695 F. Supp. 955, 957 (N.D. Ill. 1988)*.

In any event, the Eksteins' counterclaim is based wholly on contract theories. Contrary [*5] to PMC's arguments every contract under Illinois law "implies good faith and fair dealing between the parties." *First Nat'l Bank of Cicero v. Sylvester, 196 Ill. App. 3d 902, 554 N.E.2d 1063, 1069 (1st Dist. 1990)*. "Good faith between the contracting parties requires the party vested with contractual discretion to exercise it reasonably, not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties." *Id.*; *see also Continental Mobile Telephone Co., Inc. v. Chicago SMSA Limited Partnership, 587 N.E.2d 1169 (Ill. App. 1st Dist. 1992)*. The cases cited by PMC, including *Chicago College of Osteopathic Medicine v. George A. Fuller Co., 719 F.2d 1335, 1348 (7th Cir. 1983)*, involve efforts by the plaintiffs to impose tort liability for breach of a duty of good faith. *See also Martin v. Federal Life Insurance Co., 109 Ill. App. 3d 596, 440 N.E.2d 998, 1006 (1st Dist. 1982)*. In this case, by contrast, the Eksteins contend that by ceasing the operation of Midco, PMC breached the implied covenant of good faith, because the element of the rental [*6] payment which was dependent on net sales of Midco necessarily implied a covenant to use best efforts to operate the business and not terminate its operations. This is a contract principle.

The covenant of good faith and fair dealing, however, does not create an independent cause of action. It is an interpretive principle, which "comes into play in defining and modifying duties which grow out of specific contract terms and obligations." *Gordon v. Matthew Bender & Co., Inc., 562 F. Supp. 1286, 1289 (N.D. Ill.*

*1983)*. The contract provision at issue here, P2.2 of the lease agreement reads:

> Additional Rent. In the event that the net sales of the Midco Business Unit of PMC ("Net Sales") exceeds $ 2,000,000 in any calendar year, Lessor shall be entitled to Additional Rent equal to one percent (1%) of the amount by which such Net Sales exceed $ 2,000,000....

The Eksteins imply that this provision required PMC to continue running Midco even in the face of declining sales or impending bankruptcy. Neither P2.2 nor any other lease provision, however, binds PMC to base its decisions regarding Midco on the fact that the Eksteins stood to gain from its sales. [*7] Paragraph P2.2 merely allows the Eksteins a piece of the profit if Midco's sales went above $ 2,000,000. There is, therefore, no basis for an independent contract action premised on the closing of the Midco business.

PMC is also correct in arguing that punitive damages are not recoverable in Count I -- although a motion to strike, rather than a motion to dismiss, would have been the more appropriate vehicle by which to raise the argument. Under Illinois law, a party in breach of contract is required to place the other party in the position in which he would have been had the contract been performed. *Album Graphics, Inc. v. Beatrice Foods Co., 87 Ill. App. 3d 338, 408 N.E.2d 1041, 1049 (1st Dist. 1980)*. Generally, punitive damages are not available because they go beyond merely compensating the nonbreaching party. *Buehler Ltd. v. Home Life Insurance Co., 722 F. Supp. 1554, 1564 (N.D. Ill. 1989); Morrow v. L. A. Goldschmidt Associates, Inc., 112 Ill. 2d 87, 492 N.E.2d 181, 183 (1986)*. This is true even when the alleged breach is willful. *Buehler, 722 F. Supp. at 1564*. As [*8] the court stated in *Album Graphics*, "whether one intentionally, carelessly, or innocently breaches a contract, he is still considered to be in breach of that contract and the extent of his liability is generally the same." *408 N.E.2d at 1050*. Although punitive damages may be available when the alleged conduct constitutes an independent tort such as fraud or oppression, *Buehler, 722 F. Supp. at 1564*, the Eksteins have made no such allegations in their counterclaim.

Therefore, while the plaintiffs have no independent claim for breach of the implied covenant of good faith and fair dealing based on the closing of Midco's operations, and while they have no basis for punitive damages, their simple breach of contract claim for failure to make

rental payments under the lease agreement stands. Accordingly, PMC's motion to dismiss Count I of the Eksteins counterclaim is denied in part and granted in part, and the request for punitive damages is stricken. The Eksteins are given twenty-one days from the date of this opinion to file an amended Count I in conformity herewith.

## II. Count III-Action for Fraud

In Count III of the counterclaim, [*9] the Eksteins aver that PMC, in its capacity as Samuel Ekstein's employer, committed acts of fraud which made it impossible for him to perform his duties as general manager. [1] Subsequently, by letter dated July 10, 1991, PMC terminated his employment. The fraudulent conduct the Eksteins attribute to PMC includes, *inter alia*: (1) closing Midco's operations without notice to him or consultation with him; (2) directing him to refrain from pursuing new orders for Midco; (3) refusing to fill purchase orders secured by him on behalf of Midco; (4) failing to provided him adequate facilities or a sufficient budget to conduct the business; and (5) preventing him, by its representations of continuing his employment, from seeking other employment opportunities. The Eksteins contend that these actions were willful and malicious, and, thus, entitle them to both compensatory damages for contractual breach and punitive damages for fraud.

> 1 Count II of the Eksteins' counterclaim alleges that PMC breached its contractual obligations as the employer of Samuel Ekstein. PMC is not challenging this claim in this motion to dismiss.

[*10] As an initial matter, the Court notes that the Eksteins seek compensatory damages for the alleged breach of the employment contract with PMC in Count II of their counterclaim. They cannot attempt, in Count III, to convert that claim into a tort claim in order to collect punitive damages.

The Eksteins contend that they are not attempting to convert a contract into a tort claim, but that they are claiming fraud in the inducement. Count III of the counterclaim fails to set forth such a claim, however. "Fraud in the inducement must, ordinarily, be founded upon a misrepresentation of fact, and the mere breaking of a promise or an act contrary to an expression of intention does not constitute fraud or warrant the rescission of a contract." *McDonald v. McDonald, 408 Ill. 388, 97 N.E.2d 336, 339 (1951)*. The Eksteins have failed to allege any misstatement of fact which would support their Count III claim.

Moreover, the allegations of Count III do not meet the requirements of *Rule 9(b) of the Federal Rules of Civil Procedure*. Under *Rule 9(b)*, the plaintiff must plead "with particularity" any circumstances constituting the basis for that fraud. Mere conclusory [*11] language which asserts fraud but does not describe the fraudulent conduct, does not satisfy *Rule 9(b). Harris Trust & Savings Bank v. Ellis, 609 F. Supp. 1118, 1123 (N.D. Ill. 1985); see also Robin v. Arthur Young & Co., 915 F.2d 1120, 1127 (7th Cir. 1990)*. In order to constitute a fraud, (1) the representation must be a statement of material fact; (2) the representation must be false; (3) the person making the statement must know that it is false; (4) the person to whom it is made must rely on its truth; (5) it must be made for the purpose of making the person relying on it affirmatively act; and (6) the reliance must lead to the injury alleged. *Chicago College of Osteopathic Medicine, 719 F.2d at 1347; LaScola v. U.S. Sprint Communications, 739 F. Supp. 431, 438 (N.D. Ill. 1990)*.

The allegations in Count III of the Eksteins' counterclaim fail to satisfy these pleading requirements. Accordingly, Count III is dismissed.

## III. Count IV

The fourth and final count of the Eksteins' counterclaim concerns the stopped payment of Samuel Ekstein's last compensation check. The Eksteins allege that, [*12] on June 28, 1991, PMC issued and tendered a payroll check in the amount of $ 3,099.30 but subsequently stopped payment on that check. The Eksteins contend that prior to June 28, 1991, Samuel Ekstein continued to act in his capacity as general manager in reliance on the representation that he would be paid.

PMC moves to dismiss Count IV alleging that the Eksteins are once again seeking tort damages for a breach of contract claim. The Eksteins respond that they have stated a claim for the tort of conversion of services by deception. Count IV has not stated such a claim. Nowhere in Count IV does the word "conversion" even appear. Nor have the Eksteins cited any authority to support the claim that Ill. Rev. Stat., ch. 38, par. 16-3(a), may be the basis for tort recovery under Illinois law.

Accordingly Count IV is dismissed.

**ENTER:**

**JOHN A. NORDBERG**

**United States District Judge**

**DATED: May 13, 1992**

# EXHIBIT C

1 of 1 DOCUMENT

**AMERICAN HARDWARE MANUFACTURERS ASSOCIATION, a Delaware not-for-profit corporation, Plaintiff, vs. REED ELSEVIER, INC., a Massachusetts corporation, et al., Defendants.**

No. 03 C 9421

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

*2005 U.S. Dist. LEXIS 30260*

November 29, 2005, Decided
November 29, 2005, Filed

**SUBSEQUENT HISTORY:** Motion granted by *Am. Hardware Mfrs. Ass'n v. Reed Elsevier, 2006 U.S. Dist. LEXIS 49220 (N.D. Ill., July 6, 2006)*

**PRIOR HISTORY:** *Am. Hardware Mfrs. Ass'n v. Reed Elsevier, Inc., 2005 U.S. Dist. LEXIS 15678 (N.D. Ill., July 28, 2005)*

**COUNSEL:** [*1] For American Hardware Manufacturers Association, a Delaware not-for-profit corporation, Plaintiff: William Patrick Farrell, Jr., Gordon B. Nash, Jr., Michael Anthony Nicolas, Scott Jared Fisher, Gardner Carton & Douglas LLP, Chicago, IL.

For Reed Elsevier, Inc., a Massachusetts corporation, Defendant: Michael I. Rothstein, Daniel I Konieczny, Jon Jeffrey Patton, Karina H. DeHayes, Mary Beth Wynn-Smith, Tabet DiVito & Rothstein, LLC, Chicago, IL; Benjamin J. Randall, Randall & Kenig LLP, Chicago, IL.

For Reed Exhibitions, a division of Reed Elsevier, Inc., Defendant: Michael I. Rothstein, Daniel I Konieczny, Jon Jeffrey Patton, Tabet DiVito & Rothstein, LLC, Chicago, IL; Benjamin J. Randall, Randall & Kenig LLP, Chicago, IL.

For Association Expositions & Services, a division of Reed Elsevier, Inc., Defendant: Michael I. Rothstein, Daniel I Konieczny, Jon Jeffrey Patton, Tabet DiVito & Rothstein, LLC, Chicago, IL.

For Freeman Decorating Company, an Iowa corporation, Freeman Decorating Services, Inc., a Texas Corporation also known as The Freeman Companies, Defendants: Anthony Joseph Carballo, Aren Lance Fairchild, Garry L Wills, Freeborn & Peters, Chicago, IL.

For [*2] William P. Farrell, Sr., Third Party Defendant: Gordon B. Nash, Jr., Scott Jared Fisher, Gardner Carton & Douglas LLP, Chicago, IL.

For Timothy S Farrell, Counter Defendant: William Patrick Farrell, Jr., Gordon B. Nash, Jr., Michael Anthony Nicolas, Scott Jared Fisher, Gardner Carton & Douglas LLP, Chicago, IL.

For Reed Elsevier, Inc., a Massachusetts corporation, Counter Claimant: Mary Beth Wynn-Smith, Tabet DiVito & Rothstein, LLC, Chicago, IL.

For William P. Farrell, Sr., Counter Defendant: Michael Anthony Nicolas, Gardner Carton & Douglas LLP, Chicago, IL.

**JUDGES:** JAMES B. MORAN, Senior Judge, U. S. District Court.

**OPINION BY:** JAMES B. MORAN

**OPINION**

MEMORANDUM OPINION AND ORDER

Plaintiff American Hardware Manufacturers Association (AMHA) brought this action against defendants Reed Elsevier and two of its divisions, Reed Exhibitions and Association Expositions & Services (collectively "Reed"), and Freeman Decorating Co. and Freeman Decorating Services, Inc., (collectively "Freeman"), alleging thirteen counts, including fraud, conspiracy, breach of contract and violation of the Lanham Act.

EXHIBIT

C

Reed and Freeman filed motions to dismiss, which the court granted in part and denied [*3] in part. *See American Hardware Manufacturers Association v. Reed Elsevier, Inc., 2004 WL 3363844, 2004 U.S. Dist. LEXIS 28007 (N.D. Ill. 2004)* (AHMA). [1] Reed has now moved for summary judgment on Counts IX and X of its counterclaim and its second affirmative defense. Freeman joins Reed's motion for summary judgment, and seeks to dismiss the civil conspiracy claim. For the following reasons the motion for summary judgment is denied.

1    In this ruling the court denied the motion to dismiss Count I (fraud); dismissed in part Count II (Illinois Consumer Fraud and Deceptive Business Practices Act) against Reed, and in whole against Freeman; denied the motions to dismiss Count III (conspiracy); dismissed in part Count IV (breach of fiduciary duty); dismissed in part Count V (breach of contract); denied Reed's motion to dismiss Count VI (unjust enrichment), but granted Freeman's motion to dismiss that count; dismissed in part Count XI (tortious interference with prospective economic advantage and contractual relationships); and denied the motion to dismiss Count XII (accounting).

[*4] BACKGROUND

The factual background is taken from the parties' statements of fact submitted pursuant to Local *Rule 56.* AHMA is a non-profit trade association serving the hardware and home improvement industry, and it consists of manufacturer members, manufacturing representatives and trade publications. Reed owns and operates trade shows around the world. In 1977, AHMA and Reed entered into an agreement ("show agreement") concerning the operation of the National Hardware Show, a major convention and trade show. Pursuant to the show agreement, the Hardware Show was sponsored and conducted by AHMA and managed by Reed. Paragraph 11(a) of the agreement provided that Reed would not conduct, sponsor or manage any trade show primarily related to hardware, lawn, garden or home improvement products, anywhere in the United States. [2]

2    Paragraph 11(a) states:

Prior to the termination of this Agreement, neither [Reed] nor any Controlled Corporation, as below defined, shall conduct, sponsor or manage a trade exposition, other than the [Hardware Show], in the United States which primarily relates to hardware, lawn, garden and/or home improvement prod-

ucts. [AHMA] hereby acknowledges that [Reed] has produced, and may continue to produce in the future, a Building and Construction Exposition and Conference, approval for which is hereby granted by [AHMA].

Def. ex. E at 10.

[*5] Through the years, the Hardware Show enjoyed general success as attendance levels grew and revenues increased, until around 2001, when rented exhibit space began to decline. AHMA believed that the negative trend was caused by excessive fees charged to exhibitors by Freeman, the show's general contractor. Freeman allegedly increased fees to exhibitors in order to compensate for free services that it provided to Reed. AHMA asked Reed to discontinue its cost-shifting practice and accept bids from contractors other than Freeman, but Reed refused. [3] Due to parties' fundamental disagreements regarding the show's operation, they decided to end their quarter-century business relationship.

3    The court previously noted that at the heart of AHMA's complaint are "allegations that Reed made secret arrangements with Freeman, resulting in plaintiff receiving less revenue than it was due, exhibitors paying higher prices for their exhibiting costs, and attendance at the hardware show declining sharply." *AHMA, 2004 U.S. Dist. LEXIS 28007, 2004 WL 3353844, *3.*

[*6] On February 17-18, 2003, Reed and AHMA met and discussed the termination of their relationship, and on February 26, 2003, they executed an agreement known as the separation agreement. The separation agreement terminated the 1977 show agreement effective August 16, 2003. Since that date was after the 2003 Hardware Show, the terms of the show agreement remained in full force through the 2003 Hardware Show. The separation agreement also contained a release provision, under which AHMA discharged Reed from liability for actions taken before but not after February 26, 2003. [4] The release is central to the parties' dispute because AHMA claims that, prior to February 26, 2003, Reed violated the terms of the show agreement. For Reed to face liability for those alleged violations, AHMA must defeat the release provision. It attempts to do so by claiming that Reed fraudulently induced its acceptance of the terms in the separation agreement, including the release provision.

4    The release provision sets forth:

AHMA on behalf of itself and its affiliates and their respective officers, directors, employees, agents, predecessors, successors and assigns, hereby releases, covenants not to sue and forever discharges Reed and its affiliates and their respective officers, directors, employees, agents, predecessors, successors and assigns from any and all claims, demands, damages, losses, obligations, liabilities, costs, expenses (including, without limitation, attorney's fees), causes of actions, debts, contracts, torts, covenants, fiduciary duties, responsibilities, suits and judgments, at law or in equity, of every nature and kind that AHMA and its affiliates and their respective officers, directors, employees, agents, predecessors, successors and assigns have, may have had, or may have in the future against Reed and its affiliates and their respective officers, directors, employees, agents, predecessors, successors, and assigns whether known or unknown, for any and all matters, including, without limitation, all matters relating to, arising out of or in connection with the operation, management or conduct of the Show, the Show Agreement or otherwise related to the Show Agreement, for the period from the beginning of time through the date hereof; provided however, except as set forth in paragraph c. of this Section 7, nothing herein is intended to or shall be construed to affect or limit the liability or obligation of Reed and its affiliates and respective officers, directors, employees, agents, predecessors, successors and assigns, if any, to AHMA pursuant to the terms of this Agreement or under the Show Agreement, with respect to acts or omissions occurring after the date hereof.

Def. ex. D at 8-9.

[*7] AHMA initially claimed that Reed induced its consent to the separation agreement by "misrepresenting its intent (1) to conform with the show agreement's restriction on managing competing shows, (2) to refrain from using AHMA's trademark other than to promote the 2003 hardware show, and (3) to cease the practice of cost-shifting at the 2003 show." *AHMA, 2004 U.S. Dist. LEXIS 28007, 2004 WL 3363844, *5.* The court held that AHMA failed to state a promissory fraud claim based on the latter two alleged misrepresentations, but that it did state a claim based on Reed's statements that it would not sponsor competing trade shows. *Id. 2004 U.S. Dist. LEXIS 28007, at *6.* Reed's motion for summary judgment focuses on MacDonald's statements regarding the allegedly competing trade shows -- the Midwest Builders Show (Builders Show), International Security Conference (Security Show) and Home Automation Show.

According to AHMA, prior to and during negotiations for the separation agreement, Dennis MacDonald, Senior Vice-President of Reed, assured William Farrell, President of AHMA, that Reed would comply with the show agreement and not conduct any trade show that competed with the Hardware Show. Farrell became concerned about Reed's [*8] relationship with the show on January 13, 2003, after he received an e-mail advertising the Builders Show. The e-mail stated that the show was "brought to you by" Reed Business Information, a division of Reed (plf. facts PP 7, 17). The website for the show listed Reed Business Information as a presenter (*id.* at P 8; def. ex. 7). AHMA states that it began to investigate Reed's involvement in other shows that possibly competed with the Hardware Show after it received the January 13, 2003, e-mail. AHMA ultimately identified the Security Show and Home Automation Show as competing shows (plf. facts PP 34, 35). On January 27, 2003, Farrell asked MacDonald "to provide any information relating to Reed's affiliation with the Builders Show so that we may determine whether Reed's involvement violates paragraph 11(a) of the Show Agreement" (def. ex. O). MacDonald then asked Tom Fagan, a Reed employee, to see whether the Builders Show competed with the Hardware Show (def. ex. A, P 44), and Fagan concluded that it did not compete (*id;* def. ex. B, P 10). On February 4, 2003, MacDonald informed Farrell that the Builders Show "does not fall within the description contained in paragraph 11(a) [*9] of our 1977 agreement. FYI . . . Reed Business Information is simply exchanging promotional support for this local event" (def. ex. P). This e-mail drew a prompt response from Farrell, who asked MacDonald to define "exchanging promotional support," and noted that Reed's role appeared "to be tantamount to sponsorship of the show," in violation of the show agreement (def. ex. Q). The record contains no indication that MacDonald responded to Farrell's request for clarification.

During the February 17 and 18 meeting, Farrell expressed his concerns about Reed's involvement in the Builders Show (*id.* at P 24). AHMA states that Farrell and MacDonald discussed in detail Reed's involvement in the Security Show and Home Automation Show, and Reed denied that these shows violated the show agreement (plf. facts PP 36, 37; def. ex. A P 10). At the meeting, AHMA emphasized the importance of Reed's compliance with the Show Agreement, particularly paragraph 11(a) (plf. facts P 41). MacDonald asserted that Reed was in compliance with the show agreement because no show competed with the Hardware Show (def. ex. A PP 10, 13). The Builders Show took place on March 18-21, 2003, less than three weeks [*10] after the separation agreement was signed (plf. ex. 6-7), and the Security Show and Home Automation Show were held less than a week later, on March 25-28, 2003 (*id.* ex. 14).

Reed does not deny that it was involved in the shows. It argues that its role in those shows did not violate the separation agreement because the shows did not compete with the Hardware Show, in violation of the show agreement. In support of that claim, Reed contends that AHMA knew of the Builders Show, Security Show and Home Automation Show prior to signing the separation agreement, and that it did not assert that they were competing events. According to Reed, MacDonald believed that the shows did not compete and that his statements concerning the nature of the shows were not knowingly false. Reed also argues that AHMA's reliance on MacDonald's statements was not reasonable because of its prior knowledge of the shows and the express integration clause in the separation agreement. Reed further contends that the integration clause renders irrelevant any pre-contractual statements not expressly memorialized in the contract. Freeman joins Reed's claim that the separation agreement is valid, and it also argues [*11] that it was released from liability when AHMA released Reed. AHMA counters, and argues that it has created a genuine issue of fact as to the validity of the separation agreement, and that even if the release was enforceable, it does not extend to Freeman.

DISCUSSION

Summary judgment is proper when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *FED R. CIV. P. 56(c).* We do not make credibility determinations or weigh evidence when ruling on a summary judgment motion. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).* Indeed, it is error to make credibility determinations at the summary-judgment stage. *Morfin v. City of E. Chicago, 349 F.3d 989, 999 (7th Cir. 2003).* Our only task is to "decide, based on the evidence of record,

whether there is any material dispute of fact that requires a trial." *Waldridge v. American Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994).* "There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict [*12] for that party." *Anderson, 477 U.S. at 249.* Facts and inferences are construed in the light most favorable to plaintiffs, the nonmoving parties. *Darnell v. Thermafiber, Inc., 417 F.3d 657, 659 (7th Cir. 2005).*

The issue is whether the separation agreement can be enforced. If it can, then the release and covenant not-to-sue provisions bar AHMA's action as it relates to Reed's conduct prior to February 26, 2003. AHMA could be liable for breaching the terms of the separation agreement, and the indemnification provision would also come into play.[5] But AHMA may proceed with its action if the separation agreement is invalid.

5   The Separation Agreement requires AHMA to:

> indemnify, save and hold Reed harmless from and against any and all costs and expenses (including reasonable auditors' fees and attorneys' fees), losses, liabilities, obligations, damages and lawsuits or other proceedings arising out of or resulting from (i) any breach of any representation, warranty or covenant made by AHMA in this Agreement; (ii) any liability expressly assumed by AHMA pursuant to this Agreement.

Def. ex. D a 13.

[*13] To prevail on its promissory fraud claim, AHMA must prove the following elements of common law fraud: "(1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; (5) plaintiff's damages resulting from reliance on the statement." *Davis v. G.N. Mortg. Corp., 396 F.3d 869, 881-82 (7th Cir. 2005)* (quoting *Capiccioni v. Brennan Naperville, Inc., 339 Ill. App. 3d 927, 791 N.E.2d 553, 558, 274 Ill. Dec. 461 (Ill. App. 2d Dist. 2003))*; *Shanahan v. Schindler, 63 Ill. App. 3d 82, 379 N.E.2d 1307, 1316, 20 Ill. Dec. 239 (Ill. App. 1st Dist. 1978).* Whether these elements are present is an issue of fact. *See Washington Courte Condo. Association-Four v. Washington-Golf Corp., 267 Ill. App. 3d 790, 643 N.E.2d 199, 216, 205 Ill. Dec. 248 (Ill. App. 1st Dist. 1994).*

Promissory fraud exists when a party communicates an intent to perform future conduct when he does not actually intend to carry out that promise. *Houben v. Telular Corp.*, 231 F.3d 1066, 1074 (7th Cir. 2000); [*14] *Bower v. Jones*, 978 F.2d 1004, 1011 (7th Cir. 1992) (quoting *Concord Indus., Inc. v. Harvel Indus. Corp.*, 122 Ill. App. 3d 845, 849-50, 78 Ill. Dec. 898, 462 N.E.2d 1252 (Ill. App. 1st Dist. 1984)) (promissory fraud occurs when "'a party makes a promise of performance, not intending to keep the promise but intending for another party to rely on it, and where the other party relies on it to his detriment.'"). However, promissory fraud involves more than a broken promise. *McDonald v. McDonald*, 408 Ill. 388, 97 N.E.2d 336, 339 (Ill. 1951). A misrepresentation of intent to perform future conduct, even if made without a present intent to perform, is not actionable unless it is part of a pattern of fraudulent acts, known as a scheme to defraud. *Lillien v. Peak6 Invs., L.P.*, 417 F.3d 667, 671 (7th Cir. 2005); *Speakers of Sport, Inc. v. ProServ, Inc.*, 178 F.3d 862, 866 (7th Cir. 1999); *Weeks v. Samsung Heavy Indus. Co.*, 126 F.3d 926, 942 (7th Cir. 1997); *Desnick v. American Broad. Cos.*, 44 F.3d 1345, 1354 (7th Cir. 1995). A scheme to defraud may exist when there is a string [*15] of broken promises, particularly egregious broken promises that occur in close proximity to the promises. *Bower*, 978 F.2d at 1012. Because promissory fraud "is easy to allege and difficult to prove or disprove," it is disfavored in Illinois and the burden on the plaintiff claiming promissory fraud is "deliberately high." *Id.*

The parties' arguments primarily turn on the first, second and fourth elements of fraud. The false statements involve MacDonald's assertions that Reed was not violating and did not intend to violate the show agreement. [6] The second element focuses on MacDonald's belief in the veracity of his statements, and necessarily blends with the first element. The fourth element relates to the reasonableness of AHMA's reliance on MacDonald's statements. Prior to discussing the content of MacDonald's pre-contractual statements, we must first discuss whether they may be considered.

6    As noted above, AHMA initially based its fraud claim on three separate grounds, and only the allegations that Reed promised to comply with the show agreement survived the motion to dismiss. One of the two grounds that was dismissed was AHMA's claim that Reed promised to stop its practice of cost-shifting. We held that "too much time elapsed between promise and breach for the court to infer fraudulent intent" (*AHMA, 2004 U.S. Dist. LEXIS 28007, 2004 WL 3363844, *6*). AHMA may not bolster its promissory fraud claim with reference to Reed's allegedly false promises not to cost-shift, because

those alleged misrepresentations failed to state a promissory fraud claim. This is true regardless of whether the court struck AHMA's cost-shifting allegations. Since we have held that a promissory fraud claim based on allegations relating to cost-shifting failed to state a claim, AHMA cannot now re-raise that basis in its response to Reed's summary judgment motion.

[*16] We first note that there are no apparent admissibility issues concerning MacDonald's statements. [7] Reed argues that AHMA cannot rely on any precontractual statements that do not appear in the separation agreement because that agreement contains an integration clause, which provides:

> This Agreement and the exhibits attached hereto embody the entire agreement and understanding of the parties with respect to the transactions contemplated hereby and supersede all prior or contemporaneous written or oral commitments, arguments or understandings with respect thereto.

(def. Ex. D. P 13). Reed principally relies on *Barille v. Sears Roebuck & Co.*, 289 Ill. App. 3d 171, 682 N.E.2d 118, 224 Ill. Dec. 557 (Ill. App. 1st Dist. 1997), which, according to Reed, held that promises of future conduct omitted from an expressly integrated written contract cannot be reasonably relied on as a matter of law. AHMA ripostes that the integration clause does not preclude it from reasonably relying on MacDonald's statements, and cites *Vigortone AG Prods., Inc. v. PM AG Prods., Inc.*, 316 F.3d 641 (7th Cir. 2002). AHMA also claims that MacDonald's promises were not of [*17] future conduct, but instead of present fact.

7    A party may not rely on inadmissible hearsay to resist summary judgment. *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996). But statements by MacDonald arc statements of a party opponent. They are therefore admissible under *Fed. R. Ev. 801(d)(2)(D)*, and can be considered on summary judgment. *See Davis*, 396 F.3d at 874 n.3.

In *Barille*, the plaintiff claimed that the defendant's misrepresentations induced her into signing an employment contract to serve as an insurance agent for the defendant. The defendant argued that the merger clause in the contract made it unreasonable for the plaintiff to rely on prior oral representations. *Barille*, 682 N.E.2d at 122. The court noted that "statements regarding future events are not a basis for fraud," unless "the misrepresentation is

alleged to be the mechanism by which the party making that representation intended [*18] to defraud." *Id. at 123.* The court then relied on the doctrine of merger to bar the introduction of any statements not contained in the contract. [8] *Id.*

> 8   The contract provided that "it is the complete and exclusive statement of the agreement between you and the Company, and that it supersedes all proposals, oral or written, and all other communication between you and the Company relating to the subject matter of this Agreement." *Barille, 682 N.E.2d at 122.*

In *Vigortone*, the defendant made several oral assertions concerning the market risks of a business transaction with the plaintiff. *Vigortone, 316 F.3d at 643.* The defendant argued that the integration clause barred the plaintiff from relying on any pre-contractual oral assertions to establish fraud. The court disagreed with the plaintiff, noting that the "general rule is to the contrary" because unlike a breach of contract claim, a claim asserting fraud is not constrained by the parol evidence rule. *Id.* According [*19] to the court, an integration clause is relevant only in contract interpretation disputes, and serves no role when the claim is whether the contract was induced by fraud. *Id.* The court noted the absence of analysis in *Barille*, and cited an Illinois appellate decision contrary to its outcome. *Id.* (citing *Salkeld v. V.R. Business Brokers, 192 Ill. App. 3d 663, 139 Ill. Dec. 595, 548 N.E.2d 1151, 1157-58 (Ill. App. 2d Dist. 1989)*). If parties seek to bar fraud claims, the court observed, the proper course is to insert no-reliance clauses in the contracts. We have already determined that the relevant clause here resembles an integration clause and not a non-reliance clause. *AHMA, 2004 U.S. Dist. LEXIS 28007, 2004 WL 3363844, *7-8.*

Reed claims that *Salkeld* is distinguishable because it deals with false statements of then-existing facts. In *Salkeld*, the court rejected the defendant's claim that the plaintiff could not rely on pre-contractual statements because of the doctrine of merger. *Id. at 1157.* The defendant made representations about what type of assistance he would give plaintiff, that a product was selling well, and other representations about a product [*20] that the plaintiff eventually licensed from the defendant. The court concluded that the plaintiff reasonably relied on the defendant's untrue statements that, taken together, "painted a picture of a company which would 'be with plaintiff every step of the way.'" *Id. at 1158.* This observation deals with promises of future conduct, not merely present statements of fact.

According to Reed, the court should rely on *Barille* and not *Vigortone* because the former dealt with promissory fraud, but the latter dealt with misrepresentations of

fact. However, both cases dealt with false statements made by defendants before the contracts were signed, and plaintiffs relied on those statements. Further, the defendants in each case claimed that the integration clauses in the contracts rendered the plaintiffs' reliance on the statements unreasonable. Moreover, the characterization of the statements at issue does not alter the nature of AHMA's fraud claim, a tort action that is not affected by the parol evidence rule or integration clauses. *See Vigortone; W.W. Vincent & Co. v. First Colony Life Ins., Co., 351 Ill. App. 3d 752, 814 N.E.2d 960, 968, 286 Ill. Dec. 734 (Ill. App. 1st Dist. 2004)* [*21] ("The parol evidence rule, as a doctrine of contract law, has no application to cases sounding in tort."); *Astor Chauffeured Limousine v. Runnfeldt Inv., 910 F.2d 1540, 1546 (7th Cir. 1990)* ("claims of fraud in the inducement are not blocked by the parol evidence rule"). The cases do not draw the distinction that Reed attempts to delineate. False promises of future conduct that form a scheme are at the heart of promissory fraud claims. AHMA contends that Reed's fraudulent inducement renders the contract a nullity. To hold that an integration clause in a fraudulently induced contract precludes a fraud-based challenge to the contract is illogical and would also provide a blueprint for defrauding parties to shield their wrongdoing. *See J.C. Whitney & Co. v. Renaissance Software Corp., 2000 U.S. Dist. LEXIS 6180, *32 (N.D. Ill. 2000).*

Reed's reference to *Rissman v. Rissman, 213 F.3d 381, 383 (7th Cir. 2000)*, is unavailing because that case turned on a non-reliance clause, not an integration clause. The difference between the two clauses is significant. A non-reliance clause precludes a party from claiming reliance on prior statements. [*22] *Rissman* does not stand for the broad proposition that parties may not base fraud claims on pre-contractual oral statements. Indeed, in a concurring opinion in *Rissman*, Judge Rovner anticipated the claim Reed now marshals, when she stated: "I write separately merely to avoid the inevitable quotes in future briefs characterizing our holding as an automatic rule precluding any damages for fraud based on prior oral statements when a non-reliance clause is included in a written agreement." (*Id. at 389*, Rovner, J, concurring.) Reed's reliance on *Tirapelli v. Advanced Equities, Inc., 351 Ill. App. 3d 450, 813 N.E.2d 1138, 286 Ill. Dec. 445, 813 N.E.2d 1138 (Ill. App. 1st Dist. 2004)*, fails for the same reason. In *Tirapelli*, the court rejected the plaintiff's fraud claim in light of a non-reliance clause in the contract. *Id. at 1143.* The court distinguished *Salkeld* and *Vigortone* on the grounds that they involved contracts containing integration but not non-reliance clauses. *Id. at 1145.* The separation agreement contains an integration clause and clearly falls on the side of *Salkeld* and *Vigortone*, not *Rissman* and *Tirapelli*. [*23]

The reasoning in *Barille* has been rejected by state and federal courts, and we will not adopt its rationale to bind AHMA's tort action by the strictures of contract law. *See Tricontinental Indus. Ltd. V. Anixter*, 215 F. Supp. 2d 942, 950 (N.D. Ill. 2002) (holding that Barille did not apply when the plaintiff alleged fraud). Thus, we may consider MacDonald's statements and determine whether there are any material issues of fact relating to the reasonableness of AHMA's reliance on those statements.

Reasonableness of AHMA's Reliance

Reed also challenges AHMA's reliance on MacDonald's statements, and claims that it was unreasonable for a number of reasons. To determine whether AHMA reasonably and Justifiably relied on MacDonald's representations, we must consider all the facts that AHMA knew, and the facts that it could have learned through the exercise of ordinary prudence. *Cozzi Iron & Metal, Inc. v. U.S. Office Equip., Inc.*, 250 F.3d 570, 574 (7th Cir. 2001). Whether reliance is reasonable is a question of fact. *Davis*, 396 F.3d at 882; *Firstar Bank, N.A.v. Faul Chevrolet Inc.*, 249 F. Supp. 2d 1029, 1045 (N.D. Ill. 2003); [*24] *Schrager v. North Community Bank*, 328 Ill. App. 3d 696, 767 N.E.2d 376, 386, 262 Ill. Dec. 916 (Ill. App. 1st Dist. 2002). However, the reasonableness of a party's reliance "can be determined as a matter of law when no trier of fact could find that it was reasonable to rely on the alleged statements or when only one conclusion can be drawn." *Cozzi*, 250 F.3d at 574.

The record before the court is not extensive, and consists primarily of affidavits and printouts from websites. Reed objects to AHMA's reliance on affidavits, specifically the affidavit submitted by Farrell, on the grounds that they are self-serving. Most affidavits are self-serving, which alone "does not permit a district judge to denigrate a plaintiff's evidence when deciding whether a material dispute requires trial." *Wilson v. McRae's, Inc.*, 413 F.3d 692, 694 (7th Cir. 2005). A court should disregard an affidavit if it contradicts prior sworn testimony in an attempt to manufacture genuine issues of material fact. *See United States v. Funds in the Amount of $ 30,670.00*, 403 F.3d 448, 466 (7th Cir. 2005). The affidavits AHMA has submitted support [*25] its position, and in this sense they are self-serving in the same manner that MacDonald's affidavit serves Reed's cause. But they do not contradict prior statements; we do not disregard them as sham affidavits. Neither do the affidavits lack any factual support in the record. *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 925 (7th Cir. 2004) ("It is true that self-serving statements in affidavits *without factual support in the record* carry no weight on summary judgment")(emphasis in original). Affidavits should be used with caution when determining issue of intent. But affidavits may be sufficient to make intent a disputed fact, which requires that summary judgment be denied. *Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Stop Treaty Abuse-Wisconsin, Inc.*, 991 F.2d 1249, 1260-61 (7th Cir. 1993).

Prior to signing the separation agreement Farrell sought assurances from MacDonald that Reed was not violating the show agreement, and that it did not plan to violate the agreement. As set forth above in the factual background, Farrell expressed to MacDonald AHMA's concerns regarding Reed's participation in the Builders Show, the Security [*26] Show and the Home Automation Show. With respect to the Builders Show, MacDonald told Farrell that Reed was only exchanging promotional support with the Builders Show and was not a sponsor. Farrell sought additional information on the meaning of "exchanging promotional support," and he also mentioned a subsequent phone conversation with MacDonald, who recalls no such conversation (plf. facts PP 21, 22). The record does not show that the parties ever settled on the precise parameters of Reed's involvement with the Builders Show, but it is clear that MacDonald represented that Reed was not violating the show agreement. It is also evident that MacDonald did not tell Farrell that Reed had a sponsorship contract with the Builders Show (*see* plf. ex. 9), even though he knew it existed (def. ex. B PP 12-13). Reed claims that it was a presenter, which it contends is not the same as a sponsor (def. ex. A P 49).

At the February 17-18 meeting, MacDonald again assured Farrell that Reed was not violating the show agreement, and had no intention of doing so by conducting competing shows prior to the termination date (def. ex. A P 12). AHMA emphasizes that it relied on MacDonald's representations, [*27] and would not have signed the separation agreement if Reed did not promise to comply with the show agreement and not participate in the competing shows. The parties vigorously dispute what was said during the meetings regarding Reed's involvement with the other trade shows. According to Farrell, MacDonald assured him that Reed did not sponsor the Builders Show, and that Reed would comply with the show agreement with respect to the Security Show and Home Automation Show (plf. ex. 1 PP 48, 54, 58). In stark contrast, MacDonald claims that he only briefly discussed these matters with Farrell and did not concede that Reed's involvement with any of the three trade shows violated the show agreement (def. ex. W PP 10-11). This is a situation where the competing affidavits create issues of fact as to what the parties actually said.

Reed argues that the sponsorship contract between Reed and the Builders Show is irrelevant because AHMA did not rely on MacDonald's denial of sponsorship. Paragraph 24 of AHMA's statement of additional

facts states that at the February 17-18 meeting "Farrell raised the issue of Reed's involvement in the Builders Show and reiterated AHMA's concern that Reed's involvement, [*28] sponsorship or not, violated the terms of the paragraph 11(a) of the Show Agreement." Farrell states that MacDonald denied Reed's sponsorship of the Builders Show, and stated that it had never been a sponsor and that it did not intend to ever be a sponsor (plf. ex. 30 Kan. 114, 1 P 47). But, according to MacDonald, there was only a brief conversation and it touched on the focus of the Builders Show, rather than Reed's involvement with that show (def. ex. W P 11). The statement that Reed's involvement concerned AHMA, "sponsorship or not," docs not accurately represent the affidavits, which only convey that Farrell expressed "AHMA's concern that Reed's involvement violated the terms of paragraph 11(a) of the Show Agreement" (plf. ex. 30 Kan. 114, 1 P 47; 2 P 15). But this discrepancy does not submarine AHMA's assertion, or the relevance of the contract between Reed and the Builders Show. In addition to barring sponsorship, paragraph 11(a) also prohibited Reed from managing and conducting a competing trade show. The content of the sponsorship contract between Reed and the Builders Show, taken with the parties' disparate versions of what was said between MacDonald and Farrell, [*29] creates issues of fact regarding the nature of Reed's involvement with the Builders Show, regardless of the designation "sponsorship contract."

Reed also contends that AHMA's reliance on MacDonald's statements is not reasonable because those statements do not appear in the separation agreement. The separation agreement is silent as to the specific competing shows, but it speaks directly to the broader proposition that Reed would not conduct any competing shows in violation of the terms of the show agreement. This is not a case where the written documents reveal the truth, and the prior oral statements contradict the writings. See AstorChauffeured Limousine v. Runnfeldt Inv., 910 F.2d 1540, 1545 (7th Cir. 1990). AHMA claims that MacDonald told Farrell that Reed was not violating the show agreement and did not intend to violate the show agreement. The separation agreement includes the show agreement and it reflects MacDonald's pre-contractual promises to abide by the show agreement. The prior oral statements and the separation agreement are thus consistent.

According to Reed, AHMA claims that MacDonald made "Show Cancellation Promises," but it is just as easy to [*30] label MacDonald's statements "Promises to Abide by the Show Agreement," which are consistent with the terms of the separation agreement. The latter depiction is more accurate because Farrell did not only ask Reed to cancel the Midwest Builders Show, Security Show and Home Automation Show. Instead, he inquired

whether those shows violated the show agreement. Indeed, in the February 6, 2003, letter to MacDonald, Farrell wrote: "Simply comply with the terms of the Show Agreement between the Execution Date and the Effective Date and the issue will be moot" (plf. ex. 12). Here, the broader proposition to not violate the show agreement encompasses the narrower ground, to not participate in specific shows that competed with the Hardware Show. [9] To the extent that MacDonald's promises echo the show agreement, and thus anticipate the separation agreement, they are material and relevant, unlike the collateral pre-contractual statements made in Seward v. B.O.C. Div. of General Motors Corp., 805 F. Supp. 623, 631 (N.D. Ill. 1992). Thus, Reed's proposition that it is unreasonable to rely on pre-contractual oral representations when there is an express integration clause is not [*31] persuasive.

> [9]  This observation is consistent with our prior finding that "provisions in the separation agreement support representations that Reed would not participate in a competing trade show during the term of the show agreement." AHMA, 2004 U.S. DisT. LEXIS 28007, 2004 WL 3363844, *8.

Reed further argues that AHMA's reliance was not reasonable because it could have discovered through an independent investigation that Reed was not complying with the show agreement. Reed specifically contends that between February 17 and 26, 2003, AHMA could have investigated whether Reed actually cancelled the trade shows. Here the manner in which Reed characterizes AHMA's argument is relevant. As mentioned above, Farrell did not only ask MacDonald to cancel competing shows, he requested compliance with the show agreement. After viewing AHMA's argument in a more accurate light, the persuasiveness of MacDonald's criticism of AHMA's failure to investigate dwindles. Had MacDonald told Farrell that the shows competed with the Hardware Show, [*32] and that Reed would cancel the competing shows, then AHMA's failure to ensure that the competing shows were actually cancelled would be difficult to accept as reasonable conduct. But, according to MacDonald, he represented that the shows did not compete.

A party may rely on another's representations without conducting an independent investigation when the party does not possess the same ability to discover truth as the party making the representations. Schrager, 767 N.E.2d at 386. Reed and not AHMA had the sponsorship contract. When courts find a party's reliance to be unreasonable, it is often the case that the party had the truth presented to it in a contract, which it failed to read and instead relied on pre-contractual assertions. See Davis, 396 F.3d 869; Cozzi, 250 F.3d at 574-75 ("As long as the complaining party could have discovered the fraud by

reading the contract and had the opportunity to do so Illinois courts have refused to extend the doctrine of fraudulent inducement to invalidate contacts."). According to AHMA, it relied on the pre-contractual representations in large part because the separation agreement (and [*33] specifically the show agreement) did not contradict those promises. In this vein, nothing in the separation agreement set off alarms, warning of the falsehoods contained in MacDonald's prior misrepresentations.

AHMA could have asked the Builders Show directly for details of its relationship with Reed, but that independent investigation seems beyond necessary in light of MacDonald's assertion that there was no sponsorship relationship and no violation of the show agreement. Farrell did inquire about the other shows, and the party most likely to know whether he should be concerned told him not to worry. *Astor, 910 F.2d at 1550.* The parties dispute the implications of the sponsorship contract, but resolution of that dispute depends on other circumstances that have not been fully presented, which renders summary judgment improper. *Schrager, 767 N.E.2d at 387.*

In addition to arguing that AHMA's reliance was unreasonable because of what it did not know, but could have learned through an independent investigation, Reed also claims that AHMA's reliance was unreasonable based on what it actually knew. According to Reed, AHMA's reliance on MacDonald's statements [*34] is unreasonable because Reed informed AHMA on three occasions that it was involved in the Security Show. After several organizational and personnel changes within Reed, Farrell requested from MacDonald an outline of MacDonald's duties and an organizational chart (def. facts PP 52-53; def. ex. J). Farrell specifically noted that MacDonald appeared to be responsible for the "Securities Show" (def. ex. J). MacDonald replied and explained that he recently assumed responsibility for the securities shows after the office that previously managed them closed (def. ex. K). Reed states that AHMA also learned of Reed's involvement with the Security Show in 1998, when Reed proposed that the Security Show and Home Automation Show be co-located with the Hardware Show (def. facts P 56; def. ex. N). In the co-location proposal, Reed described the events, exhibitors and attendees at the Security Show and Home Automation Show (def. ex. L). The products included "Motion Detectors, CCTV equipment, Alarm Monitoring Equipment, Electronic Access Control, Home Theater and Lighting Controls" (*id.*). The proposal also noted that only five out of the three thousand Hardware Show exhibitors participated in [*35] the Security Show and Home Automation Show. The attendees are described as professional tradesmen (*id.*). The parties did not adopt Reed's co-location proposal, but AHMA never suggested that the Security Show competed with the Hardware Show or

violated the Show Agreement (def. facts P 65). Finally, at a 2001 AHMA Show meeting attended by Mac-Donald, a calendar listing Reed's worldwide trade shows, including the Security Show, was distributed (def. facts P 66). Turning to AHMA's knowledge of the Builders Show, Reed points to Farrell's January 27, 2003, letter as proof that AHMA knew about the show and therefore could not reasonably rely on MacDonald's representations that the Builders Show did not compete with the Hardware Show. In response, AHMA denies that it knew Reed regularly participated in the Security Show (plf. ex. 30 Kan. 377, 1 P 104), and emphasizes MacDonald's representation that Reed did not sponsor the Builders Show (*id.* at PP 48-49).

Reed thus claims that AHMA's knowledge indicates that AHMA did not believe the shows competed, and that its reliance on MacDonald's statements was unreasonable. The fact that AHMA failed to raise immediate objections [*36] upon learning that Reed was conducting other shows, does not itself make AHMA's reliance unreasonable. Reed is a worldwide leader in the trade show industry, so AHMA should not have been surprised to learn that it was involved with other trade shows. No details concerning the nature of the Security Show accompanied MacDonald's brief mention of the event in 1995 and 1998. At the February 17-18 meeting, Mac-Donald allegedly represented that the Security Show did not compete with the Hardware Show. Thus, despite knowing that Reed was involved in the Security Show, AHMA did not have any reason to suspect that it competed with the Hardware Show by being primarily related to hardware, lawn, garden and/or home improvement products. With respect to the Builders Show, AHMA knew that Reed was involved with the show but it did not know about the sponsorship contract.

Reed cites *Dixie-Portland Flour Mills v. Nation Enterprises, 613 F.Supp. 985 (C.D. Ill. 1985)* and *Peterson Indus., Inc. v. Lake View trust and Savings, 584 F.2d 166 (7th Cir. 1978)* in support of its claim that AHMA's reliance was unreasonable because it knew about the shows. But in those cases, the [*37] plaintiffs' fraud claims failed because after completing independent investigations they discovered facts directly contrary to the representations the defendants made to them. *See Dixie-Portland, 613 F. Supp. at 990; Peterson Indus., 584 F.2d at 168.* AHMA's investigation consisted of looking at Reed's websites, and specifically at the web pages related to the Builders Show, Security Show and Home Automation Show (plf. ex 1 P 42; plf. ex 2 P 10). Based on this information, Farrell believed that the shows were primarily related to hardware, lawn, garden and/or home improvement products (plf. ex. 1 P 43). It was obvious to Farrell that Reed was involved with the shows, but he did not know whether Reed's participation violated the terms

of the show agreement (*id.* at P 44). Farrell then communicated with MacDonald, who, according to Farrell, assured him that there was no violation and that Reed would not participate in any competing shows.

Making all reasonable inferences in AHMA's favor, AHMA engaged in a limited investigation that raised its suspicions, which MacDonald then allayed. Illinois [*38] law clearly states that "if you ask the defrauder point blank, you need not investigate further." *Ash v. Georgia-Pacific Corp., 957 F.2d 432, 436 (7th Cir. 1992).* Yet, a party is reckless if it closes its eyes to a known risk and proceeds in the face of a manifest danger. *AM-PAT/Midwest, Inc. v. Illinois Tool Works, Inc., 896 F.2d 1035, 1042 (7th Cir. 1990).* AHMA may have held lingering doubts in connection with Reed's involvement in competing shows after Farrell and MacDonald communicated in early February. However, AHMA sought to eliminate those doubts during the February 17-18 meeting, when it asked Reed to confirm its adherence to the show agreement, MacDonald allegedly told Farrell that Reed would not participate in the Builders Show (plf. facts P 33), and that Reed would make necessary scheduling changes for the Security Show and Home Automation Show (plf. facts P 40). MacDonald denies making those statements (def. ex. W PP 13, 18), and also asserts that Farrell never claimed that the Security Show competed with the Hardware Show (def. ex. A. P 41). AHMA was entitled to trust the word of its bargaining partner. *AMPAT/Midwest, 896 F.2d at 1042.* [*39] After asking Reed point-blank if it was violating the show agreement, AHMA did not need to embark on additional investigation or "dig beneath apparently adequate assurances." *Id.* Further, seeking assurances at the February 17-18 meeting is inconsistent with recklessly, or worse, intentionally, disregarding a manifest risk that Reed violated and intended to continue violating the show agreement.

AHMA has produced evidence that creates a genuine factual dispute as to whether Reed was violating the show agreement with the Builders Show, Security Show and Home Automation Show when MacDonald assured Farrell the contrary was true, and that he was planning to conduct competing shows in violation of the show agreement during negotiations for the separation agreement. It was reasonable for AHMA to not insist on naming the specific shows in the contract when MacDonald assured Farrell that those specific shows did not compete. In this sense, the omission of the specific shows supports AHMA's claim of reliance in that if it did not rely on and believe MacDonald's representations, then it would have insisted upon specific mention of the Builders Show, Security Show and Home Automation Show [*40] in the separation agreement.

**Falsity of the Statements**

Having found that AHMA could reasonably rely on MacDonald's statements, and that there exists a genuine issue of material fact as to the reasonableness of AHMA's reliance, we now consider whether there are any material disputes concerning the veracity of MacDonald's statements. At issue are MacDonald's representations about the nature of the Builders Show, Security Show and Home Automation Show, and, specifically, statements regarding the products displayed, exhibitors and attendees.

Pursuant to paragraph 11(a) of the show agreement, Reed promised not to participate in any show that primarily related to hardware, lawn, garden, and/or home improvement products. Emphasizing the term "primarily," Reed argues that a show does not violate the show agreement if it merely contains some hardware, lawn, garden and/or home improvement products. According to Reed, the Security Show focused on security systems and devices, such as retina scanners and infrared cameras, and the Builders Show targeted the residential home building industry by offering products sold directly to building and remodeling contractors. Reed characterizes [*41] the attendees of the Hardware Show to be buyers for or suppliers to retail outlets, but depicts the attendees for the Security Show to be security professionals and custom installers of security equipment (def. facts P 45). Reed claims that the attendees at the Builders Show included residential home building executives, tradespeople involved in home building, lenders to the housing industry, legal professionals specializing in real estate, and similar parties who focus in the housing industry (*id.* at P 79). In response, AHMA contends that whether or not the Builders Show, Security Show or Home Automation Show primarily related to hardware, lawn, garden and/or home improvement products is a question that should not be determined on summary judgment based on the limited record before the court.

Reed describes the attendees at the Builders Show to be, "Builders, Remodelers, Land Planners, Architects, Landscape Architects, Engineers, Purchasing Agents, IT Specialists, Consultants, Suppliers, Distributors and others" (def. ex. C P 8). According to AHMA, these categories also comprise the Hardware Show audience (plf. facts. P 49). The 2003 Hardware Show visitor profile includes hardware [*42] stores, home centers, builders, remodelers, contractors, architects, designers, manufacturing representatives, importers/exporters, wholesalers, and distributors (plf. ex. 17). Reed argues that the 2003 visitor profile is limited because it begins with the phrase, "Retailers include" (*see* plf. ex. 17), which reinforces its position that the focus of the Hardware Show was the retail market. Even though the visitor profile begins with the description "retailers include," which

arguably characterizes the succeeding categories as "retailers," the Hardware Show and Builders Show still share a number of categories. Further, it is difficult to depict several categories, such as builders, remodelers and architects, as retailers, which militates against using the phrase "Retailers include," to limit the scope of the Hardware Show to the retail market. Reed also contends that the shows do not compete because the products exhibited targeted different markets.

In contrast to Reed's position, AHMA views the products displayed at the Security Show, Home Automation Show and Builders Show to constitute hardware and home improvement products. With respect to the Builders show, AHMA also contends [*43] that building products make up a major portion of products exhibited at the Hardware Show, and in support it highlights several exhibits attached to Reed's motion. It first points to Reed's calendar of events, which describes the Hardware Show as "the leading showcase for the complete spectrum of home improvement and building products and services" (def. ex. H). Next, the official directory and buyer's guide for the 2003 Hardware Show lists "Building Products" as one of seven product categories (def. ex. F at 5). AHMA also highlights a presentation given by MacDonald that addressed concerns in the buildings products segment (plf. facts. P 63). AHMA further contends that MacDonald agreed that the Builders Show primarily related to hardware and home improvement products (plf. facts P 30). But MacDonald denies that he ever made such a concession (def. ex. W P 12). Reed does not dispute that the Hardware Show has included a building supplies category for decades (plf. facts P 59), but claims that the building supplies are retail products in the retail distribution chain that are sold at retail (def. resp. to plf facts P 60).

Reed's citations to the affidavits of MacDonald and Peter Schwartz, [*44] CEO of the Home Builders Association of Greater Chicago, do not show that the Hardware Show is unequivocally retail-oriented, and fail to demonstrate that there is no possible competition with the Builders Show. It is true that Farrell describes the Hardware Show's principal audience in terms of retailers seeking to identify innovative products for their consumers (def. ex. F at 5). But this only affirms that the Hardware Show focused on retailers. It does not preclude the attendance of non-retailers who also attended the Builders Show, or the display of products that were also exhibited at the Builders Show. Moreover, the retail/non-retail distinction should not overshadow the central issue of whether the Builders Show primarily related to hardware, lawn, garden and/or home improvement products. In sum, there are material issues of fact as to whether the Hardware Show and Builders Show competed, and thus

whether Reed's participation in the Hardware Show violated the show agreement.

Prior to discussing whether the Security Show and Home Automation Show compete, we must first determine if they are separate shows. Reed contends that the Home Automation Show was merely a pavilion in [*45] the Security Show, not a distinct show. The 2003 Security Show directory supports that claim (see def. ex. G at 27). However, Reed also states that the Home Automation Show was co-located with the Security Show (see plf. ex. 14; def. mem. at 2 n.2). Reed defines co-location as "an industry term. It refers to the running of separate trade shows at the same time and in the same general geographic location" (def. ex. A P 31). Reed's definition thus creates an issue of fact as to whether the Home Automation Show was actually a separate show. At this stage, without additional information as to the precise nature of a pavilion, [10] it is improper to group the Home Automation Show with the Security Show. Still, the two shows may be discussed in the same context because much of Reed's promotional material discusses the shows together, and conclusions drawn from this material with respect to one show necessarily implicates the other.

> 10    In his affidavit MacDonald states that he does not consider pavilions to be separate trade shows or expositions, and defines a pavilion as "an organization of like technologies, products, or services organized in a common area within a trade show or exposition" (def. ex. W P 46). This definition alone is insufficient, especially in light of Reed's explanation that co-location involves the combining of separate shows in a single space. Moreover, even if the Home Automation Show is not a separate show, and is instead a component of the Security Show, this fact alone would not mean that the Security Show does not compete with the Hardware Show.

[*46] Turning first to the Security Show, AHMA claims that the focus of the show, residential and commercial security products, primarily relates to home improvement products. It also finds that the Security Show and Home Automation Show shared attendees with the Hardware Show. We note that, similar to the Builders Show, AHMA claims that during the February 17-18 meeting MacDonald did not dispute that the Security Show and Home Automation Show primarily related to home improvement products (plf. facts. P 39). But MacDonald asserts that he never agreed to AHMA's characterization of the shows (def. ex. W P 16).

The addition of security equipment in a home would improve the home by making it safer, but this does not necessarily mean that retina scanners are home improvement products. "Home improvement" is an am-

biguous term, and we are not prepared to settle on a final and concrete definition that will likely constrain rather than guide this matter in the future. If the products at the Security Show and Home Automation Show could be categorized as home improvement products, then those shows likely competed with the Hardware Show. The record does not show that residential and commercial security [*47] products could not be home improvement products. Product categories at the Hardware Show included Home Security, Personal Security, and Safety products. Those groups were, however, subcategories within broader categories (Electrical Lighting, Housewares, and Hardware, respectively) (def. ex. F at 209). We cannot determine, based on the record, whether or not the products exhibited at the Hardware Show were sufficiently similar to products at the Security Show, but the similarity in name is sufficient to create issues of material fact.

In support of its claim that the Home Automation Show primarily related to home improvement products, AHMA points to a seminar held at the 2005 Hardware Show that was entitled "Home Improvement through Automation" (plf. ex. 38). The description for that seminar begins: "Home automation is a growing market in the home improvement industry" (id.). This is strong evidence in favor of finding that the Home Automation Show is primarily related to home improvement products, but the seminar AHMA highlights was from the 2005 Hardware Show, and thus has limited relevance to the 2003 show. Moreover, in support of its claim that the product categories in the [*48] Home Automation Show and Hardware Show were identical, AHMA references the home page for the 2002 Security Show that was held in Orlando (plf. ex. 16). The information on the website is not relevant absent any verification that the product categories at the 2002 Orlando show were the same as those in the 2003 Security Show held in Las Vegas.

Comparing the Hardware Show directory with the directory for the Security Show and Home Automation Show reveals many differences in products exhibited. But the issue does not turn on whether the products were different. Instead, the relevant inquiry is whether the Security Show and Home Automation Show primarily related to the home improvement industry. Substantial similarities in products exhibited could lead to an affirmative answer, whereas significant differences might yield the opposite. The analysis is more complicated than simply comparing "tile grout coating, tile care products [and] drywall tools" (def. ex. F at 107) and "rope hammocks, fabric bed hammocks in two-point, full swing design, and four-point lounge designs (id. at 38) from the Hardware Show with "X-ray security screening systems and metal detectors" (def. ex. G at 168) [*49] and "wireless systems for the security, access control and personal emergency reporting markets" (id. at 172) from the Security Show and Home Automation Show. Several exhibitors at the Home Automation Show offered products and services that seem primarily related to home improvement products. [11]

> 11    See def. ex. G at 62 (Beam Industries: "World-leading central vacuum system manufacturer"); id. at 140 (Hayden Industries: products necessary to finish a home for central vac.); id. at 200 (OnQ Technologies: "new products for home networking, home entertainment, home management, and home infrastructure."); and id. at 220 (Russound: audio/visual and connectivity products for the residential systems market).

With respect to the attendees, the 2003 visitor profile for the Security Show specifies the broad target audience as security dealers/installers and end-users of residential security and commercial equipment. That group includes architects/architectural engineers, builders, business owners, [*50] electrical contractors, locksmiths, HVAC consultants, safety managers, financial managers, and other industry professionals (plf. ex. 14). [12] These groups share similarities with the attendees at the 2003 Hardware Show (compare plf. ex. 14 with plf. ex. 17). Whether these similarities evidence competition between the shows is impossible to determine based on the record in its current state. We can only glean so much from website printouts and affidavits. Those submissions do, however, demonstrate a factual dispute as to whether, under the terms of the show agreement, the shows competed. Empirical data related to the actual attendees and exhibitors at the shows, as well as a more comprehensive listing of the products exhibited, will help determine if there was actual competition based on whether Reed's shows were primarily related to hardware, lawn, garden and/or home improvement products. [13]

> 12    The visitor profile for the 2006 Security Show (plf. ex. 32) is by itself not relevant.
> 13    For example, AHMA's exhibits 20-21 provide data that explain who attended the Hardware Show, both in terms of retailers and non-retailers, and also specific categories within those two groups. These exhibits show that non-retailers comprised the majority of attendees. For 2002, 45,514 non-retailers attended and 15,199 retailers attended. And for 2003, there were 11,007 non-retailers and 5,776 retailers. We note that Reed objects to these exhibits as misleading, based on its impression that several of the business categories, such as manufacturers' representatives and wholesalers and distributors in the non-retail group were actually "part of the retail distribution channel" (def. ex. W P 46). In addition to the am-

biguity of "retail distribution channel," we also observe that the Hardware Show attendee registration form specifically categorizes manufacturers' representatives and wholesalers and distributors as non-retailers (plf. ex. 22). Ultimately, we hesitate to rely on exhibits 20-21, absent additional foundation, but still highlight them here to illustrate useful empirical data that will help resolve whether the shows actually competed.

[*51] Scheme to Defraud

AHMA must also show that Reed's misrepresentations were part of a scheme to defraud. Courts have not settled on a standard definition for the scheme-to-defraud element. However, promissory fraud has been held actionable "only if it either is particularly egregious or, what may amount to the same thing, it is embedded in a larger pattern of deceptions or enticements that reasonably induces reliance" *Desnick, 44 F.3d at 1354*. Thus, a single promise will not support a promissory fraud claim unless it is particularly egregious. In *Luttrell v. Wyatt, 305 Ill. 274, 137 N.E. 95, 98 (Ill. 1922)*, the court found promissory fraud based on "a number of false representations" that induced the plaintiff's reliance. The word "scheme" also suggests that the defendant must possess a pre-existing intent to defraud. See Roger L. Price & Mark L. Johnson, *Understanding the Scheme to Defraud" Exception to Promissory Fraud in Illinois*, 90 ILL. B.J. 536, 538 (2002) (identifying pre-existing intent to defraud as an element of a promissory fraud claim). Drawing on *Desnick*, we believe that a scheme to defraud is evidenced by a [*52] pattern or number of coordinated falsehoods or misrepresentations that are made with an intent to deceive and which ultimately induce reliance.

AHMA contends that MacDonald's statements were part of a scheme to defraud because MacDonald knew that Reed sponsored the Builders Show and that its involvement with the Security Show and Home Automation Show violated the show agreement. According to AHMA, MacDonald stated that Reed would comply with the show agreement after AHMA asserted that it would not sign the separation agreement without Reed's compliance (plf. facts PP 43, 45).

Making all reasonable inferences in AHMA's favor, the record shows that MacDonald represented on several occasions to Farrell that Reed was in compliance with the show agreement, and that it did not intend to violate the agreement. On February 4, 2003, MacDonald told Farrell that Reed only exchanged promotional support with the Builders Show. During the February 17-18 meetings AHMA alleges that MacDonald repeatedly asserted Reed's present and future compliance with the show agreement. MacDonald denies he conceded that

any show competed with the Hardware Show, or that he agreed to make any changes to Reed's exhibition [*53] calendar. The competing affidavits create disputes that require credibility determinations, which we cannot make at the summary judgment stage.

MacDonald's statements were not mere puffery, but were instead statements of fact relating to existing contractual obligations under the show agreement. Viewing the record in the light roost favorable to AHMA, there is a genuine factual dispute as to whether MacDonald promised to comply with the show agreement, when he knew that Reed was not in compliance with the agreement and that it intended to continue violating the agreement. In *Stamatakis Indus., Inc. v. King, 165 Ill. App. 3d 879, 881-82, 520 N.E.2d 770, 117 Ill. Dec. 419 (Ill. App. 1st Dist. 1987)*, a scheme to defraud was present when the defendants repeatedly promised to comply with a contract requiring that he buy equipment when he knew that he could not pay for the equipment. Similarly, there is a genuine factual dispute whether Reed promised not to conduct competing shows when those shows were actually in the works. MacDonald made the false statements in order to secure a release for the violations that he said did not exist. MacDonald's misrepresentations were [*54] thus part of a larger scheme, and may be characterized as "stations on the way to taking [AHMA] to the cleaners." *Desnick, 44 F.3d at 1354-55*.

Knowledge of the False Statements

AHMA must also show that MacDonald actually knew that his statements were false, or were made with reckless disregard as to their truth. MacDonald's knowledge that his statements were false is implied in the finding that a scheme to defraud exists (to the extent necessary to survive the summary judgment motion). MacDonald acknowledges that he "did generally discuss that the Show Agreement would continue until August 16, 2003, that the parties would not conduct competing shows before that time, that Reed intended to comply with the Show Agreement, and that Reed had no intention of improperly competing" (def. ex. A 12). MacDonald knew of the sponsorship contract with the Builders Show, but did not disclose it to Farrell. Fraudulent intent can be inferred because MacDonald did not disclose this important fact and decided instead to report that Reed was only exchanging promotional support with the Builders Show. Ultimately, considering the factual disputes that have already been discussed, [*55] the contents of MacDonald's mind and the genuineness of his beliefs are factual matters that cannot be resolved at this stage.

In the amended complaint, AHMA directed three of the thirteen counts against Freeman. The court dismissed two of the three counts against Freeman, and now only

the conspiracy count (Count III) remains. In its motion to dismiss, Freeman argues that the conspiracy claim is based on acts or omissions leading up to the separation agreement, and that when AHMA released Reed, it also released Freeman. The ruling on Reed's motion to dismiss did not reach Freeman's argument, and Freeman has again raised its release argument by joining Reed's motion for summary judgment. Freeman contends that the release of a joint tortfeasor releases all other joint tortfeasors for the same injury. AHMA counters that it did not excuse Freeman's conduct because Freeman is not specifically mentioned in the separation agreement. AHMA further contends that there is a genuine issue of material fact as to the validity of the release. On the latter front AHMA is correct, and a ruling on whether the release extends to Freeman would be premature.

## CONCLUSION

For the foregoing reasons, [*56] the motion for summary judgment is denied.

JAMES B. MORAN

Senior Judge, U. S. District Court

Nov. 29, 2005.

# EXHIBIT D

1 of 1 DOCUMENT

**JADA TOYS, INC., Plaintiff and Counter-Defendant, v. CHICAGO IMPORT, INC., Defendant and Counter-Plaintiff.**

**Case No. 07 C 699**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*2008 U.S. Dist. LEXIS 29286*

**April 10, 2008, Decided**
**April 10, 2008, Filed**

**COUNSEL:** [*1] For Jada Toys Inc, a California corporation, Plaintiff, Counter Defendant: David F. Wentzel, LEAD ATTORNEY, Daniel Paul Derechin, Wentzel Law Offices, Chicago, IL.

For Chicago Import Inc, an Illinois corporation, Defendant, Counter Claimant: Ronald R. Rassin, LEAD ATTORNEY, Susan A. Stoddard, Gordon & Rappold LLC, Chicago, IL; Michelle S. Tamkin, Haney Buchanan and Patterson, Los Angeles, CA; Steven H. Haney, Attorney at Law, Los Angeles, CA.

**JUDGES:** GERALDINE SOAT BROWN, United States Magistrate Judge.

**OPINION BY:** GERALDINE SOAT BROWN

**OPINION**

**MEMORANDUM OPINION AND ORDER**

In an earlier oral ruling, the court denied the motion of Plaintiff/counter-defendant Jada Toys, Inc. ("Jada") to dismiss Count I of the Amended Counterclaim filed by Defendant/counter-plaintiff Chicago Imports, Inc. ("Chicago Imports"). [Dkt 67.] [1] The portion of the motion seeking to dismiss Count II of the Amended Counterclaim was taken under advisement. Discovery proceeded, and new counsel appeared for Jada. [Dkt 74.] This opinion rules on Jada's motion to dismiss Count II.

1 Chicago Imports had filed its initial counterclaim earlier [dkt 41], but after Jada moved to dismiss that counterclaim [dkt 44, 46], Chicago Imports sought leave to file an [*2] Amended Counterclaim, which the court allowed [dkt 52, 56, 57].

Count I of the Amended Counterclaim alleges that Jada breached an oral agreement to sell toy cars to Chicago Imports at the same prices Jada was selling the toys to distributors in New York and California. (Am. Countercl. P 10.) Count II alleges fraud in the inducement of that agreement. Specifically, Chicago Imports alleges that Jada's representative Jack Lee stated, in a conversation in Chicago in 1999, that Jada would sell the cars to Chicago Imports at the same prices, but that Mr. Lee's statement was part of a scheme to defraud because Jada never intended to carry out that promise. (Am. Countercl. PP 8, 10, 16, 18, 20.)

Jada first argues that Count II should be dismissed because it is not pled with the requisite specificity. (Jada's Mem. Law at 9-10.) [Dkt 61] Fed. R. Civ. P. 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." That means that a complaint alleging fraud must provide "the who, what, when, where, and how. . . ." *DiLeo v Ernst & Young, 901 F.2d 624, 627 (7th Cir. 1990).* [*3] Count II satisfies that requirement.

Jada's main argument, however, is that Count II fails to state a claim because it fails to sufficiently allege the "scheme to defraud" required by Illinois law for a claim of promissory fraud. [2] (Jada's Mem. Law at 10-13.) Chicago Imports alleges, in a conclusory way, that Jada's representation that it would sell cars to Chicago Imports at the same prices it was selling to others "was part of a scheme to defraud." (Am. Countercl. P 20.) It also alleges that from 1999 to 2006, Chicago Imports entered into a series of agreements to buy toys from Jada in reliance on that representation. (*Id.* PP 22, 23.) Thus, it alleges one representation and a series of acts over seven years in reliance on that representation. The issue is

**EXHIBIT**

**D**

whether that is sufficient to allege a "scheme to defraud" under Illinois law.

2   The parties agree that Illinois law governs Count II. (Jada's Mem. Law at 10; Chicago Imports' Resp. at 9 [dkt 63].)

Under Illinois law, misrepresenting an intention to perform future conduct, even if made without a present intention to perform, does not constitute fraud. *HPI Health Care Servs. v. Mt. Vernon Hosp., Inc.*, 131 Ill. 2d 145, 545 N.E.2d 672, 682, 137 Ill. Dec. 19 (Ill. 1989) [*4] (citations omitted). However, Illinois has recognized an exception to that rule. Under that exception, such promises are actionable if "the false promise or representation of future conduct is alleged to be the scheme employed to accomplish the fraud." *Id.* (citations omitted). Thus, under Illinois law, the promise must be part of a scheme to defraud in order to state a claim for promissory fraud. ³

3   The Illinois Supreme Court recently reinforced the fact that Illinois law does not recognize fraud as the making of a promise that one does not intend to keep. *Avery v. State Farm Mut. Auto. Ins. Co.*, 216 Ill. 2d 100, 835 N.E.2d 801, 844, 296 Ill. Dec. 448 (Ill. 2005). In that case, which involved the Consumer Fraud Act, the court stated, quoting an earlier decision by an Illinois appellate court:

> What plaintiff calls "consumer fraud" or "deception" is simply defendants' failure to fulfill their contractual obligations. Were our courts to accept plaintiff's assertion that promises that go unfulfilled are actionable under the Consumer Fraud Act, consumer plaintiffs could convert any suit for breach of contract into a consumer fraud action. . . . We believe that a "deceptive act or practice" involves more than the mere fact that [*5] a defendant promised something and then failed to do it. That type of "misrepresentation" occurs every time a defendant breaches a contract.

*Id.* (quoting *Zankle v. Queen Anne Landscaping*, 311 Ill. App. 3d 308, 724 N.E.2d 988, 992-93, 244 Ill. Dec. 100 (Ill. App. 2nd Dist. 2000)). Although *Avery* involved the Consumer Fraud Act, it emphasizes the law in Illinois that a simple

failure to fulfill contractual obligations does not constitute fraud.

The distinction between a false promise and a *scheme* of promissory fraud is elusive and has caused considerable uncertainty, as many courts have acknowledged. *See, e.g., Desnick v. American Broadcasting Cos., Inc.*, 44 F.3d 1345, 1354 (7th Cir. 1995) (citing cases). While some courts suggest that the exception has swallowed the rule, others appear unwilling to apply the exception. *Id.; Bower v. Jones*, 978 F.2d 1004, 1011 (7th Cir. 1992). As the *Desnick* court noted:

> The distinction certainly is unsatisfactory, but it reflects an understandable ambivalence, albeit one shared by few other states, about allowing suits to be based on nothing more than an allegation of a fraudulent promise. There is a risk of turning every breach of contract suit into a fraud suit, of circumventing the limitation [*6] that the doctrine of consideration is supposed however ineptly to place on making all promises legally enforceable, and of thwarting the rule that denies the award of punitive damages for breach of contract. A great many promises belong to the realm of puffery, bragging, "mere words," and casual bonhomie, rather than to that of serious commitment.

*44 F.3d at 1354.*

In terms of deciphering what is meant by "scheme to defraud," the Seventh Circuit has held that promissory fraud is actionable "if it is either particularly egregious or, what may amount to the same thing, it is embedded in a larger pattern of deceptions or enticements that reasonably induces reliance and against which the law ought to provide a remedy." *Id.* In another case, the Seventh Circuit described a scheme to defraud as "a pattern of fraudulent acts." *Speakers of Sport, Inc. v. ProServ, Inc.*, 178 F.3d 862, 866 (7th Cir. 1999). ⁴ *See also Bower*, 978 F.2d at 1012 (stating that "[i]n order to survive the pleading stage, a claimant must be able to point to specific, objective manifestations of fraudulent intent -- a scheme or device").

4   In *Speakers of Sport*, the discussion of Illinois law of promissory fraud was technically [*7] dicta. The plaintiff was a competitor of the defendant, and the claim asserted was tortious interference with business relations, not fraudulent inducement of a contract. 178 F.3d at 864. The court held that the allegedly false promise -- that

the defendant would obtain millions of dollars of endorsements for a star baseball player -- was puffery because it involved something over which the defendant had no control. *Id. at 866.*

In this case, Chicago Imports' allegations lack the elements that have distinguished a scheme to defraud from a mere false promise. For instance, in *HPI*, the scheme alleged consisted of *repeated* false promises of future payment in order to induce the plaintiff to continue provision of pharmaceutical goods and services. *545 N.E.2d at 683.* In this case, there is no allegation that Jada repeatedly made false promises to induce Chicago Imports to continue purchasing from it. Chicago Imports alleges only one proposal by Jada to sell toy cars at the same prices it was selling to other distributors. (Am. Countercl. P 10.) Although Chicago Imports alleges that it entered into a "series of agreements" with Jada based on that proposal, the subsequent agreements entered **[*8]** into by the parties were based not on additional false promises or proposals, but, rather, on the single proposal alleged.

In another case, *Carl A. Haas Auto. Imports, Inc. v. Lola Cars Ltd.,* the court found that the plaintiff had sufficiently alleged a scheme to defraud based on allegations that the defendant falsely promised plaintiff that it would be defendant's exclusive distributor of Indy cars on a long-term basis. *933 F. Supp. 1381, 1392 (N.D. Ill. 1996).* In that case, the defendant made the false promise on the condition that the plaintiff terminate all existing relations with a competitor of the defendant, which the plaintiff did, and the defendant reiterated its assurance that plaintiff would serve as defendant's exclusive car dealer throughout the next few years. *Id.* Those facts are "particularly egregious," as the plaintiff allegedly gave up a lucrative contract in reliance on the defendant's false promise, and the defendant made *repeated* false assurances over a long period of time in order to induce the plaintiff's reliance.

The facts pled in Chicago Imports' Amended Counterclaim are more akin to those found in cases where a motion to dismiss was granted. For instance, in **[*9]** *International Star Registry of Ill. v. ABC Radio Network,*

*Inc.,* the court dismissed plaintiff's promissory fraud count where the complaint mentioned only one objective manifestation of a scheme to defraud, namely, that the defendant falsely represented that it would run plaintiff's advertisements with a certain frequency. *451 F. Supp. 2d 982, 988 (N.D. Ill. 2006).* That single false promise did not qualify as particularly egregious, nor was it embedded in a larger pattern of deceptions or enticements that would reasonably induce reliance. *Id. See also ABM Eng. Servs. v. Thompson, 2006 U.S. Dist. LEXIS 38168, 2006 WL 1517776 at *3 (N.D. Ill. May 24, 2006)* (Ashman, M.J.) (dismissing promissory fraud claim where plaintiff's allegations did not include other acts of trickery compounding the initial misrepresentations nor the suggestion that defendants perpetrated fraud on a regular basis, and did not amount to a series of misrepresentations or an elaborate artifice of fraud).

In summary, Chicago Imports' promissory fraud claim does not sufficiently allege a "scheme to defraud," and Illinois law does not allow a claimant to proceed on a promissory fraud claim based solely on a misrepresentation of intention to perform **[*10]** future conduct.

## CONCLUSION

Accordingly, Jada's motion to dismiss Count II of the Amended Counterclaim [dkt 60] is granted. Because Chicago Imports has already amended its Counterclaim once following a motion to dismiss, this dismissal as to Count II is with prejudice. All fact discovery on both the Complaint and on Count I of the Amended Counterclaim shall be noticed in time to be completed by June 9, 2008. This case is set for status on May 6, 2008.

**IT IS SO ORDERED.**

/s/ Geraldine Soat Brown

**GERALDINE SOAT BROWN**

**United States Magistrate Judge**

**DATED: April 10, 2008**