IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERBN DIVISION

| | |
|---|---|
| AIR TIGER EXPRESS (USA), INC., ) <br> a corporation of Delaware ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> PAUL BARCLAY; and THE ORIGINAL ) <br> AUSTRALIAN, LLC, an Ohio limited ) <br> liability company; ) <br> ) <br> Defendants. ) | No. 08 C 1945 <br> The Hon. Judge Darrah <br> The Hon. Mag. Judge Ashman |

### ANSWER AND AFFIRMATIVE DEFENSES TO COUNTERCLAIMS

Pursuant to Rule 12 of the Federal Rules of Civil Procedure, Plaintiff and Counter-Defendant Air Tiger Express ("ATE") submits this answer in response to the Counterclaim of The Original Australian, LLC ("Warmbat"):

1. Warmbat is an Ohio limited liability company with its principal place of business in Ohio. Warmbat is in the business of manufacturing and wholesaling boots and other footwear. Warmbat manufactures its footwear in China and has it shipped it to its US facility in Dayton, Ohio.

**ANSWER:** ATE admits that Warmbat is an Ohio limited liability company. ATE is without information or knowledge sufficient to form a belief as to the truth of the remaining allegations of paragraph 1 beyond an admission that ATE has provided freight forwarding services pursuant to a contract between the parties that called for transportation of Warmbat's goods from China to Dayton, Ohio.

2. Plaintiff, Air Tiger Express (USA), Inc. ("ATE"), is a Delaware corporation with its principal place of business in Springfield Gardens, New York. ATE maintains an office in Elk Grove Village, Illinois. ATE is in the business of brokering overseas freight shipments, especially from China to the US.

**ANSWER:** ATE admits the allegations in paragraph 2.

3. On September 24, 2007, at 10:08 a.m., Warmbat's CEO, Defendant, Paul Barclay, emailed ATE's Asian Route Developer, Joe Davis, to request quotes for three shipments from China to Dayton, Ohio, including a shipment available October 5 in Shanghai to

1

move by sea freight to the Port of Long Beach (the "Shipment"). At that time, Warmbat intended to arrange trucks from Long Beach to Dayton through someone other than ATE.

**ANSWER:** ATE admits that Barclay sent an e-mail to ATE's Joe Davis at 10:08 am on September 24, 2007 listing three shipments Warmbat needed shipped from China to Dayton, Ohio. ATE is without information or knowledge to form a belief as to the truth of the allegations in the second sentence of paragraph 3; answering further the e-mail states in relevant part "(Warmbat to arrange trucks)".

4. The Shipment contained a custom-made order of boots that Warmbat had contracted to sell to The Finish Line, Inc. ("Finish Line"). The timing of Warmbat's delivery to Finish Line was critical because Finish Line required that the boots arrive in time for the Christmas shopping season and had a cancel date of November 1, 2007.

**ANSWER:** ATE is without information or knowledge to form a belief as to the truth of the allegations of paragraph 4.

5. On September 24, at 11:33 a.m., Davis emailed Barclay to ask: "what kind of transit times do you need?"

**ANSWER:** ATE admits that the quoted section of the e-mail is contained in an e-mail sent on September 24, 2007 from Davis to Barclay.

6. On September 24, at 2:06 p.m., Barclay emailed Davis that, "the timing is *critical*," and that "trucking it ourselves saves about 1 week."

**ANSWER:** ATE admits that the quoted sections in paragraph 6 are contained in an e-mail sent on September 24, 2007 from Barclay to Davis; however, it denies that any portion of the e-mail was highlighted or placed in bold.

7. On September 25, 2007, at 2:51 p.m., Barclay instructed Davis: "Please proceed with this . . . shipment via sea container."

**ANSWER:** ATE admits that the quoted sections in paragraph 7 are contained in an e-mail sent on September 25, 2007 from Barclay to Davis.

8. At 4:14 p.m., Davis emailed Barclay: "Attached are the ocean rates ex Shanghai to LAX." In the Notes to the Ocean Import Rates, Davis represented: "Transit Time: 12-14 Days (Port to Port)."

**ANSWER:** ATE admits that the quoted section in the first sentence in paragraph 8 is contained in an e-mail sent on September 25, 2007 from Davis to Barclay. ATE admits that the quoted section in paragraph 8 is contained in an e-mail sent on September 25, 2007 from Barclay to Davis.

9. Later in the day on September 25, at 5:30 p.m., Barclay forwarded factory contact information to Davis for the Shipment, and urged: "We need this to get on the *1st available vessel* and *as soon* as it has cleared customs, available to unpack and send onto us."

**ANSWER:** ATE admits the substance of the Notes referred to in paragraph 9; however, ATE denies that any portion of the Notes was highlighted or placed in bold.

10. On September 26, 2007, Davis emailed Barclay the "shipment status for the ocean containers," including that: *"Cargo will be ready on Oct 5th-Oct 6th."*

**ANSWER:** ATE admits that the quoted sections in paragraph 10 are contained in an e-mail sent on September 26, 2007 from Davis to Barclay; however, it denies that any portion of the e-mail was highlighted or placed in bold.

11. On September 26, at 4:11 p.m., Barclay emailed the following to Davis:
> Hi Joe,
> Can you let me know first:
> 1. Sailing date
> 2. ETA into long beach
> *Remember, timing is very important to us and every day counts*.

**ANSWER:** ATE admits that the quoted sections in paragraph 11 are contained in an e-mail sent on September 26, 2007 from Barclay to Davis; however, it denies that any portion of the e-mail was highlighted or placed in bold.

12. At 11:27 p.m., Davis responded that the sail date would be October 12, and the arrival into Long Beach October 23.

**ANSWER:** ATE admits that Davis sent an e-mail to ATE at 8:27 pm that is similar to the one in paragraph 12; answering further, ATE denies the description of this e-mail as an inaccurate summary of the e-mail's contents.

13. On September 27, 2007, inquiring into the Air Shipment, Barclay emailed to Davis that they *"desperately* need an update of customs and of course to have the shipment delivery the day after it clears." Also on September 27, Barclay emailed, concerning the Shipment: "Please proceed with this shipment. As discussed, we will need to breakdown in LA and get the product to Dayton *ASAP.*"

**ANSWER:** ATE denies the allegations in the first sentence of paragraph 13. For the second sentence of paragraph 13, the ATE admits that this e-mail was sent; however, it denies that any portion of the e-mail was highlighted or placed in bold.

14. In response, on September 27, at 7:49 p.m., Davis wrote: "If you don't have a trucker *I can quote this business as well.*"

**ANSWER:** ATE admits that a portion of the e-mail referred to in paragraph 14 was sent; however, ATE denies that any portion of the e-mail was highlighted or placed in bold.

15. On October 19, 2007, at 1:03 p.m., Barclay emailed Davis to ask him to "please confirm the ETA and number of containers for our sea shipment. We will coordinate the trucking to get to our warehouse *ASAP.*" Receiving no response, at 2:23 p.m., in an email marked "High" importance, Barclay asked Davis to "Please confirm." Barclay later confirmed that the containers would arrive at the Port of Long Beach on October 24.

**ANSWER:** ATE admits that a portion of the e-mail referred to the first two sentences of paragraph 15 was sent; however, ATE denies that any portion of the e-mail was highlighted or placed in bold. ATE denies the allegations in the third sentence of paragraph 15. ATE admits the allegations in the fourth sentence of paragraph 15.

16. Before the Shipment arrived at the Port of Long Beach, Barclay and Davis repeatedly discussed whether ATE could move the shipment from Long Beach to Dayton. On October 23, Barclay wrote: "As per our conversation, please quote us on moving all the containers to Dayton *via express. **We will want it here in about 2 work days after it clears customs.***"

**ANSWER:** ATE denies the allegations in the first sentence of paragraph 16. For the second sentence of paragraph 16, ATE admits that Barclay sent an e-mail with the wording of the e-mail; however, ATE denies that any portion of the e-mail was highlighted or placed in bold.

17. On October 24, 2007, *before* Davis issued a quote for the line haul, Barclay wrote:

> ***Please make sure you baby-sit this shipment, its for Finish Line*** and they could be worth up to 5 million to us next year. Late shipments make it harder to sell in the stores this late in the season.

**ANSWER:** ATE admits that the quoted sections in paragraph 17 are contained in an e-mail sent on October 24, 2007 from Barclay to Davis; however, it denies that any portion of the e-mail was highlighted or placed in bold.

18. Later in the day on October 24, Davis issued a quote (the "Quote") for a line haul from "ATE/LAX – Dayton, OH" of $4,900 per trailer. The Notes represent: *"**Transit for Line Haul is 2-3 days**."* A copy of the Quote is attached as "Exhibit A."

**ANSWER:** ATE admits the allegations of the first sentence of paragraph 18. ATE admits the substance of the Notes referred to in the second sentence of paragraph 18; however, ATE denies that any portion of the Notes was highlighted or placed in bold. ATE admits the allegations of the third sentence of paragraph 18.

19. Also on October 24, ATE emailed Barclay:

>Attached please find a Surety Bond Application for that we need you to complete and sign in order for us to apply for a Single Entry Bond for the ocean shipment with 7 containers which has arrived in Los Angeles *today*. . . . Please expedite this bond as quickly as possible *so we can get the approval we need to arrange clearance* in Los Angeles.

**ANSWER:** ATE admits that ATE sent Barclay an e-mail with the wording of the e-mail; however, ATE denies that any portion of the e-mail was highlighted or placed in bold.

20. On Wednesday, October 24, in the afternoon, Barclay transmitted his expectations to Davis: "Please proceed! Hopefully we can clear customs *today or Thursday* so we can move it over the weekend." Based on Warmbat's past experience, and in accordance with Warmbat's transmitted expectations, Warmbat expected to receive the entire Shipment by no later than October 29, 2007.

**ANSWER:** ATE admits that the quoted sections in paragraph 20 are similar to those contained in an e-mail sent on October 24, 2007 from Barclay to Davis; however, it denies that any portion of the e-mail was highlighted or placed in bold. ATE denies the allegations in the second sentence of paragraph 20.

21. On October 25, 2007, ATE emailed Barclay to advise that the bond would not be delivered to California until the next day.

**ANSWER:** ATE admits the allegations of paragraph 21.

22. ATE did not secure release from U.S. Customs until Monday, October 29, 2007, five days after the containers arrived in Long Beach. Nevertheless, even with the delay in moving the Shipment through Customs, in accordance with shared expectations, Air Tiger should have delivered the entire Shipment by no later than November 1, 2007.

**ANSWER:** ATE admits that U.S. Customs did not release the Shipment until the night of October 29, 2007; however, ATE denies that any issues Warmbat may have concerning the timing of the release relates to ATE's performance under the freight forwarding agreement between the parties. ATE denies the allegations in the second sentence of paragraph 22.

23. On October 30, 2007, ATE advised Warmbat that one container (perhaps two) would be delivered to Dayton on November 2. Warmbat asked ATE to confirm the 2-3 day transit time, but ATE's employee *was not aware* of the delivery terms quoted to Warmbat.

**ANSWER:** ATE is without information or knowledge sufficient to form a belief as to the truth of the allegations of paragraph 23.

24. On November 2, 2007, Warmbat received *one* container.

**ANSWER:** ATE admits the allegations of paragraph 24.

25. Before ATE could deliver any of the remaining six containers, Finish Line canceled its order with Warmbat.

**ANSWER:** ATE is without information or knowledge sufficient to form a belief as to the truth of the allegations of paragraph 25 of the counterclaim.

26. ATE tried to schedule delivery of six containers for November 5. If delivery had been timely, Warmbat would have accommodated a shipment of six containers in one day. Because Finish Line had already canceled its order, Warmbat had no need to accept all six containers on November 5, and scheduled the deliveries for November 5 and 6, so that it could handle higher priorities.

**ANSWER:** ATE denies the allegations of the first sentence of paragraph 26. ATE is without information or knowledge sufficient to form a belief as to the truth of the allegations of the second and third sentences of paragraph 26.

27. On November 8, ATE delivered the last container. The last container arrived so long after the freight cleared Customs (i.e., ten days later) because ATE dispatched it with just one driver, instead of having it team-driven.

**ANSWER:** ATE admits the allegations in the first sentence of paragraph 27. ATE denies the allegations in the second sentence of paragraph 27.

## COUNT I

28. Warmbat incorporates the allegations of ¶¶ 1 through 27 into this paragraph as if they were fully re-written herein.

**ANSWER:** ATE incorporates and realleges its answers to paragraphs 1-37 of the Counterclaim as its answer to paragraph 27.

29. ATE and Warmbat entered into a contract providing for ATE's transportation and delivery of the Shipment from Shanghai, China, to the Port of Long Beach, California, to Dayton, Ohio.

**ANSWER:** ATE admits the allegations of paragraph 29.

30. Time was of the essence in the performance of the contract.

**ANSWER:** This paragraph calls for a legal conclusion to which ATE can neither admit nor deny.

31. ATE knew and understood that time was of the essence in the performance of the contract.

**ANSWER:** This paragraph calls for a legal conclusion to which ATE can neither admit nor deny.

32. ATE knew and understood that Warmbat intended to resell the contents of the Shipment to Finish Line for a profit.

**ANSWER:** ATE denies the allegations in paragraph 32; however, answering further, ATE assumed that Warmbat planned to sell the contents of the shipment to some person(s) or entity(ies) for a profit.

33. Under the terms of their contract, ATE was obligated to make complete delivery of the Shipment to Warmbat in Dayton by no later than October 29, 2007.

**ANSWER:** ATE denies the allegations in paragraph 33.

34. ATE's failure to begin delivery of the Shipment until November 2, 2007, and its failure to complete delivery until November 8, 2007, constitutes a material breach of contract.

**ANSWER:** ATE denies the allegations in paragraph 34.

35. Until ATE's material breach of contract, Warmbat did all that it was required to do under the terms of the contract.

**ANSWER:** ATE denies the allegations in paragraph 35.

36. As a direct result of ATE's material breach of contract, Finish Line canceled its order with Warmbat. Warmbat lost its anticipated profit from the sale and was left with custom-made boots that it could not resell. Warmbat was damaged in an amount exceeding $180,000.00.

**ANSWER:** ATE denies the allegations in paragraph 36 that it materially breached the contract between ATE and Warmbat. ATE is without knowledge as to whether Warmbat and Finish Line entered into any contract or order and therefore, this allegation and all allegations relating thereto cannot be admitted or denied.

37. Warmbat's damages as the result of ATE's material breach of contract were within the specific contemplation of the parties at the time that ATE agreed to transport the Shipment from the Port of Long Beach to Dayton.

**ANSWER:** ATE denies the allegations in paragraph 37.

## COUNT II

38. Warmbat incorporates the allegations of ¶¶ 1 through 37 into this paragraph as if they were fully re-written herein.

**ANSWER:** ATE incorporates and realleges its answers to paragraphs 1-37 of the Counterclaim as its answer to paragraph 38.

39. Warmbat and ATE formed an express contract providing for ATE's transportation and delivery of the Shipment from Shanghai, China, to the Port of Long Beach, California, to Dayton, Ohio.

**ANSWER:** ATE denies the allegations of paragraph 39.

40. ATE committed a material breach of the express contract.

**ANSWER:** ATE denies the allegations of paragraph 40.

41. As a direct result of ATE's material breach of contract, Warmbat is excused from any further performance under the terms of the contract.

**ANSWER:** ATE denies the allegations of paragraph 41.

42. Warmbat is entitled to a declaratory judgment from the Court providing that Warmbat is excused from making any further payment to ATE.

**ANSWER:** ATE denies the allegations of paragraph 42.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense – Waiver and Estoppel

1. Warmbat's claims are barred by the doctrines of waiver and estoppel. The facts supporting this affirmative defense are stated in ATE's complaint and are incorporated herein by reference.

### Second Affirmative Defense – Good Faith

1. Warmbat's claims are barred by the doctrine of good faith. The facts supporting this affirmative defense are stated in ATE's complaint and are incorporated herein by reference.

### Third Affirmative Defense – Unclean Hands

1. Warmbat's claims are barred by the doctrine of unclean hands. The facts supporting this affirmative defense are stated in ATE's complaint and are incorporated herein by reference.

### Fourth Affirmative Defense – Barring of the Claims

1. Warmbat's claims are barred by the agreements executed between the parties. The facts supporting this affirmative defense are stated in ATE's complaint and are incorporated herein by reference.

### Fifth Affirmative Defense – Failure to Mitigate

1. Warmbat's claims are barred in whole or in part by its failure to mitigate its damages. The facts supporting this affirmative defense are stated in ATE's complaint and are incorporated herein by reference.

2. Further, the allegations of the counterclaim indicate that Warmbat has not taken any steps to attempt resell the goods to any entity other than Finish Line.

### Sixth Affirmative Defense – Account Stated

1. Warmbat's claims are barred by the doctrine of account stated. The facts supporting this affirmative defense are stated in ATE's complaint and are

incorporated herein by reference.

                Respectfully submitted,

                AIR TIGER EXPRESS (USA), INC.


                By: /s/ David Seidman

                David Seidman
                ENTERPRISE LAW GROUP, LLP
                70 W. Madison St., Suite 740
                Chicago, Illinois 60602
                312-578-0200
                312-578-0202 (fax)
                Firm ID 40994

Dated: June 4, 2008